Dean Francis Pace
State Bar Number 31809
PACE AND ROSE
Suite 2400 Century City
1801 Century Park East
Los Angeles, California 90067
Telephone: (310) 277-2900
Facsimile: (310) 277-2407
Email: falseclaimsact@paceandrose.com

Attorneys for Coplaintiff Relator

ORIGINAL

FILED
2006 JUN -9 PM 4:12

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. SEAL | CIVIL ACTION |
| Plaintiff | CV06-3614 |
| v. | [FILED UNDER SEAL] |
| SEAL | [31 U.S.C. 3730(b)(2)] |
| Defendant | |

PA
FMOx

COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT

31 U.S.C. § 3729 ET SEQ.

DOCKETED ON CM
JUN 16 2006
BY ___ 019



ORIGINAL

6/9/2006 4:26:02 PM Receipt #: 85964
Cashier : NPONCE [LA 1-1]
Paid by: DEAN FRANCIS PACE
2:CV06-03614
2006-086900 5 - Civil Filing Fee(1)
Amount : $60.00
2:CV06-03614
2006-510000 [illegible] - Special Fund F/F(1)
Amount : $190.00
2:CV06-03614
2006-086400 Filing Fee - Special(1)
Amount : $100.00
Check Payment : 6481 / 350.00

Dean Francis Pace
Bar Number 31809
PACE AND ROSE
Suite 2400 Century City
1801 Century Park East
Los Angeles, California 90067
Telephone: (310) 277-2900
Facsimile: (310) 277-2407
Email: falseclaimsact@paceandrose.com

Attorneys for Coplaintiff Relator

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. STEVEN MATESKI<br>Plaintiff,<br>v.<br>RAYTHEON COMPANY, NORTHROP GRUMMAN CORPORATION<br>Defendants | CIVIL ACTION<br><br>COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT 31 U.S.C. § 3729 ET SEQ.<br><br>REQUEST FOR TRIAL BY JURY |

NOW COMES PLAINTIFF and alleges against Defendants RAYTHEON COMPANY and NORTHROP GRUMMAN CORPORATION.

FIRST CAUSE OF ACTION

VIOLATION OF FALSE CLAIMS ACT

BY RAYTHEON COMPANY

1.

JURISDICTION

Jurisdiction is predicated upon federal subject matter jurisdiction pursuant to Title 31 U.S.C. of the False Claims Act, 31 U.S.C. §§§ 3729, 3730 and 3732(a), and 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

2.

VENUE

Venue in the United States District Court for the Central District of California is predicated upon 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). Defendant RAYTHEON COMPANY ("RAYTHEON"), the entity charged herein with violations of the False Claims Act, 31 U.S.C. § 3729 et seq., now and at all times alleged herein had its place of business in the Central District of California in El Segundo, California. Defendant Northrop Grumman Corporation ("NORTHROP"), the entity charged herein with violations of the False Claims Act, 31 U.S.C. § 3729 et seq., now and at all times alleged herein had its place of business in the Central District of California in Los Angeles, California. The violations of the False Claims Act, 31 U.S.C. § 3729 et seq., alleged herein occurred in the Central District of California. Plaintiff has sustained the damages for violation of the False Claims Act, 31 U.S.C. § 3729 et seq., alleged herein within the Central District of California.

3.

PARTIES

The Plaintiff is the United States of America and the Coplaintiff Relator Steven Mateski ("MATESKI"). Coplaintiff Relator MATESKI now and at all times alleged herein is a resident in the Central District of California. From 1985 to 1995 by Defendant NORTHROP and from 1997 to 2006 by Defendant RAYTHEON, MATESKI has been employed as a Manufacturing Planner Engineer.

Defendant RAYTHEON was and at all times alleged herein is a corporation which is qualified to do business and doing business

in the State of California, with the Raytheon Space and Airborne Systems ("SAS") in El Segundo, California, and the Raytheon Vision Systems and Santa Barbara Remote Sensing ("RVS" and "SBRS") in Goleta, California, as subcontractor to design, develop and produce seven flight units of the Visible Infrared Imaging Radiometer Suite ("VIIRS"), which is a component of the National Polar-Orbiting Operational Environmental Satellite System ("NPOESS") for the prime contractor Northrop Grumman Corporation ("NORTHROP").

Defendant NORTHROP now and at all times alleged herein is a corporation under the laws of the State of Delaware, qualified to do business and doing business in the State of California, with its principal offices in Los Angeles and El Segundo, California. Defendant NORTHROP is engaged in the manufacture and sale of aerospace and defense systems for the United States Government, including Prime Contractor on the NPOESS Program.

4.

STANDING OF RELATOR TO SUE AS ORIGINAL SOURCE

Coplaintiff Relator MATESKI has standing to sue pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1). Coplaintiff Relator MATESKI is the Original Source of all the false claims by Defendant RAYTHEON pursuant to the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), on grounds that MATESKI had direct and independent knowledge of the false claims by Defendants RAYTHEON and NORTHROP which he acquired during the course of his employment at Defendants RAYTHEON and NORTHROP. Before filing the Qui Tam action, Coplaintiff and Relator MATESKI first repeatedly revealed the RAYTHEON false claims *inter alia* by communications with RAYTHEON executives *inter alia* John Bouergey, Program Manager, Bernard

Malis, Manager of Manufacturing, Thomas James, Engineering Authority, Ronald Estes, Test Director and Lead Engineer, Michael Haley, Operations Manager, Eugene Jarmillo, Head of Quality Assurance, and Cledith Davis, Quality Assurance.

VIOLATION OF THE FALSE CLAIMS ACT

BY DEFENDANT RAYTHEON COMPANY

5.

The False Claims Act, 31 U.S.C. § 3729(a)(1) and(2) provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, presents, or causes to be presented, a false or fraudulent claim to the United States Government for payment or approval, or who makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 for each claim, plus three times the amount of the damages sustained by the United States Government because of the false claim. Specifically, the False Claims Act legislates, to wit:

§ 3729. False claims

(a) Liability for certain acts.--Any person who--

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

6.

Since the 1960s, the United States operational polar-orbiting meteorological satellite program has been a complex infrastructure encompassing two satellite systems, the Polar-orbiting Operational Environmental Satellites ("POES") managed by the Department of Commerce National Oceanic and Atmospheric Administration ("NOAA"), and the Defense Meteorological Satellite Program ("DMSP"), managed by the Department of Defense ("DOD"). The satellites carry a suite of sensors that collect environmental data to generate graphical weather images and specialized weather data for forecasters, the military, and the public.

7.

Under a shared agreement among four satellite data processing centers, the NOAA National Environmental Satellite Data and Information Service ("NESDIS"), the Air Force Weather Agency, the Naval Fleet Numerical Meteorology and Oceanography Center, and the Naval Oceanographic Office, different centers are responsible for producing and distributing, via a shared network, different environmental data sets, specialized weather and oceanographic products, and weather prediction model outputs. For the DOD centers, the users include regional meteorology and oceanography centers, as well as meteorology and oceanography staff on military bases. NESDIS forwards the data to the NOAA National Weather Service for distribution and use by government and commercial forecasters.

8.

Currently, there are two operational POES satellites and two operational DMSP satellites that are positioned so that they can

observe the earth in early morning, mid-morning, and early afternoon polar orbits. Together, they ensure that for any region of the earth, data are no more than six hours old. There are an estimated 150 field terminals operated by the United States (including battlefields and ships) and foreign governments and academia, which are able to receive weather data directly from the polar-orbiting satellites. On May 5, 1994, Presidential Decision Directive NSTC-2, Convergence of U.S. Polar-orbiting Operational Environmental Satellite Systems, required that the POES and DMSP programs be converged into the National Polar-orbiting Operational Environmental Satellite System ("NPOESS").

9.

The National Polar-Orbiting Operational Environmental Satellite System ("NPOESS") is the low-earth-orbit environmental satellite system which is composed of satellites, sensors, a ground-control system and a data processing and dissemination network. NPOESS provides civilian, military and scientific communities with regional and global meteorological data, oceanographic, environmental, climatic, and space environmental remote sensing information, surface data collection and search and rescue capabilities.

10.

The NPOESS relies upon three critical sensors, the Visible Infrared Imaging Radiometer Suite ("VIIRS"), and the Cross-Track Infrared Sounder ("CRIS") and the Conical-Scanned Microwave Image/Sounder ("CMIS"). The Visible Infrared Imaging Radiometer Suite ("VIIRS") for the NPOESS collects visible/infrared imagery and radiometric data on the atmosphere, clouds, earth radiation

budget, clear-air land/water surfaces, sea surface temperature, ocean color, and low-light visible imagery.

11.

The NPOESS tri-agency Integrated Program Office ("IPO") is comprised of the Department of Defense ("DOD"), the National Oceanic and Atmospheric Administration ("NOAA") in the Department of Commerce ("DOC"), and the National Aeronautics and Space Administration ("NASA") that is engaged in the combination of the two current satellite systems into a single environment monitoring satellite system called the National Polar-orbiting Operational Environmental Satellite System ("NPOESS"), which is critical for weather forecasting and strategic global climate monitoring through the year 2020.

12.

Within the NPOESS IPO, NOAA, DOD and NASA have the lead on certain NPOESS activity. NOAA has overall program management responsibility for the converged system and for satellite operation, DOD has the lead on the acquisition and contract management, and NASA has primary responsibility for facilitating the development and incorporation of new technologies into the converged system. NOAA and DOD share the costs of funding NPOESS, while NASA funds specific technology projects and studies.

13.

Overall NPOESS program oversight is assigned to an executive committee ("EXCOM") composed of the top officials from each of the IPO agencies: the Under Secretary of Commerce for Oceans and Atmosphere, the Under Secretary of Defense for Acquisition and Technology, and the NASA Deputy Administrator. In November 2005,

the NPOESS EXCOM established a Program Executive Office (PEO) to independently oversee the IPO and conduct an ongoing independent analysis and review of the NPOESS program.

14.

In August 2002, DOD procurement authority awarded a single NPOESS integration contract for $4.5 billion to the prime contractor NORTHROP for the procurement of six satellites and seven instrument sensors, incorporating previously awarded sensor contracts as subcontracts to the prime contract, including the RAYTHEON VIIRS Subcontract 65349DGE2S. The NORTHROP prime contract included base fee and rollover award fee provisions of up to 20 percent of the total estimated costs in the three types of fees:

(1) Base Fees are guaranteed 2 percent of estimated costs, which are paid to the contractor automatically each billing period.

(2) Award Fees up to 13% of estimated cost or $369,294,988 are based on the contractor performance in management, technical and cost.

(3) Mission Success Fees up to 5 percent of estimated cost or $136,817,498 are based upon the contractor performance concerning seven program events.

15.

At least $123 million, which constitutes from 84% to 90% of the available award fee pool, has been paid by the United States Government in spite of the false claims, reports and statements alleged herein. The NPOESS contract provides that all award fees are "at risk", whereby NORTHROP will have to return up to 100% if NORTHROP fails to deliver a NPOESS system that provides useful service over the life of the NPOESS. Plaintiff alleges that 100%

of the award fees should be returned by NORTHROP caused by the false claims alleged herein, especially in the event that the EXCOM or IPO decide not to launch the first NPOESS satellite because of the defective nonconformance VIIRS which will compromise the NPOESS mission assurance and cause the NPOESS downgrade or failure.

16.

NASA is engaged in the NASA Preparatory Project ("NPP") which will launch a demonstration satellite equipped with VIIRS and two other critical sensors in order to test their operation prior to the launch of the first NPOESS. Delays and cost overruns have pushed the NPOESS Preparatory Project ("NPP") launch to 2009 at the earliest and the NPOESS launch to 2012 at the earliest. VIIRS itself is at least 12 percent behind schedule, and at least 30 percent overrun, and has caused over 60 percent of the NPOESS contract overrun, whereby NPOESS is currently under review pursuant to the Nunn-McCurdy provision of the FY 1982 National Defense Authorization Act. The RAYTHEON First Flight VIIRS was so defective that it has been relegated to a nonflight nonentity. The Second Flight VIIRS is now the First Flight VIIRS, and the Third, Fourth and Fifth Flight VIIRS are now the Second, Third and Fourth Flight VIIRS, which are presently in production at RAYTHEON El Segundo, all with the false defective nonconformances alleged with particularity hereinafter. The RAYTHEON false claims concerning the latent defective nonconformance VIIRS will compromise the NPOESS mission assurance, and cause the NPOESS mission degrade or failure.

17.

The RAYTHEON VIIRS Subcontract 65349 DGE2S and the Statement of Work for the VIIRS Day/Night Band Module Assembly, P/N 417350-100, are incorporated herein by reference, including the reference documents and revisions thereto:

(1) Integrated Master Plan (IMP) PDM# Y0013233-0004.

(2) Integrated Master Schedule (IMS), PDM# Y0013234

(3) Quality Requirements (QR), PDM# Y0013221

(4) Quality Control Plan, PDM# Y1433

(5) SBRS Reliability Program Plan for NPOESS/VIIRS, #Y3584

(6) SBRS Configuration Management Plan for NPOESS/VIIRS, #Y6445

(7) Approved Materials and Process List, AMPL154640

(8) Approved Parts List (EEE) VIIRS, APL154640

(9) Structural Product Specification, PS154640-111

(10) Thermal Product Specification, PS154640-112

(11) Electronics Module, Product Specification for Visible/Infrared Imager Radiometric Suite, PS154640-114

(12) Contamination Control Plan, PS154640-132

(13) Process Specification for Packaging, Handling, and Storage of VIIRS Modules, PS154640-730

(14) FPIE Assy Interface Control Document (ICD), 421310-500

(15) Focal Plane Assy - DNB FPA ICD, 417360-500

(16) DNB Module Electrical ICD, 417350-500

18.

From at least August, 2002 to 2006, Defendants RAYTHEON and NORTHROP knowingly in reckless disregard have caused and invoiced NPOESS and VIIRS false claims which compromise the NPOESS/VIIRS

Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure, alleged with particularity hereinafter.

(1) <u>False Use of Prohibited Materials</u>. Materials that are known to produce detrimental effects when used in space environments, compromising unit integrity and reducing system life-expectancy, have been used extensively on the NPOESS/VIIRS space program. RAYTHEON knowingly continued with the use of prohibited materials in Flight Unit 1 production and plans to continue using prohibited materials in subsequent Flight Unit 2,3,4, and 5 unit productions (confirmed on June 5, 2006 during the conference with Michael Haley, Operations Manager, Ronald Estes, El Segundo Lead Engineer, John Pakusich, Manufacturing, and the Relator MATESKI), which will jeopardize NPOESS Flight 1 as well as the future NPOESS Flights by the compromise of the NPOESS/VIIRS Unit/System integrity and the mission assurance, and the NPOESS mission downgrade or failure.

(2) <u>False ESD Exposure</u>. Electrostatic discharge sensitive (ESDS) items have not been designed and produced by RAYTHEON to provide protection against exposure to damaging electrostatic fields, static discharges, and electrical transients latent defects, which compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

(3) <u>False Circumvention of Test Prerequisites, First Article Testing, and Test Protoflight Specifications</u>. RAYTHEON knowingly produced First Article units that have not been test-qualified at specified levels to demonstrate flight worthiness. RAYTHEON has

substituted reduced STR (Special Test Requirements) in lieu of specified testing, which compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

(4) False Circumvention of Procurement Processes, Qualification Testing of Procured Components, and Trace Requirements for Space Programs. RAYTHEON knowingly circumvented supply chain procurement processes on components purchased for the NPOESS/VIIRS space program resulting in failures to meet the minimum requirements for Quality Inspections, Component Qualification Testing, and Space Trace requirements.

(5) False Nonsegregation of Flight Hardware from Non-Flight Hardware to Maintain Trace Requirements for Space Programs. RAYTHEON knowingly stored Flight and Non-Flight quality level components in the same Wip location and intermingled Flight and Non-Flight quality levels of hardware on the same work stations while performing operations, failing to meet the minimum segregation requirements for Space Programs Space Trace requirements.

19.

False Use of Prohibited Materials and Production of the Unit Chassis and Top Cover with Forbidden Materials.

Specification: RAYTHEON CAGE Code 11323 Specification PS154640-132, ¶ 4.6.3, sub-section "I" of the Contamination Control Requirements Specification for the Visible/Infrared Imager Radiometer Suite VIIRS) specifies:

The use of the following materials on the VIIRS sensors is forbidden:

I. Plated, threaded fasteners, including connectors, where rotational engagement may generate metal debris.

False Defective Nonconformance: The 421312 FPIE Chassis was designed using interrupted thread, locking Heli-Coils as shown on the 421312 Drawing F/Ns 2 & 3. These Heli-Coils are designed to interrupt the Major Diameter of the Screw thread during installation. As the fastener rotational installation is made, the Major Diameter of the Screw thread displaces the Heli-Coil interrupted thread flats (3 places each) causing the interrupted thread to expand the seize the Screw. This additional friction causes metal galling to occur providing the locking action. Each time the fastener is installed or removed, metallic dust and debris is generated within the fastener hole. Inserts and attach screws are of corrosion resistant (CRES) materials exacerbating the problem.

Use of (forbidden - I) Debris generating attach hardware occurs at all attach points as follows;

At the PWB attach points (#2 Screws 26 places total)

At the J1 Connector attach points (#2 Screws 2 places and #4 Screws 2 places)

At the J2 Connector attach points (#4 Screws 4 places)

At the Top Cover attach points (#4 Screws 35 places total)

The attach points are made using Socket Head Cap Screws at J1 & J2 Connectors. These must be de-mated and mated during Final Unit integration after installation into the Next Assembly. Each time as the Wear Savers attach Screws are removed and the cables attach Screws are installed, metallic debris (shavings) will drop out contaminating the Unit/System and surrounding hardware in the

cleanroom (Ref: Drawing 421312):

F/N 2 MS21209C0215 #2 interrupted thread, locking Heli-Coil (debris generating).

F/N 3 MS21209C0415 #4 interrupted thread, locking Heli-Coil (debris generating).

Both are unplated CRES interrupted thread locking Heli-Coils (generating debris on each use).

The 421314 FPIE Top Cover was designed using interrupted thread, locking Heli-Coils as shown on the 421314 Drawing F/N 2. These Heli-Coils are designed to interrupt the Major Diameter of the Screw thread during installation. As the fastener installation is made, the Major Diameter of the Screw thread displaces the Heli-Coil interrupted thread flats (3 places each) causing the interrupted thread to expand and seize the Screw. This additional friction causes metal galling to occur providing the locking action. Each time the fastener is installed or removed, metallic dust and debris is generated and entrapped within the fastener hole. This occurs at all attach points as follows;

At the Top Cover cable support bracket attach points (#8 Screws 6 places) (Drawing 421314):

F/N NAS1130-08-15 #8 interrupted thread, locking Heli-Coil (debris generating).

Unplated CRES interrupted thread locking Heli-Coils (generating debris on each use).

The 421310-001 S/N 002 FPIE Flight 1 Unit has a total of (75) debris generating locations. As Screws are installed and/or removed, metallic debris is generated contaminating CCAs (Circuit Card Assemblies) Conformal Coatings, and surrounding hardware.

Final connection of J1 & J2 Connectors made on the Next Assembly will contaminate surrounding systems upon final attach. In a zero-gravity environment, metallic particles are free to migrate, bridge, and short-out electric components, and/or redeposit on the optics surfaces severely limiting and degrading performance. At this time the FPIE Flight 1 Unit must be considered unfit for integration into the next assembly as integration, because of compromise of the NPOESS/VIIRS Unit/System integrity and mission assurance, and the NPOESS mission downgrade or failure.

20.

False Design and Production of the Unit "J7" Connector Wiring with Forbidden Materials.

Specification: RAYTHEON CAGE Code 11323 Specification PS154640-132 ¶ 4.6.3, sub-section "D&E" of the Contamination Control Requirements Specification for the Visible/Infrared Imager Radiometer Suite (VIIRS) specifies:

The use of the following materials on the VIIRS sensors is forbidden:

D. Tin plating unless subsequently fused or reflowed.

E. Pure, unalloyed Tin (greater than 99.1% Sn).

W. Electrolytic Nickel plating unless an Electroless process is employed, or Electrolytic Nickel is used on a on-optical surface as an underplate, diffusion barrier, or coating.

False Defective Nonconformance: J7 Connector is wired with (forbidden D&E materials) pure Tin plated wire (421327 Drawing F/N 53), M55342H06B6E65S Resistors' End Bells are pure Tin dipped (NCMR EIS69006). Hardware plated with (forbidden W materials)

Electrodeposited Nickel:

Chassis, FPIE, (421312 Dwg, Note 3)
Top Cover, FPIE, (421314 Dwg, Note 3)
Bottom Cover, FPIE, (421317 Dwg, Note 3)
PWB, A/D Board, (421328 Dwg, Note 12)
PWB, Clock Board (421332 Dwg, Note 12)
Spacers, J8 (421327 Dwg, Note 34)

The RAYTHEON PMI/PME (Prohibited Materials Inspection/Prohibited Materials Exoneration) process was implemented late in the VIIRS program (RDW-W0121A, RDW-W014 "Attach A - Description" violation of NGIID D31418 Rev B and Raytheon Invision Issue 25, April/May 2006 page 5 article "Mission Assurance in Action - Taking a Deliberate Approach to Prohibited Materials on VIIRS"). RAYTHEON implemented its Prohibited Material Plan in mid 2005. While the restriction on the use of Prohibited Materials in space has been known for over 29 years (Mil-Hdbk 5400), RAYTHEON only implemented the Prohibitive Material Plan in 2005 (Ref: NCMR EIS69006, EIS74862, EIS77143-1, EIS77144-1, EIS77169-1, EIS77511, EIS76924, EIS77819).

The J7 is the VIIRS power connector. There is no redundant J7 power connector. If the J7 shorts, the DNB shuts down to cause a NPOESS/VIIRS catastrophic failure. After extensive rework, the FPIE Flight 1 Unit still has Prohibited Materials on board (pure tin), (prohibited processes Electrodeposited Nickel plating), and (prohibited debris generating fastener hardware). The J7 Connector was never potted and sealed creating an open uncontrolled leak to the environment (NCMR N00015) as opposed to the controlled top cover venting. Metallic debris generated by attach hardware is free to migrate forward between the "J7" Power Connector pins and the Connector Spacing Header (approximately 5 mil gap at each pin 25 places total).

RAYTHEON has falsely stated (RDW_VIIRS-W012A) that the Electrodeposited Nickel plating would be acceptable for flight use because the FPIE Flight 1 Unit was painted with an Expoxy-based paint effectively sealing most of the debris-shedding plated surfaces. RAYTHEON stated that the remaining unpainted surfaces posed a minimal threat as the FPIE Flight 1 Unit was not in the direct line of the optics. The use of Electrodeposited Nickel plating causes Hydrogen Embrittlement to occur on part surfaces trapping Hydrogen gas at the plated surfaces during the plating process. The Covers to Chassis design did not allow for a Chromerics EMI/EMC gasket seal preventing RAYTHEON from painting the unit at the very end of build after testing. This required an out-of-sequence early application of paint topcoat (prior to build-up) causing the paint finish to endure several cleaning steps along the assembly build process. The final result was that the paint broke-down and degraded no longer meeting the workmanship requirements of the HP 4-143 Paint Specification (numerous pin holes, scrapes, wear-thin spots, and other defects NCMR 70705). Electrodeposited Nickel plating (hydrogen outgassing through the paint creating numerous pinholes). Pin holes in the painted surfaces allow numerous paths for Electrodeposited metallic particles shedding from outer plated surfaces to migrate and contaminate surrounding systems and equipment. Poor design, use of prohibited plating processes, early out-of-sequence application of paint topcoat, and subsequent cleaning and Bake-Out processes have caused the Epoxy-based paint to fail while the VIIRS FPIE is still on the ground. The perfect vacuum of a space environment can only serve to worsen that condition.

Only the FPIE Flight 1 Unit outer Chassis surfaces are partially painted and none of the Chassis inner surfaces, or Top and Bottom Cover inner surfaces are painted. This represents a tremendous risk as the Electrodeposited metallic particles shedding from plated inner surfaces in a zero-gravity environment, are free to redeposit on the Circuit Card assemblies, or migrate, bridge, and short-out electronic components, and/or, migrate through the J7 Power Connector Pins to Header gap (25 places) shorting out the FPIE Flight 1 Unit, or migrate through the Top Cover Vent Screen and redeposit on the optics surfaces severely limiting and degrading the VIIRS Unit and/or System performance, or in a worst-case scenario, produce a latent defect causing catastrophic failure, which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

21.

<u>False ESD Exposures, Multiple ESD Exposures, and Latent Defects</u>. <u>Reckless Disregard of ESD Protection of Flight Quality Hardware During Assembly</u>.

<u>Specification</u>: RAYTHEON CAGE Code 4U884 Specification RP 10-001/2, ¶ 3.2.9 ESDS item protection provides; ESDS items shall be individually or collectively protected ESD protective covering or packaging enclosures when not being worked on, during movement or when handled outside of ESD protected areas.

Paragraph 3.2.9.1 Work in process protective covering enclosures provides; On site work-in-process (WIP) protection of ESD items designated for Normal Controls (RP 10-001/1) shall include enclosures in protective covering containers

and/or static shielding packaging (Ref: 3.2.9.2.).

Paragraph 3.2.9.2 Protective packaging, provides; Transportation of ESDS items (shipped by suppliers or moved between sites) and ESDS items designated for Rigid Controls (RP 10-001/2) shall be enclosed in static shielding type packaging materials for Preparation for Delivery, 5.0). Static shielding packaging materials shall conform to one or more of the following:

a. Shielding bags, pouches and bulk films shall meet the requirements of MIL-PRF-81705, Type I or Type III barrier materials.

b. Shielding bags and pouches shall be capable of a minimum 90 percent charge attenuation when evaluated per the ANSI/EIA-541 two probe capacitance test method.

RAYTHEON CAGE Code 4U884 Specification RP 10-001/2, ¶ 3.2.4.2. Rigid controls category, specifies:

Materials and equipment capable of generating more than the ESD sensitivity or withstand voltage limits of the most sensitive ESDS items being handled, shall not be permitted within the ESD protected area. Verification checks shall be performed no less than every 12 months or upon designating a SSWS with Rigid Control voltage limits. ESD threshold signs shall be placed on the individual workstations and/or work areas identifying ESD sensitivity or withstand voltage limits based on the sensitivity of the ESDS items being handled. (A example of a Rigid Controls ESD threshold sign is shown in RP 10-001, Fig 3.)

<u>False Defective Nonconformance</u>: The FPIE Flight 1 Unit was routinely worked on (rebuilt) in a Non-Flight STE Lab environment located at E01/Rm C1250/Lab 22 and moved between Labs for bonding, cleaning, bake-out, and testing operations. As of February 2005, the Circuit Card level rework and Unit level assembly operations were carried out in a Non-Flight STE Lab under conditions not following basic ESD grounding requirements: CCAs (Circuit Card Assemblies) awaiting work were not double ESD bagged, tote boxes had larger lids simply resting on the boxes without the ability to positively lock, and some of the kit box tote lids were not present. As kits awaiting work were pulled for work, lids were swapped with remaining kits stored on the incoming work rack. There were not enough lids for all of the tote boxes present. Work stations/areas were not identified with ESD sensitivity or withstanding voltage limits based on the sensitivity of the ESDS items being handled. This is in violation of RAYTHEON Specification RP 10-001, ¶ 3.2.9 ESDS item protection, ¶ 3.2.9.1 Work in process protective covering enclosures, ¶ 3.2.9.2 Protective Packaging, and ¶ 6.2.2 Rigid Controls.

FPIE Unit Part Number 421310-001 S/N 001, S/N 002, S/N 003, and S/N 004 (consisting of circuit card assembly 421327 S/N 001, S/N 002, S/N 003, and S/N 004 and 421331 S/N 001, S/N 002, S/N 003, and S/N 004 respectively) have been exposed to Latent ESD Defect Failure conditions (multiple occurrences), which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

22.

<u>Reckless Disregard of the Installation of the Shorting Plugs or ESD Dust Caps on Connectors "While Not in Use" to Protect Hardware during Assembly and Handing per FE94 Program Quality Requirements</u>.

<u>Specification</u>: Program QR (Quality Requirements) FE94, Line 9.4.A (9&10) specifies;

(9) Dust caps shall be used at all times when connectors are not in use.

(10) Shorting plus or conductive dust caps shall be used if directed by engineering or manufacturing.

<u>False Defective Nonconformance</u>: The FPIE Flight 1 Unit was routinely worked on (rebuilt) in a Non-Flight STE Lab environment located at E01/Rm C1250/Lab 22 and moved between Labs for bonding, cleaning, bake-out, and testing operations. During the course of assembly and Workmanship Thermal Cycle Testing, the CCAs (Circuit Card Assemblies) should have Shorting Plugs or ESD Dust Caps applied to all connectors to prevent stray ESD (Electro Static Discharge) voltages from entering through open connectors "zapping" the hardware during buildup and testing. Shorting Plugs and ESD Dust Caps were not in use throughout the entire initial buildup and testing of the VIIRS hardware from the beginning of the program through the end of the first Acceptance Test. Shorting Plus were then installed on the completed Unit and the first attempt to sell-off the Unit was made at the Goleta, California sell-off meeting on July 30, 2004.

After the hardware was rejected at the first sell-off CTI (Consent to Integrate) meeting, numerous findings required

subsequent rework in El Segundo, California. Shorting Plugs were removed and the hardware underwent additional rework and handling in this unprotected condition until just prior to post rebuild Acceptance Testing in mid-September 2005. The RAYTHEON El Segundo facility stocks ESD Dust Caps for Sub-D connectors in the Cable Lab (such as the FPIE J7 connector) but does not stock ESD Dust Caps for Micro-D connectors (as are used in the FPIE J1, J2, J3, J4, J5, J6, J8, and P8 connectors. New ESD Protective Dust Caps were added to the Drawing. on 9/09/05 (Ref: 225741 Drawing, Rev. A Parts List as shown below, and Note 22 added to 421310-001 Drawing). Micro-D ESD Dust Caps were subsequently purchased for use on the hardware approximately mid-September 2005 (Ref: 225741 Drawing, Rev. A Parts List):

| Item | Qty | Cage Code | P/N | Description |
|---|---|---|---|---|
| F/N 19 | 1 | 99017 | DCC-13 | ESD Dust Cap |
| F/N 20 | 2 | 10400 | MD051RS | ESD Dust Cap |
| F/N 21 | 1 | 10400 | MD051RP | ESD Dust Cap |
| F/N 22 | 1 | 10400 | MD100RP | ESD Dust Cap |
| F/N 23 | 2 | 10400 | MD100RS | ESD Dust Cap |
| F/N 24 | 1 | 10400 | MD037RP | ESD Dust Cap |
| F/N 25 | 1 | 10400 | MD037RS | ESD Dust Cap |

The FPIE Unit Part Number 421310-001 S/N 001, S/N 002, S/N 003, and S/N 004 (consisting of circuit card assembly 421327 S/N 001, S/N 002, S/N 003, and S/N 004 and 421331 S/N 001, S/N 002, S/N 003, and S/N 004 respectively) have been exposed (multiple occurrences) to Latent ESD Defect Failure conditions, which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

23.

False Thermal Cycle Testing ESD Exposures. Reckless Disregard Concerning Prior ESD Design Approval for Materials and Equipment Used in Compliance with ESD Protection Requirements for Flight Hardware.

Specification: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.2.10 Approved ESD protective materials and equipment, specifies:

> ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

24.

Reckless Disregard to Maintain ESD Protection of Flight Quality Hardware During "Workmanship" Thermal Cycle Testing.

Specification: RAYTHEON CAGE Code Specification RP 10-001, § 3.0.1 End product requirements - Workmanship, specifies:

> Electrostatic discharge sensitive (ESDS) items covered by this specification shall be designed and handled to provide protection against Exposure(s) to damaging electrostatic fields, static discharges, and electrical transients. Protection shall be maintained continuously for all ESDS items from initial component receipt through assembly, test, system integration, and final shipment.

False Defective Nonconformance: During STE Rack (Dewar) Qualification The Non-Flight FPA EDU2 Unit had failed due to broken connector pins. The Non-Flight FPIE Emulator (Unit S/N 001) had

been disassembled (for circuit damage analysis) and CCAs were installed into a test fixture part number 225741 (nick-named "The Butterfly fixture"). The "Butterfly test fixture" was designed to be black anodized as shown per Drawing 225741, Sheets 2 & 3.

Subsequent to the first CTI sell-off meeting on July 30, 2004, the Relator MATESKI was notified by the Test Technician, Tim Kilduff, that the Butterfly test fixture anodic coating was preventing the achievement of ground and the test had been halted. After additional investigation, it was discovered that the anodic coating extended to all frame and fixture surfaces as well as threaded screw attach holes. It was discovered that RAYTHEON had a spare "Butterfly test fixture" that had not been completed (anodized) per Drawing 225741, Sheets 2 & 3 and was still in the "bare" aluminum condition. This "bare" fixture was substituted in and the test was resumed.

The FPIE CCA (Circuit Card Assembly) 421327 and CCA 421331 are required to be Workmanship Thermal Cycle Tested per their respective drawings (Note 10) at the CCA level. These CCAs are first mounted into "The Butterfly fixture".

The anodized fixture was used on the FPIE Flight Unit S/N 001, 002, and 003 CCAs for Workmanship Thermal Cycling (prior to the first CTI sell-off meeting date 7/30/04), which without the ability to obtain "a continuous ground', violated RAYTHEON procedures by (a) failure to obtain an ESD design approval per RAYTHEON Specification RP 10-001, ¶ 3.2.10 Approved ESD protective materials and equipment and (b) failure to Maintain Hard ESD Protection throughout the manufacturing cycle per RAYTHEON Specification RP 10-001, ¶ 3.0.1 End product requirements-Workmanship.

The FPIE Unit CCA 421327 S/Ns 001, 002, & 003 and CCA 421331 S/N's 001, 002 & 003 (used in the FPIE Unit 421310-001 S/N 001, 002 & 003 respectively) have been exposed to Latent ESD Defect Failure conditions (multiple occurrences), which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

25.

False Acceptance Testing ESD Exposures. Reckless Disregard to Obtain prior ESD Design Approval for Material and Equipment used in meeting ESD Protection Requirements for Flight Hardware.

Specification: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.2.10 Approved ESD protective materials and equipment, specifies:

> ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

Reckless Disregard of ESD Protections of Flight Quality Hardware During Acceptance Testing.

Specification: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.0.1 End product requirements-Workmanship, specifies:

> Electrostatic discharge sensitive (ESDS) items covered by this specification shall be designed and handled to provide protection against Exposure(s) to damaging electrostatic fields, static discharges, and electrical transients. Protection shall be maintained continuously for all ESDS items from initial component receipt through assembly, test, system

integration, and final shipment.

False Defective Nonconformance: The 421310-001 FPIE Unit is required to be Acceptance Tested per drawing (Note 17). The FPIE Unit is first connected using STE (Special Test Equipment) Cables (Ref: 225742-100 Interface Cable Drawing). The STE Cables were constructed of ESD unapproved materials "Hot Plastics" (Nylon Sleeving and plastic ID Marker tags) capable of building and storing excessive electrical charges. These cables were completely rebuilt using ESD approved materials ("Before and After" STE Cable redesign Drawing and rework planning books), including without limitation:

STE Cables "Hot Plastics"

228343 W1 Rev – vs; Rev A
228344 W1A Rev – vs; Rev C
228345 W2 Rev –
228346 W2A Rev – vs; Rev A
228349 W4 Rev – vs; Rev A
228351 W6 Rev – vs; Rev A
228352 W7 Rev – vs; Rev A
228355 W11 Rev – vs; Rev B
228359 W15 Rev – vs; Rev C
228360 W16 Rev – vs; Rev C
228361 W17 Rev – vs; Rev C
228362 W18 Rev – vs; Rev B
228364 W101 Rev – vs; Rev A
228365 W102 Rev –
228367 W104 Rev – vs; Rev B
228369 W106 Rev – vs; Rev A
228370 W107 Rev – vs; Rev A
228371 W108 Rev – vs; Rev A
228372 W109 Rev – vs; Rev A
229709 W110 Rev – vs; Rev A
229926 W19 Rev –

The 421310-001 S/N 001 & 002 FPIE Unit and FPIE Unit CCAs 421327 S/Ns 001, 002, & 003, and CCA 421331 S/Ns 001, 002, & 003 Lower Level Thermal Cycle test, had been tested prior to the first CTI using the STE Cables in the ESD unapproved condition. It is necessary to "break test configuration" and make a new test set-up

several times when the Acceptance Test is run. The STE Cables are first connected in the "Primary" configuration, and then broken down and reconfigured into the "Redundant" configuration, to test both Primary and Redundant (back-up) systems, each time exposing the "opened" Unit connectors to stray accumulated Static charges built-up on the STE Cables "Hot Plastics". Exposures occurs when the STE Cable connections are disconnected (opened) and reconnected (closed). Prior to the STE Cable rebuild effort, many ESD Exposures to the FPIE Flight 1 Unit have occurred (Mate/Demate logs). This violated our procedures by (a) failure to obtain an ESD design approval per RAYTHEON Specification RP 10-001, ¶ 3.2.10 Approved ESD protective materials and equipment, and (b) failing to maintain continuous ESD protection throughout the manufacturing cycle per RAYTHEON Specification RP 10-001, ¶ 3.0.1 End product requirements-Workmanship. The FPIE Unit CCA 421327 S/Ns 001, 002 & 003 and CCA 421331 S/Ns 001, 002, & 003 (used in the FPIE Unit 421310-001 S/N 001, 002 & 003 respectively) have been exposed to Latent ESD Defective Failure conditions (multiple occurrences) which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

26.

<u>False "Cold" Acceptance Testing ESD Exposures</u>. <u>Reckless Disregard to Obtain prior ESD Design Approval for Materials and Equipment used in meeting ESD Protection Requirements for Flight Hardware</u>.

<u>Specification</u>: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.2.10 Approved ESD Protective Materials and Equipment,

specifies:

> ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

<u>Reckless Disregard to Maintain ESD Protection of Flight Quality Hardware During "Cold" Acceptance Testing</u>.

<u>Specification</u>: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.0.1 End product requirements-Workmanship, specifies:

> Electrostatic discharge sensitive (ESDS) items covered by this specification shall be designed and handled to provide protection against Exposure(s) to damaging electrostatic fields, static discharges, and electrical transients. Protection shall be maintained continuously for all ESDS items from initial component receipt through assembly, test, system integration, and final shipment.

<u>False Defective Nonconformance</u>: The 421310-001 FPIE Flight 1 Unit is required to be Acceptance Tested at various "cold" temperatures as a part of the Acceptance Test per drawing (Note 17). The FPIE Unit is mounted in a "Dewar" (cold-box, Drawing 229030) configuration with the FPIE Unit mounted on thermally isolated pedestals (which also meant electrically isolated). When Relator MATESKI discovered the grounding scheme did not include grounding of the FPIE and related FPA equipment, Relator MATESKI directed Design Engineering to add two ground straps to the FPIE configuration at opposite corners and one ground strap to the FPA configuration inside the "Dewar" (cold-box, Drawing 229030, Ref:

EO Y5216) to prevent charge buildup on Unit surfaces. This prior design violated our procedures by (a) failure to obtain an ESD design approval per RAYTHEON Specification RP 10-001, § 3.2.10 Approved ESD protective materials and equipment, and (b) Failing to Maintain Hardware ESD Protection throughout the manufacturing cycle per RAYTHEON Specification RP 10-001, § 3.0.1 End product requirements-Workmanship. Prior testing without these ground straps using the STE Cables build with ESD unapproved "Hot Plastic" materials exposed the FPIE Unit 421310-001 S/N 001 and 002 to Latent ESD Defect Failure conditions (multiple occurrences) which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

27.

<u>Reckless Disregard to Identify and Implement ESD Rigid Controls Requirements on the Drawings</u>.

<u>Specification</u>: RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 3.1.2.3, specifies:

> Class 1 ESDS parts, assemblies and equipment, including ESDS items in assembly parts lists, requiring Rigid Controls shall be identified as follows:
>
> a. If a specification or drawing indicates an ESDS part, assembly or equipment requiring Rigid Controls, it shall be identified by an assembly note stating the representative ESD sensitivity or withstand voltage limit (6.2.2.).
>
> b. If ESDS item(s) requiring Rigid controls are included in the assembly drawing parts list, these items shall be identified in the Nomenclature or Description column, or the Notes column as ESDS (XX) with a representative ESD

sensitivity or withstand voltage limit shown parenthetically in volts. The items shall be cross referenced to an assembly note.

RAYTHEON CAGE Code 4U884 Specification RP 10-001, ¶ 6.2.2 Rigid Controls, specifies:

a. If a specific ESDS part, assembly or equipment requires Rigid Controls, the drawing note shall read:

HANDLE AND PROTECT ELECTROSTATIC DISCHARGE SENSITIVE (ESDS) ITEM REQUIRING RIGID CONTROLLED EXPOSURE(S) TO LESS THAN XX VOLTS, TO THE REQUIREMENTS OF RP 10-001/2.

b. If used as a reference to the parts list Nomenclature or Description Column or Notes column as requiring Rigid Controls, the drawing note shall read:

HANDLE AND PROTECT ELECTROSTATIC DISCHARGE SENSITIVE (ESDS) ITEM(S) TO THE REQUIREMENTS OF RP 10-001/2 REQUIRING RIGID CONTROLLED EXPOSURE(S) TO LESS THAN THE VOLTAGE IDENTIFIED: "ESDS (XX)".

<u>False Defective Nonconformance</u>: The FPIE Unit Part Number 421310-001 (consisting of one circuit card assembly 421327 and one circuit card assembly 421331) contains devices that require "Rigid" ESD Controls (Class 2, able to withstand ≤100 volts [≈ 20 volts actual]). Drawing 421310-001 Notes 6 and 7, Drawing 421327 Note 3, and Drawing 421331 Note 3, all callout RP 10-001 without a Class requirement defaulting to Class 1 per Specification. This default is considered "Normal" ESD controls (Class 1, able to withstand ≥100 volts). Work stations are required to be identified as dedicated for the installation of Class 2 components when Rigid Controls are necessary to protect components. The FPIE has

numerous components that should be identified as "Rigid" ESD Controls (Class 2) (Ref: 421310-001, 421331, and 421327 Drawings), which has been confirmed in a conference on June 5, 2006 with Gundurao Prabhakar, El Segundo Principal Electrical Components Engineer, Matthew Lee, Active Components Technician, and the Relator MATESKI.

The FPIE has numerous components that should be identified as "Rigid" ESD Controls (Class 2): (Ref: 21310-001, 421331, and 421327 Drawings (Ref: Active Components):

R10002396-0001
R10003046-0001
R10003047-0001
R10003048-0001
5962R583403VXA
5962-8859301VPA
5962-9560401VXA
5962R9655801VXA
5962R9583403VXA
5962R9583303VXA
JANSR2N7389
JANS1N6642U
JANS1N6677UR-1

Sensitive components used in the FPIE Unit Part Number 421310-001 S/Ns 001, 002, 003, and 004 (consisting of circuit card assembly 421327 S/Ns 001, 002, 003, and 004 and 421331 S/Ns 001, 002, 003, and 004 respectively) should have been identified as "Class 2" (Rigid Controls) and were not. These Circuit Card Assembly components have been exposed to Latent ESD Defect Failure conditions exceeding their "Maximum Withstand Voltage Ratings" which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

28.

False Circumvention of Test Specifications, First Article Testing, and Test Protoflight Specifications.

Specification: Statement of Work For the VIIRS Day/Night Band Module Assembly P/N 417350-100 (Flight Unit 1), ¶ 5.5.3: Special Test Request, specifies:

> During acceptance testing if the need arises to perform engineering evaluation tests, or any special test that may be requested from the customer, program management or engineering that is not in the normal flow of the build/test sequence, a Special Test Request (STR) shall be generated in accordance with FE94.P13_0 (3.0). The STR shall not be used as a substitute for test procedures when testing flight hardware.

Reckless Disregard to Perform 3-Axis Random Vibration Protoflight Test Specifications on First Article Flight Hardware.

Specification: RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, ¶ 3.1 General Test Requirements, specifies:

> Para 3.1, General Test Requirements;
>
> This section describes the test requirements, test objectives, equipment requirements, and control provisions for the Focal Plane Interface Electronics, referred to as FPIE, vibration test. The detailed steps necessary to carry out this procedure for Protoqualification levels are contained in Section 4. The detailed steps necessary to carry out this procedure for Acceptance levels are contained in Section 5. The detailed steps necessary to carry out this procedure for Workmanship/Penalty levels are contained in

Section 6. The FPIE will be tested to verify the soundness of the unit's design/assembly and to demonstrate that the unit will survive and perform after being subjected to specified vibration levels. During each vibration test, the FPIE shall be mounted to a vibration test fixture in a manner simulating actual service installation and launch configuration. Prior to each test, the vibration test fixture shall be inspected to ensure that the correct mounting hardware is property installed. Vibration testing shall be applied separately along the three orthogonal axes defined in Figure 1.

RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, ¶ 3.1.1 Prerequisites specifies:

Para 3.1.1, Prerequisites

Prior to commencing specific operations within this procedure, a consent to test meeting to assure the readiness of the FPIE for unit level vibration shall be held. All documentation for the FPIE and its subassemblies shall be reviewed for completeness. Any item that would prevent the FPIE from being tested is resolved prior to testing. In addition, the DNB FPIE integration and test procedures shall have been completed. The FPIE shall be fully assembled and in unpowered launch configuration, but without any connector savers or shorting plugs attached to the unit connectors.

RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, ¶ 3.1.2 Order of Execution specifies:

Para 3.1.2, Order of Execution

The normal order of testing is a sequence starting with the

X-axis test, then the Z-axis and finally the Y-axis. The order of execution of the axis sequence in this procedure may be altered, as required, by the test director or his designee (The sequence of steps for a given axis to remain as described in this procedure.)

RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, ¶ 3.2 Objectives of this Procedure specifies:

Para 3.2, Objectives of this Procedure

The objective of the tests performed pursuant to this procedure is to demonstrate that the FPIE will survive the vibration levels expected during the launch of the NPP or NPOESS satellite without degrading the performance of the FPIE.

RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, ¶ 3.3.1 [specific] Test Requirements specifies:

Para 3.3.1, [specific] Test Requirements

The FPIE shall be subjected, separately along each of the three orthogonal axes defined in Figure 1, to resonance search and random vibration excitation. The FPIE shall be subjected to tests at the protoqualification, acceptance or workmanship levels found in PS154640-111 (also in Appendices III, IV and V).

NPOESS/VIIRS Program QR (Quality Requirements) FE94, Lines 24/25: Testing specifies:

Lines 24/25: Testing

1. Tests must be described and documented before commencing and:

A. Test procedures shall be a part of the engineering design package.

B. Test records become part of the assembly traveler.

C. Must describe in detail the following items:

(1) Procedure

(2) Setup

(3) GSE (STE and OTE)

(4) Flight hardware to be used

D. Must be approved by (P.I. 7.6):

(1) REA

(2) Systems or Test Director

(3) QA (HW and SW)

E. At completion:

(1) The data must show pass/fail/conclusion, signature, and date by the test operator, the REA, and Quality.

(2) The documentation must be complete. All blanks and intended information must be filled in. "N/A" is allowable.

F. The whole sequence is considered mandatory after approval and when called out in the AHR unless deleted by one of the above "approval" personnel.

G. Portions may be changed with the approval of any two of the above "approval" personnel.

H. For special tests that are not part of the released engineering, and that use Flight hardware that is mechanically or electrically active, documentation must be prepared and handled per STR P..I. 3.0.

False Defective Nonconformance: The 421310-001 S/N 002 FPIE Flight 1 Unit was presented as a "complete" unit at the first CTI (Consent To Integrate) sell-off meeting at RAYTHEON Goleta, California on July 30, 2004. One of the "Quality Findings" during the first CTI meeting was the discovery that the RAYTHEON Random Vibration Test Specification TP154640-764 was not 'Baseline' released as required in RAYTHEON Drawing procedures and Program QR (Quality Requirements) FE94. The FPIE Flight 1 Unit was originally tested using an unapproved and released Random Vibration Test Procedure. This test procedure was first released on July 12, 2005 as Rev. "-". During the Random Vibe Acceptance preparations for the next CTI sell-off meeting, numerous changes were added and the specification was released as Rev "A" on March 3, 2006.

The 421310-001 S/N 002 FPIE Flight 1 Unit was completely disassembled during rework invalidating all previous Random Vibe Protoflight testing. Because this was the first FPIE Flight Unit to deliver, this Unit was required to be Protoflight Tested in 3-Axis as described TP154640-764, Rev. A, ¶ 3.1, and the Unit was required to be fully assembled as a prerequisite. Although the sequence order of execution could be altered as described TP154640-764, Rev. A, ¶ 3.1.2 the sequence of steps for each given axis were to be performed as described, to demonstrate that the FPIE will survive the vibration levels expected during the launch of the NPP or NPOESS satellite without degrading the performance of the FPIE.

Because the 421310-001 S/N 002 FPIE Flight 1 Unit was never tested in the completed configuration to an approved and released test procedure (TP154640-764), and was in fact disassembled, reassembled, and tested for the first time in the fully completed

configuration to a reduced penalty Test STR-181 (Special Test Requirement, Penalty Test Section 6, VIIRS Statement of Work) at reduced levels, in (one) Y-Axis only, when it should have been tested to the more severe Protoflight levels in 3-Axis (Protoflight Test Section 4) as is required of the first Unit, whereby the 421310-001 S/N 002 FPIE Flight 1 Unit is considered unfit for launch, because it will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

29.

False Defective Nonconformance "Cold" (Dewar) Acceptance Testing. Reckless Disregard to Perform "Cold" Acceptance Test Requirements on First Article DNB Flight Hardware.

Specification: RAYTHEON CAGE Code 11323 Specification TP154640-762, Rev. A, ¶ 1.1 Scope specifies:

Para 1.1, Scope

This document describes the Acceptance Test Procedure for the Day Night Band Module, P/N 417350-100, a visible band imaging subassembly of the NPOESS VIIRS sensor suite. The performance test procedures defined herein constitute a sequence of tests to be performed to measure and verify the performance requirements of the DNB Module per PS154640-124.

False Defective Nonconformance: RAYTHEON builds, tests, and produces the 421310-001 FPIE Unit using the FPA tuning data provided to El Segundo from RVS Goleta. This tuning data is used to determine what Resistor "Select" values are to be installed in the FPIE. Acceptance Testing must be performed using the actual "Matched Pair" Flight Units to validate and confirm the Resistor

"Selects" have been properly chosen and the integral system will optimally perform as predicted. The "Matched Pair" of Units must be tested in Flight-like conditions requiring the paired Units to be installed and tested in a Cold-Box (Dewar) configuration to achieve the cold temperatures that the Units will be required to perform in during their mission. Units are cycled over various cold temperatures under power to validate performance as an integral system.

The 417350-100 DNB (Day/Night Band) module was retested using (1) 421310-001 S/N 002 FPIE Flight 1 Unit (built at RAYTHEON El Segundo) and (1) D417360-100 FPA Non-Flight Unit (built at RAYTHEON RVS Goleta) to perform testing.

The FPIE Flight 1 Unit was Acceptance "Cold" Tested after the first CTI (consent To Integrate meeting on July 30, 2004) for the second time to an abbreviated Acceptance Test (STR-248) using a Non-Flight FPA EDU2 of unknown Drawing revision level and suspect quality. This was done to assist in the closure of test EFRs (Event Failure Reports) that were generated as a result of poor performance in the first test. These were EFRs No. 2183 and 2132. The Non-Flight FPA EDU2 was used because the Flight FPA 417360-100 S/N 001 had already been integrated into the next assembly and was not available to be used in analyzing the failures to close the EFRs.

The 421310-001 S/N 002 FPIE Flight Unit 1 has been unnecessarily exposed to a marginally functioning Non-Flight FPA EDU2 (D417360-100 S/N 002) of unknown Drawing revision level and suspect quality, damaged in test when connected to the Non-Flight FPIE Emulator while attempting to qualify the STE (Dewar) Cold-Box,

whereby the 421310-001 S/N 002 FPIE Flight 1 Unit integrity has been compromised and must be considered unfit for launch, because it will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

30.

NON-FLIGHT FPA EDU2 UNIT DAMAGE CHRONOLOGY

One of the "Quality Findings" during the first CTI meeting was the discovery that RAYTHEON Test Specification TP154640-760 was not "Baseline" released, and our STE (Special Test Equipment) Rack had not been pre-qualified prior to use on Flight hardware for Acceptance Testing. It was during this STE Qualification that the following damage occurred.

During one of the Cold-Box (Dewar) STE Qualification tests, it was necessary to configure the Non-Flight Emulator FPIE Emulator and the Non-Flight FPA EDU2 in combination into the Cold-Box (Dewar) configuration. The Non-Flight FPA EDU2 rigid-flex cable is approximately 2.00" shorter than the Flight version. This caused excessive strain to be placed on the rigid-flex cable while stretching to make the mate with our FPIE Emulator connector.

The EDU2 (Engineering Demonstration Unit) FPA had not been assembled as a flight unit and was missing the Connector Backshells, it was instead potted as a means of electrical isolation and was a very poor means of mechanical protection against shorting when mounting.

As strain was applied, internal pins broke on the FPA EDU2 potted Connector causing a dead short to occur. The power was switched on and the Non-Flight Emulator FPIE Emulator circuits were

subjected to a dead shorted condition. Several subsequent analysis tests were performed to determine if the Emulator FPIE Emulator circuits had suffered damage, not test to determine if a latent defect will manifest itself later.

The FPA EDU2 unit was removed and sent to SBRS/RVS (Santa Barbara Remote Sensing/Raytheon Vision Systems in Goleta, California) for repairs. Cliff Nichols, RVS Systems Engineer, informed Relator MATESKI that SBRS/RVS had replaced the 100 pin Connector and the 51 pin Connector. When asked why there were no Backshells to protect the Connector pins from breaking and/or shorting, Cliff Nichols replied, "This is the way we've done it for 25 years, we're not going to change now."

Relator MATESKI went to Ronald Estes, El Segundo Lead Engineer, and demanded he use his authority to have the Backshells installed on the FPA EDU2 Unit, after RAYTHEON had just rebuilt all the sub-standard STE cables at tremendous VIIRS Program expense to ensure that this would not happen in Acceptance testing. Ronald Estes, Lead Engineer in El Segundo, agreed and asked Relator MATESKI to put it in writing, and send it in an Email to him. He agreed to forward it through channels to Cliff Nichols, Lead Engineer in Goleta, who finally agreed to install the Backshells.

Cliff Nichols called to inform that RAYTHEON Goleta was about to return the FPA EDU2 Unit to RAYTHEON El Segundo. When asked if RAYTHEON had buzzed-it-out to determine if any damage had occurred when the pins were shorted together, Cliff Nichols responded that limited probing had been performed but he was not certain what the results meant, and agreed to do some additional point-to-point probe testing. A dead short to ground was found and a decision was

made to isolate the stage 1B right and left circuit by removing the wire bonds at the flex cable to board interface (2 places). When this was done, the dead short was gone, but so was the capability to Acceptance Test the FPIE Flight 1 Unit stage 1B right and left gates. The 421310-001 S/N 002 FPIE Flight 1 Unit was never tested on this circuit. Authorization for the use of this Non-Flight FPA EDU2 Unit with a non-functioning Stage 1B right and left is not documented anywhere on the Flight FPIE book.

The RAYTHEON excuse was that the Flight 1 FPIE would be tested at the Next Assembly when the Unit is installed in the space craft and all system testing gets repeated. To date, (and since the rebuild) the FPIE Flight 1 Unit has never had the "Cold" Acceptance Test performed in conjunction with and using a Flight Quality FPA Unit. The FPIE/FPA tuning data must be performed as a "Matched Pair" for optimal system performance. If it performs poorly and has to be returned for retuning (3-6 month delay minimum). RAYTHEON will not know this until the FPIE/FPA is tested at the space craft because this testing was never conducted at the lower DNB (FPIE/FPA) level. The reason the Flight FPA was not available, is because the RAYTHEON FPIE Flight 1 Unit was rejected in the first attempt at CTI sell-off and delivery. The FPA was given permission to integrate so the space craft could proceed forward while the FPIE Flight 1 Unit was to be rebuilt and retested. The 421310-001 S/N 002 FPIE Flight 1 Unit has not been tested to the Flight requirements as defined in TP154640-762, Rev. A, whereby it is considered unfit for launch, because it will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

31.

Reckless Disregard to Identify and Test in Compliance with the FPA/FPIE "Matched Pair" Specifications.

Specification: RAYTHEON is contracted to build, test, and produce (1 each) part Number 417350-100 DNB (Day/Night Band) module for each Flight (Paragraph 1 of the Statement of Work). The DNB Module consists of (1) 421310-001 FPIE Unit (built at RAYTHEON El Segundo) and (1) 417360-100 FPA Unit (built at RAYTHEON Goleta). The FPA and FPIE Units must be "tuned" together as a "matched pair". FPA test measurements generate tuning data subsequently provided to RAYTHEON El Segundo from RAYTHEON Goleta. RAYTHEON El Segundo used this data to determine what value Resistors are to be installed (Ref: 421331 Drawing Note 38 and 421327 Drawing Note 27). "Resistor Select" requirements vary in values due to cumulative tolerance buildup caused by individual part tolerances in any given circuit and Unit.

False Defective Nonconformance: RAYTHEON failed to identify the "matched pair" requirements on the drawings which in turn allowed RAYTHEON to test the Flight FPIE Flight 1 Unit with another (Non-Flight) FPA EDU2 Unit. Testing in this manner does not provide Resistor Select value validation at the lower DNB level of production thus covering-up marginal performance findings.

32.

False Acceptance Testing Thermal Cycling.

Specification: Statement of Work For the VIIRS Day/Night Band Module Assembly P/N 417350-100 (Fit Unit 1), Revision "-"/August 15, 2005, ¶ 5.5.3: Special Test specifies:

During acceptance testing if the need arises to perform engineering evaluation tests, or any special test that may be requested from the customer, program management or engineering that is not in the normal flow of the build/test sequence, a Special Test Request (STR) shall be generated in accordance with FE94.P13_0 (3.0). The STR shall not be used as a substitute for test procedures when testing flight hardware.

Reckless Disregard to Perform "Thermal Cycling" per Acceptance Test Requirements on First Article DNB Flight Hardware.

Specification: Day/Night Band Module Test Procedure Cage Code 11323, TP154640-762, ¶ 1.1 specifies:

1.1 Scope

This document describes the Acceptance Test Procedures for the Day Night Band Module, P/N 417350-100, a visible band imaging subassembly of the NPOESS/VIIRS sensor suite. The performance test procedures defined herein constitute a sequence of tests to be performed to measure and verify the performance requirements of the DNB Module per PS154640-124.

False Defective Nonconformance: RAYTHEON El Segundo is contracted to deliver to RVS (Raytheon Vision Systems Goleta) a DNB Unit Part Number 417350-100 consisting of (1) RAYTHEON El Segundo built 421310-001 FPIE Unit and (1) RAYTHEON RVS supplied 417360-100 FPA Unit. RAYTHEON is responsible to build, inspect, and test the FPIE, integrate it with the FPA, and perform several additional tests including Thermal Cycling tests still not performed as required. The FPIE 421310-001 S/N 002 FPIE Flight 1 Unit was Acceptance Thermal Cycle Tested to a reduced requirement STR-040.

Due to VIIRS schedule constraints, the decision was made to issue an STR reducing the overall Thermal Cycling duration to approximately (2) days in lieu of the required Thermal Cycle tests duration of approximately (23) days. This is the first deliverable flight unit which should have been tested using the "Matched Pair" FPA to perform Thermal Cycle requirements that would in fact validate and qualify the DNB Module performance.

The 421310-001 S/N 002 FPIE Flight 1 Unit was completely disassembled during rework invalidating all previous Thermal Cycle testing. In that this was the first flight FPIE Unit to deliver, this FPIE Flight 1 Unit was required to be Thermal Cycle Tested in flight configuration using a flight FPA as described TP154640-762, Rev. A.

In that the 421310-001 S/N 002 FPIE Flight 1 Unit was never tested in the completed configuration to the approved and released test procedure (TP154640-762), and was in fact disassembled, reassembled, and tested for the first time in an incomplete (non-flight) configuration to a Penalty Thermal Cycle Test STR-040 (Special Test Requirement, Penalty Test Section 6, Statement of Work) at reduced levels, when it should have been tested to the more severe Acceptance levels in flight configuration as is required of the flight Units, the 421310-001 S/N 002 FPIE Flight 1 Unit is considered unfit for launch, because it will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

33.

Reckless Disregard to Perform to "EMI/EMC" Test Requirements on First Article DNB Flight Hardware.

Specification: 417350-100 DNB Drawing, Note 3: Assy shall meet the Rqmt's of Module Performance Specification PS154640-124. PS154640-124, ¶ 3.3.2 defines EMI/EMC Susceptibility requirements. 421310-001 FPIE Drawing, Note 26, Assy shall meet the Rqmt's of 421310-500 FPIE Assembly Interface Control Drawing and PS154640-126 (Product Spec. DNB Focal Plane/FPIE VIIRS). PS154640-126, ¶ 3.3.2 defines EMI/EMC Susceptibility Design requirements.

False Defective Nonconformance. RAYTHEON El Segundo is contracted to deliver to RVS (Raytheon Vision Systems Goleta) a DNB Unit Part Number 417350-100 consisting of (1) RAYTHEON El Segundo built 421310-001 FPIE Unit and (1) RAYTHEON RVS supplied 417360-100 FPA Unit. RAYTHEON is responsible to build, inspect and test the FPIE, integrate it with the FPA, and perform several additional tests including visual tests still not performed. EMI/EMC (Electro-Magnetic Interference/Electro-Magnetic Contamination) testing (required for all instruments) has not been performed. RAYTHEON RVS is scheduled to deliver to NORTHROP mid-year 2006, but is already late.

34.

False Circumvention of Procurement Processes, Qualification Testing of Procured Components, and Trace Specifications for Space Programs. Reckless Disregard to Procure Flight Parts Through Supply Chain Circumventing Quality. Reckless Disregard to Maintain Space Trace Requirements on Flight Parts Throughout Buildup.

Specification: PQR (Program Quality Requirements) FE94, Line 6, Purchasing requirements. Mil-Std 981 and Mil-HDBK-5400 Guideline 22 Parts Control Program.

False Defective Nonconformance: Numerous Capacitors and Resistors were purchased through the El Segundo Facility Experimental Non-Flight "EPP Stores" circumventing the normal Procurement Process violating PQR (Program Quality Requirements) FE94, Line 6, Purchasing requirements (as itemized in Cap-trace2.txt, and Email-Cap-trace.doc dated 2/28/06 Mario Farr, Shop Supervisor). All of these parts went out to a vendor American Tape and Reel Company to be placed on "Tape & Reels" for use in the Pick-N-Place machine. Stores use of "various receipts" has effectively broken the trace from the original PO these parts were purchased on, violating the "Space Trace" requirements of the PQR, FE94 (itemized in initial kit-pull trace reports (including wrong CCA serialization) presented at the first CTI date 7/30/04 vs.; corrected kit-pull trace reports presented at the second CTI date of 4/25/06).

CWR11JC156KCB (RAYTHEON Lot # AVT0213PO151804)

CWR11MC475KCB (RAYTHEON Lot # AVT0213PO151804)

CWR11MC475KCB (RAYTHEON Lot # AVT0213PO151804)

M123A11BPB102JS (RAYTHEON Lot # KEM0018A1PO151804)

M123A10BPB101JS (RAYTHEON Lot # KEM0209A4PO151804)

M123A12BXB103KS (RAYTHEON Lot # KEM0212A7PO151804)

M123A12BXB104KS (RAYTHEON Lot # KEM0147A6PO151804)

35.

False Initial Failure to Perform Qualification Testing, Destructive Physical Analysis Testing, and Burn-in on Flight Parts. Specification: R10002396, R10003046, R10003047, R10003048, R10002340, R10002694, R10002695 Group A, B, D, E, DPA, and RLAT testing as well as Specific Burn-in.

False Defective Nonconformance: The 421310-001 S/N 002 FPIE Flight 1 Unit was presented as a "complete" Unit at the first CTI (Consent To Integrate) sell-off meeting in RAYTHEON Goleta, California on July 30, 2004. After numerous Quality Defective Nonconformances were discovered, the FPIE Flight 1 Unit was rejected at CTI sell-off and returned to El Segundo for rework. An audit was performed to discover all unknown Quality Discrepancies (Mark Ross QAE Lien List). There were 77 Quality Findings listed for the CCAs FPIE Unit, and DNB Unit combined.

As RAYTHEON began to rebuild the FPIE Flight 1 Unit, the Relator MATESKI was told by several VIIRS FPIE Team Members (Bernie Malis, RES Manufacturing Lead, RES Thomas James, Responsible Engineering Authority, Ronald Estes, RES Lead Engineer), not to look at the trace, revisions, or perform a Configuration Review on the hardware prior to beginning Acceptance Testing as is required. The Relator MATESKI was told that the FPIE Unit had already been presented at CTI, and therefore, only to rework the Quality Findings and not to reinvent the wheel. Relator MATESKI was instructed to remove the Configuration Verify sequence (Oper B330) and proceed with the FPIE Flight 1 Unit test. When the FPIE Flight 1 Unit testing had been completed, Relator MATESKI began to perform a Configuration Review prior to sell-off CII (Complete Item Inspection) as is also required. It was at this time that the Relator MATESKI discovered that the previous audit did not uncover the fact that numerous components used in the FPIE Flight 1 Unit had not been tested and/or DPA Inspection qualified, as well as Space Trace deficiencies.

The FPIE contains devices that require Group A, B, D, E, DPA and RLAT testing as well as Specific Burn-in requirements that were missed (Ref: active Ics: R10002396, R10003046, NCMR EIS76525, R10003047, NCMR EIS76515, R10003048), and (Ref: passive RF inductor chip coils; R10002340, R10002694, R10002695). Violates Mil-Std 981 and Mil-HDBK-5400 Guideline 22 Parts Control Program. These very basic component testing requirements were not performed on the VIIRS, which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

36.

Reckless Disregard of Initial Failure to Perform X-Ray Testing on Flight Parts.

Specification: R10002340, R10002694, R10002695 devices require (3) views (or more as needed) 100% X-Ray internal image verification screening (for FOD, alignment, wire nicks, wire attach, core damage, etc.).

False Defective Nonconformance: The FPIE contains devices that require 3 views (or more as needed) 100% X-Ray internal image verification screening (for FOD, alignment, wire nicks, wire attach, core damage, etc.) that were never performed (Ref: passive RF inductor chip coils; R10002340, R10002694, NCMR EIS76505, R10002695, NCMR EIS6508). This is required to be performed at the vendor after assembly or may be performed by advance agreement by RAYTHEON. Neither the vendor or RAYTHEON performed this critical 100% X-Ray of every part as is evidenced by the FOD (Foreign Object Damage) Particles found inside the sample tested, and also a cracked bobbin core (Ref: R10002694-0001, confirmed on February 28,

2006 with Rick Zelman QAE, and Richard Murth, Components Engineer).

A vendor may not change the process by which it assembles these parts without a prior 30 day notification in writing through RAYTHEON procurement agents. The wire winding attach was made via resistance welding vs; hi-temp solder without prior authorization (DPA Report DA06-0093A). RF Inductors could not meet the required 100% X-Ray testing (3) view requirement as they had already been installed into the FPIE Flight 1 Unit. The 421310-001 S/N 002 FPIE Flight 1 Unit has components that have not been X-Ray tested (Ref: R10002694-0001) as defined in the Specification R10002694 whereby the FPIE Flight 1 Unit must be considered compromised and unfit for launch which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

37.

Reckless Disregard to Segregate Flight vs. Non-Flight Hardware During Assembly.

The FPIE Flight 1 Unit was routinely worked on (rebuilt) in a Non-Flight STE Lab environment located at E01/Rm C1250/Lab 22. Additionally, this work was performed on work stations not identified as "PRD/PRG Flight Only". Non-Flight hardware remained on the work stations and in close proximity to the Production Flight Hardware under assembly. This STE Lab had an abundance of both Non-Flight and Flight components stored together including; Resistors, Capacitors, Thermistors, Jack Posts, Nuts, Screws, Wire, Shrink Sleeving, etc. This is in violation of PQR (Program Quality Requirements) FE94, Line 8, Trace requirements. The FPIE Unit Part Number 421310-001 S/N 001, S/N 002, S/N 003, and S/N 004

(consisting of one circuit card assembly 421327 S/N 001, S/N 002, S/N 003, and S/N 004 and consisting of one circuit card assembly 421331 S/N 001, S/N 002, S/N 003, and S/N 004 respectively) have been exposed and intermingled with Non-Flight hardware, which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure.

At the first CTI (Consent To Integrate - Date 7/30/04) meeting, an attempt was made by RAYTHEON El Segundo to sell-off the 421310-001 S/N 002 FPIE Flight 1 Unit. The "Space Trace" reports presented (kit pulled reports) did not meet the minimum Space Trace requirements. Documentation and trace were not being kept as parts were changed (NCMR EIS74862, EIS7714301, EIS77144-1, EIS77169-1, EIS77511, EIS 76924, EIS77819). Original pulled kit reports (from first CTI delivery attempt) vs; cleaned-up pulled kit reports for comparison.

Both STE (Non-Flight Special Test Equipment) kits and PRD/PRG (Production Program Flight) kits were routinely stored intermingled.

Since the first CTI (Consent To Integrate) meeting on July 30, 2004, the FPIE Unit S/N 001 has been formally downgraded to Non-Flight (NCMR N00018). It was discovered that there were too many Deltas to complete the Unit "as-built". This S/N 001 Unit was unable to demonstrate both "Space Trace" requirements and Assembly Record documentation and was subsequently disqualified for Flight.

On several occasions work was performed in advance of Engineering documentation. Ref: C2 and C170 removal and wire shorting of pads with buss wire of unknown size and trace on S/N 001 and S/N 002 CCAs. The Non-Flight STE Lab located at E01/Rm

C1250/Lab 22 had an abundance of both Non-Flight and Flight components stored together including: Resistors, Capacitors, Thermistors, Jack Posts, Nuts, Screws, Wire, Shrink Sleeving, etc. Several components other than Flight quality replaced in this context (i.e., replacement of Thermistors, resistors, capacitors, C2 and C170 shorting wires, resetting of parts for discrepant solder joints, etc.) has exposed these units to installation of discrepant Non-Flight components compromising their integrity.

S/N 003 and S/N 004 CCAs exhibit many of the same defective nonconformances and likewise do not meet the minimum space trace requirements and build history record entries required for flight hardware. Much of the missing Data: operator sign-offs, oven equipment numbers, epoxy trace, cure times, cure temps, etc., are missing forever (Flt_2-3_Delta's.xls separate spreadsheet for recent audit findings Relator MATESKI performed to determine flight worthiness of these CCAs). (Ref: Performance of work on Flight hardware without Certified Planner screening of Planning. Ref: Illegal rework of 421314 (4 Quantity) Top Cover milled Boss break-thru and plating violations. Ref: Installation of Connectors J1 and J2 using Socket Head Cap Screws on flight hardware (S/N 002) without washers where washers were required per drawing).

38.

In deliberate ignorance and reckless disregard, Defendant RAYTHEON has concealed the VIIRS defective nonconformances, which compromise the NPOESS/VIIRS integrity and mission assurance, and cause the NPOESS downgrade or failure, from the NPOESS EXCOM, PEO, IPO, and DOC Inspector General, while the RAYTHEON SAS President Jon Jones made false statements *inter alia* concerning the VIIRS

integrity, tests and milestones.

39.

From at least 2002 to 2006, Defendant RAYTHEON knowingly in reckless disregard presented, or caused to be presented, to an Officer of the Department of Defense vouchers for payment and approval for the defective nonconformance VIIRS, on which payment was made by the United States Government with funds appropriated by the United States Congress for the NPOESS contract, and RAYTHEON knowingly made a false record and statements to conceal the defective nonconformance VIIRS to secure approval and payment of vouchers by the United States Government and to secure appropriation approval by the United States Congress. Plaintiff alleges that each and every false VIIRS voucher, record and statement by RAYTHEON constitute false claims under the False Claims Act, 31 U.S.C. § 3729(a), in a sum according to proof at the time of trial. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a), the total damages caused by the false claims by Defendant RAYTHEON should be trebled plus a civil penalty of $5,000 to $10,000 for each RAYTHEON false claim.

40.

During at least 2002 to 2006, Defendant RAYTHEON had actual knowledge and deliberately authorized, directed, and/or ratified the conduct of the officers, managers and employees of Defendants RAYTHEON in the performance of the acts with deliberate ignorance and reckless disregard as herein alleged in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

41.

During at least 2002 to 2006, in doing the acts herein alleged, the Defendant RAYTHEON officers, agents and employees have acted in their respective capacities as officers, agents or employees of Defendant RAYTHEON, in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

42.

In the event that the United States Government pursues recovery for any of the false claims by Defendant RAYTHEON, through any alternative remedy available to the United States Government, including any administrative proceeding or disposition, Coplaintiff and Relator shall have the same rights thereto as Coplaintiff and Relator would have had under the False Claims Act, including awards, attorneys fees, expenses and costs, pursuant to the False Claims Act, 31 U.S.C. § 3730(c)(5).

WHEREFORE, Plaintiff prays for judgment against Defendant RAYTHEON COMPANY as follows:

(1) Restitution to the United States Government of the damages sustained from false claims by Defendant Raytheon Company for payment by the United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3729 et seq.

(2) Statutory three times the damages sustained from the false claims by Defendant Raytheon Company for payment by the United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3729(a);

(3) Statutory civil penalty of not less than $5,000 and not more than $10,000 for each and every invoice false claim by Defendant Raytheon Company for payment under United States

Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3730(d);

(4) Statutory awards, attorneys fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

(5) Such other and further relief as the Court deems just and proper.

SECOND CAUSE OF ACTION

VIOLATION OF THE FALSE CLAIMS ACT

BY NORTHROP GRUMMAN CORPORATION

43.

Paragraphs 1 through 38 of the First Cause of Action are hereby realleged and incorporated hereby by reference.

44.

On March 30, 2006, at an Oversight Hearing on National Polar-orbiting Operational Environmental Satellite Systems, before the Committee on Commerce, Science, and Technology, Subcommittee on Disaster Prevention and Prediction of the United States Senate, David L. Ryan, Vice President and NPOESS Program Director, Northrop Grumman Space Technology, made false written record and statements in order to secure contract and appropriation approval of false cost and award fee claims for payment by the United States Government, including without limitation:

(1) "Northrop Grumman has intervened at the Visible Infrared Imaging Radiometer Suite ("VIIRS") subcontractor by placing our specialists onsite to resolve significant technical, cost and schedule problems."

(2) "Northrop Grumman intervened and relocated 10 specialists to be onsite at the subcontractor's facility to

proactively assist them through the design and development process. The team has comprehensively reviewed their processes and their detailed design and has implemented corrective action across the subcontractor's engineering, manufacturing, quality, and management disciplines."

(3) "The VIIRS subcontractor is currently ahead of the FY2006 schedule and has recently successfully completed some very important development unit environmental tests. The unit is meeting all of its key performance requirements and passed its vibration testing, a key test for this instrument."

45.

In deliberate ignorance and reckless disregard of known RAYTHEON defective nonconformance VIIRS by the admitted NORTHROP ten specialists inhouse at RAYTHEON, NORTHROP has deliberately in reckless disregard made a NPOESS false record and statements to the United States Senate and DOD procurement officers, as alleged hereinbefore, in order to secure contract and appropriation approval by the United States Congress, and payment approved by the NPOESS IPO and DOD procurement officials.

46.

In deliberate ignorance and reckless disregard, Defendant NORTHROP has concealed the NPOESS/VIIRS defective nonconformances, which compromise the NPOESS/VIIRS integrity and mission assurance, and cause the NPOESS downgrade or failure, from the NPOESS EXCOM, PEO, IPO and DOC Inspector General, while the NORTHROP Vice President and NPOESS Program Director, David L. Ryan made false statements *inter alia* concerning the NPOESS/VIIRS integrity, tests

and milestones.

47.

The NORTHROP false statements and records to the United States Senate, which have been repeated to the DOD procurement officers, have caused the payment by the United States Government of the cost and award fee vouchers of NORTHROP and RAYTHEON, and the payment of at least $123 million in award fees on the NPOESS contract performance, which is replete with delays, cost overruns, and the latent defective nonconformance NPOESS/VIIRS which will compromise the NPOESS integrity and mission assurance, and cause the NPOESS degrade or failure.

48.

From at least 2002 to 2006, Defendant NORTHROP knowingly in reckless disregard presented, or caused to be presented, to an Officer of the Department of Defense vouchers for payment and approval, on which payment was made by the United States Government with funds appropriated by the United States Congress for the NPOESS contract, and knowingly made a false record and statements concerning the defective nonconformance NPOESS/VIIRS to secure approval and payment of cost and award fee vouchers by the United States Government and to secure appropriation approval by the United States Congress. Plaintiff alleges that each and every NPOESS/VIIRS voucher, and false record and statement by NORTHROP constitute false claims under the False Claims Act, 31 U.S.C. § 3729(a), in a sum according to proof at the time of trial. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a), the total damages caused by the false claims by Defendant NORTHROP should be trebled plus a civil penalty of $5,000 to $10,000 for each NORTHROP

false claim.

49.

During at least 2002 to 2006, Defendant NORTHROP had actual knowledge and deliberately authorized, directed, and/or ratified the conduct of the officers, managers and employees of Defendants NORTHROP in the performance of the acts with deliberate ignorance and reckless disregard as herein alleged in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

50.

During at least 2002 to 2006, in doing the acts herein alleged, the Defendant NORTHROP officers, agents and employees have acted in their respective capacities as officers, agents or employees of Defendant NORTHROP, in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

51.

In the event that the United States Government pursues recovery for any of the false claims by Defendant NORTHROP, through any alternative remedy available to the United States Government, including any administrative proceeding or disposition, Coplaintiff and Relator shall have the same rights thereto as Coplaintiff and Relator would have had under the False Claims Act, including awards, attorneys fees, expenses and costs, pursuant to the False Claims Act, 31 U.S.C. § 3730(c)(5).

WHEREFORE, Plaintiff prays for judgment against Defendant NORTHROP GRUMMAN CORPORATION as follows:

(1) Restitution to the United States Government of the damages sustained from false claims by Defendant Northrop Grumman Corporation for payment by the United States Government, according

to proof at the time of trial, pursuant to 31 U.S.C. § 3729 et seq.

(2) Statutory three times the damages sustained from the false claims by Defendant Northrop Grumman Corporation for payment by the United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3729(a);

(3) Statutory civil penalty of not less than $5,000 and not more than $10,000 for each and every invoice false claim by Defendant Northrop Grumman Corporation for payment under United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3730(d);

(4) Statutory awards, attorneys fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

(5) Such other and further relief as the Court deems just and proper.

REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, request is hereby made for trial by jury.

Dated: June 8, 2006

PACE AND ROSE

By

Dean Francis Pace
Attorneys for Coplaintiff