FILED

2012 SEP -5  AM 10: 47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1   Dean Francis Pace (SBN 031809)
    Allan J. Graf (SBN 057148)
2   CARLSMITH BALL LLP
    Suite 2900
3   515 South Flower Street
    Los Angeles, CA 90071-2901
4   Telephone: 213.955.1200
    Facsimile:  213.623.0032
5   Email: falseclaimsact@carlsmith.com

6   Attorneys for Coplaintiff Relator

7

8                   UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA        CIVIL ACTION CV06-3614 ODW(FMOx)
    EX REL. STEVEN MATESKI,
12

13

14                                        FOURTH AMENDED
15                                          COMPLAINT
                                         FOR VIOLATIONS OF
16           Plaintiff,                    FALSE CLAIMS ACT
                                        31 U.S.C. § 3729 ET SEQ.
17  v.

18  RAYTHEON COMPANY,

19

20                                    REQUEST FOR TRIAL BY JURY

21           Defendant.

22

23        NOW COMES PLAINTIFF and alleges against Defendant RAYTHEON

24  COMPANY.

25                       FIRST CAUSE OF ACTION

26               VIOLATIONS OF FALSE CLAIMS ACT

27                      BY RAYTHEON COMPANY

28

1.

## JURISDICTION

Jurisdiction is predicated upon federal subject matter jurisdiction pursuant to Title 31 U.S.C. of the False Claims Act, 31 U.S.C. § 3729, 3730 and 3732(a), and 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

2.

## VENUE

Venue in the United States District Court for the Central District of California is predicated upon 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c). Defendant RAYTHEON COMPANY ("RAYTHEON"), the entity charged herein with violations of the False Claims Act, 31 U.S.C. § 3729 et seq., now and at all times alleged herein had its place of business in the Central District of California in El Segundo, California. The violations of the False Claims Act, 31 U.S.C. § 3729 et seq., alleged herein occurred in the Central District of California. Plaintiff has sustained the damages for violations of the False Claims Act, 31 U.S.C. § 3729 et seq., alleged herein within the Central District of California.

3.

## PARTIES

The Plaintiff is the United States of America and the Coplaintiff Relator Steven Mateski ("MATESKI"). Coplaintiff Relator MATESKI now and at all times alleged herein is a resident in the Central District of California. From 1985 to 1995 by NORTHROP and from 1997 to 2006 by Defendant RAYTHEON, which acquired Hughes Aircraft Company, MATESKI has been employed as a Manufacturing Planner Engineer.

Defendant RAYTHEON was and at all times alleged herein is a corporation which is qualified to do business and doing business in the State of California, with the Raytheon Space and Airborne Systems ("SAS") in El Segundo, California, and

the Raytheon Vision Systems and Santa Barbara Remote Sensing ("RVS" and "SBRS") in Goleta, California, as subcontractor to design, develop and produce seven flight units of the Visible Infrared Imaging Radiometer Suite ("VIIRS"), which is a component of the National Polar-Orbiting Operational Environmental Satellite System ("NPOESS") for the prime contractor Northrop Grumman Corporation ("NORTHROP").

4.

STANDING OF RELATOR TO SUE AS ORIGINAL SOURCE.

Coplaintiff Relator MATESKI has standing to sue pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1). Coplaintiff Relator MATESKI is the Original Source of all the false claims by Defendant RAYTHEON pursuant to the False Claims Act, 31 U.S.C. § 3730(e)(4)(A), on grounds that MATESKI had direct and independent knowledge of the false claims by Defendant RAYTHEON which he acquired during the course of his employment at Defendant RAYTHEON. Before filing the Qui Tam action, Coplaintiff and Relator MATESKI first repeatedly revealed the RAYTHEON false claims inter alia by communications with RAYTHEON VIIRS executives inter alia John Bouregy, Program Manager, Bernard Malis (Retired), Manager of Manufacturing, Thomas James (Retired), Engineering Authority, Ronald Estes, Test Director and Lead Engineer, Michael Haley, Operations Manager, Eugene Jaramillo, Head of Quality Assurance, Steven Adams, Configuration Management, and Cledith Davis, Program Quality Assurance. Disclosure with particularity by the Coplaintiff Relator has been made during three conferences each attended by at least fifteen top Executives, Engineers and Special Agents from DOJ, DOC NOAA, DOD and NASA in Los Angeles, California on July 14, 2006, February 15, 2007 and March 9, 2007, and in Supplemental Disclosure Statements to the Department of Justice dated September 21, 2006, September 26, 2006, October 5, 2006, October 10, 2006, January 9, 2007,

March 26, 2007 (2), April 25, 2007, July 2, 2007, July 12, 2007, September 5, 2007, April 28, 2008, August 21, 2008, April 23, 2010, July 7, 2010, March 7, 2011 and January 31, 2012.

5.

## VIOLATIONS OF THE FALSE CLAIMS ACT
## BY DEFENDANT RAYTHEON COMPANY

The False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B) provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, presents, or causes to be presented, a false or fraudulent claim to the United States Government for payment or approval, or who makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $11,000 for each claim, plus three times the amount of the damages sustained by the United States Government. The 1986 and 2009 amendments to the False Claims Act legislate, to wit:

1986 § 3729.  False Claims

(a) LIABILITY FOR CERTAIN ACTS. - Any person who -

 (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

 (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

2009 § 3729.  False Claims

(a)  LIABILITY FOR CERTAIN ACTS

 (1)  IN GENERAL. --Subject to paragraph (2), any person who--

1    (A) knowingly presents, or causes to be presented, a false or fraudulent

2    claim for payment or approval;

3    (B) knowingly makes, uses, or causes to be made or used, a false

4    record or statement material to a false or fraudulent claim;

5    Because RAYTHEON delivered the first flight VIIRS S/N002 to

6 NORTHROP in January, 2010, the aforesaid 2009 Amendment to the False Claims

7 Act applies to the VIIRS False Claims by RAYTHEON.

8    6.

9    Since the 1960s, the United States operational polar-orbiting meteorological

10 satellite program has been a complex infrastructure encompassing two satellite

11 systems, the Polar-orbiting Operational Environmental Satellites ("POES")

12 managed by the Department of Commerce National Oceanic and Atmospheric

13 Administration ("NOAA"), and the Defense Meteorological Satellite Program

14 ("DMSP"), managed by the Department of Defense ("DOD"). The satellites carry a

15 suite of sensors that collect environmental data to generate graphical weather

16 images and specialized weather data for forecasters, the military, and the public.

17    7.

18    Under a shared agreement among four satellite data processing centers, the

19 NOAA National Environmental Satellite Data and Information Service

20 ("NESDIS"), the Air Force Weather Agency, the Naval Fleet Numerical

21 Meteorology and Oceanography Center, and the Naval Oceanographic Office,

22 different centers are responsible for producing and distributing, via a shared

23 network, different environmental data sets, specialized weather and oceanographic

24 products, and weather prediction model outputs. For the DOD centers, the users

25 include regional meteorology and oceanography centers, as well as meteorology

26 and oceanography staff on military bases. NESDIS forwards the data to the NOAA

27 National Weather Service for distribution and use by government and commercial

28

1   forecasters.

2                                      8.

3        There have been operational POES satellites and operational DMSP satellites

4   that are positioned so that they can observe the earth in early morning, mid-

5   morning, and early afternoon polar orbits. Together, they ensure that for any region

6   of the earth, data are no more than six hours old. There are an estimated 150 field

7   terminals operated by the United States (including battlefields and ships) and

8   foreign governments and academia, which are able to receive weather data directly

9   from the polar-orbiting satellites.

10                                     9.

11       On May 5, 1994, Presidential Decision Directive NSTC-2, Convergence of

12  U.S. Polar-orbiting Operational Environmental Satellite Systems, required that the

13  POES and DMSP programs be converged into the National Polar-orbiting

14  Operational Environmental Satellite System ("NPOESS").

15                                     10.

16       The National Polar-Orbiting Operational Environmental Satellite System

17  ("NPOESS") is the low-earth-orbit environmental satellite system which is

18  composed of a single satellite, sensors, a ground-control system and a data

19  processing and dissemination network. NPOESS was created to provide civilian,

20  military and scientific communities with regional and global meteorological data,

21  oceanographic, environmental, climatic, and space environmental remote sensing

22  information, surface data collection and search and rescue capabilities.

23                                     11.

24       The NPOESS relied upon three critical sensors, the Visible Infrared Imaging

25  Radiometer Suite ("VIIRS"), and the Cross-Track Infrared Sounder ("CRIS") and

26  the Conical-Scanned Microwave Image/Sounder ("CMIS"). The Visible Infrared

27  Imaging Radiometer Suite ("VIIRS") for the NPOESS was created to collect

28

visible/infrared imagery and radiometric data on the atmosphere, clouds, earth radiation budget, clear-air land/water surfaces, sea surface temperature, ocean color, and low-light visible imagery.

12.

Until 2010, the NPOESS tri-agency Integrated Program Office ("IPO") was comprised of the Department of Defense ("DOD"), the National Oceanic and Atmospheric Administration ("NOAA") in the Department of Commerce ("DOC"), and the National Aeronautics and Space Administration ("NASA") that was engaged in the combination of the two current satellite systems into a single environment monitoring satellite system called the National Polar-orbiting Operational Environmental Satellite System ("NPOESS"), which was created for weather forecasting and strategic global climate monitoring through the year 2020.

13.

Until 2010, within the NPOESS IPO, NOAA, DOD and NASA had the lead on certain NPOESS activity. NOAA had overall program management responsibility for the converged system and for satellite operation. The DOD USAF Space and Missile Systems Center had the lead on the acquisition and contract management. NASA had primary responsibility for facilitating the development and incorporation of new technologies into the converged system. NOAA and DOD have shared the costs of funding NPOESS, while NASA has funded specific technology projects and studies.

14.

Until 2010, overall NPOESS program oversight was assigned to an executive committee ("EXCOM") composed of the top officials from each of the IPO agencies: the Under Secretary of Commerce for Oceans and Atmosphere, the Under Secretary of Defense for Acquisition and Technology, and the NASA Deputy Administrator. In November 2005, the NPOESS EXCOM established a Program

Executive Office ("PEO") to independently oversee the IPO and conduct an ongoing independent analysis and review of the NPOESS program.

15.

On February 1, 2010, the White House announced the cancellation of NPOESS which has been plagued with technical underperformance, cost overruns and six years delays, whereby there will be resort to the preexisting DOD and DOC NOAA polar-orbiting satellites to serve military and civilian requirements. DOD will continue the Defense Meteorological Satellite Program (DMSP) of morning polar-orbiting satellites. Under the management of NASA, the DOC NOAA new Joint Polar Satellite System (JPSS) afternoon polar-orbiting satellites are scheduled for launch in 2015 and 2017.

16.

Delays and cost overruns and the RAYTHEON false claim defective nonconformances have delayed the NPOESS VIIRS launch six years to 2011 and caused the termination of Flights 2, 3 and 4 NPOESS VIIRS launches. VIIRS itself was six years behind schedule, and at least 30% overrun, and has caused over 60% of the NPOESS contract overrun. The VIIRS sensor has "bedeviled the program" of NPOESS by the RAYTHEON false claims alleged with particularity hereinafter, summarily including without limitation:

(1) During three conferences each attended by at least fifteen top Executives, Engineers and Special Agents of DOD, DOC NOAA, NASA and DOJ, travelling from Washington, D.C. to Los Angeles to confer with the Coplaintiff Relator MATESKI, there was "serious concern" over the VIIRS false claims by RAYTHEON as alleged with particularity hereinafter.

(2) At a conference with Coplaintiff Relator and at least fifteen top Executives, Engineers and Special Agents from DOD, DOC NOAA, NASA and DOJ in Los Angeles, California on February 15, 2007, the NASA ESD Exposure

Expert Michael Sampson interrogated the Coplaintiff Relator for six hours on the VIIRS false claims by RAYTHEON and concluded, to wit: "Mateski knows what he is talking about, has the documents to support what he is talking about, and the ESD Exposure is catastrophic."

(3) At a conference by the Coplaintiff Relator with DCMA and DCIS, NASA and OSI Special Agents at the USAF Air Force Base in El Segundo, California, on October 6, 2011, DCMA Engineer Robert G. Duarte ("DUARTE") concluded, to wit: "The sheer volume of the number of incidents marks this case especially the failure to test and prohibitive materials as one of out and out fraud." DUARTE further inquired why it took three years to grant a NPOESS VIIRS waiver and why $50 million was demanded for what was already required in the VIIRS Statement of Work.

(4) The RAYTHEON First Flight VIIRS (S/N 001) was so defective that it has been downgraded and relegated to a nonflight nonentity. The Second Flight VIIRS (S/N 002) is now the First Flight VIIRS, whereby the VIIRS FPIE has been delivered by RAYTHEON El Segundo  to NORTHROP in January 2010. Production on the VIIRS Second Flight (S/N 003) and Third Flight (S/N 004) at RAYTHEON El Segundo with all the false defective nonconformances alleged with particularity hereinafter was terminated completely in July, 2006. The RAYTHEON VIIRS the latent defective nonconformances in VIIRS Flights 2, 3 and 4 would compromise the NPOESS mission assurance, and cause the NPOESS mission degrade or failure, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(5) Failure of the VIIRS DNB (Day/Night Band Module) causes the loss of down-looking low-light visible imagery visual confirmation as well as across the event-horizon, in effect blinding the NPOESS telescope, thereby compromising the NPOESS/VIIRS System integrity and mission assurance.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

(6) A VIIRS Latent Failure was documented after Integration at Ball Aerospace while performing Final Acceptance Testing at the Space Craft Level. VIIRS sensors are designed to measure at least 22 different parameters including (DNB) Day-Night Band, ice cover, cloud cover, and forest cover. VIIRS does not accurately report ocean color, because one of the responsible filters is defective. Ocean color data is critical for measuring primary productivity and sedimentation, among other things. After a failure with the filter on one of NPOESS sensors VIIRS, that if the problem is not fixed, a data gap will emerge in the time series of ocean color data. There are visible channels, whereby a filter failure will prevent VIIRS from accurately measuring ocean color, i.e., a failure to measure the spectra as well as distort the accuracy of the results, thereby compromising the NPOESS VIIRS System integrity and mission assurance.

(7) On October 28, 2010, the NPOESS VIIRS, renamed SUOMI in 2012, was launched in spite of NASA warnings of defects in all 32 NPOESS 100 Level Sensors and Subsystem Units that will cause the planned useful life in space of 7 years to be 5 years with several NASA engineers predicting 3 years VIIRS useful life. The NPOESS VIIRS space flight has already experienced at least two In Orbit shutdowns and failure bands of data transmission, as predicated by NASA report one month before launch in September, 2010, as alleged with particularity hereinafter.

17.

The RAYTHEON VIIRS Subcontract 65349DGE2S and the Statement of Work for the VIIRS Day/Night Band Module Assembly, P/N 417350-100, are incorporated herein by reference, including the reference documents and revisions herein, including without limitation:

(1) NPOESS General Instrument Interface Document NGIID D31418.

(2) Integrated Master Plan (IMP) PDM# Y0013233-0004.

(3) Integrated Master Schedule (IMS), PDM# Y0013234.

(4) Quality Requirements (QR), PDM# Y0013221.

(5) Quality Control Plan, PDM# Y1433.

(6) SBRS Reliability Program Plan for NPOESS/VIIRS, #Y3584.

(7) SBRS Configuration Management Plan for NPOESS/VIIRS, #Y6445.

(8) Approved Materials and Process List, AMPL154640.

(9) Approved Parts List (EEE) VIIRS, APL154640.

(10) Structural Production Specification, PS154640-111.

(11) Thermal Product Specification, PS154640-112.

(12) Electronics Module, Product Specification for Visible/Infrared Imager Radiometric Suite, PS154640-114.

(13) Contamination Control Plan, PS154640-132.

(14) Process Specification for Packaging, Handling, and Storage of VIIRS Modules, PS154640-730.

(15) FPIE Assy Interface Control Document (ICD), 421310-500.

(16) Focal Plane Assy - DNB FPA ICD, 417360-500.

(17) DNB Module Electrical ICD, 417350-500.

(18) RP 10-001 Electro Static Discharge (Ref: PS154640-132)

(19) TP 154640-760 Functional Acceptance Testing.

(20) TP 154640-762 DNB "Cold" Acceptance Testing.

(21) TP 154640-764 Vibration Acceptance Testing.

(22) PS 154640-101 DNB Performance Specification.

(23) PS154640-124 EMI/EMC Susceptibility Specification.

(24) PS154650-126 EMI/EMC Susceptibility Specification.

(A) When Prime Contractor NORTHROP was awarded the NPOESS prime contract, NORTHROP worked together with the government agencies including DOC NOAA, DOD, NASA and NPOESS IPO, to generate NPOESS Government

requirements together with NPOESS Program Quality Requirements into a specification known as the NPOESS General Instrument Interface Document (NGIID D31418). That NPOESS NGIID program governing specification was all encompassing delineating critical NPOESS contractual requirements for Build-up of Circuit Cards and Units, Unit Integration, Quality Control, Spacecraft Reliability, Configuration Control, Approved Parts, Materials, and Processes to be used, (as well as Prohibited Parts, Materials, and Process not to be used), Structural and Thermal Requirements, Packaging, Handling, and Transporting of Units and assemblies throughout the build process to delivery, as well as a Contamination Control Plan which also governed Electro-Static Discharge Exposures. The NGIID specification was created to ensure subcontractors, including RAYTHEON, would have clear direction of NPOESS contractual requirements as flowed-down from the Government and NORTHROP Prime Contractor by written documentation, namely the NGIID specification.

(B) By the time the NPOESS VIIRS subcontract had been awarded to RAYTHEON, a Revision A of the NGIID (NGIID D31418, Revision A) had been written and flowed-down to Subcontractor RAYTHEON encompassing a Final Requirements version of the NGIID which was used by RAYTHEON in the authorship of their internal RAYTHEON documents to be used at RAYTHEON facilities for NPOESS VIIRS hardware production, testing, and delivery to Prime Contractor NORTHROP.

(C) The NGIID D31418, Revision A document was the version of the NGIID by which RAYTHEON did deliver all NPOESS VIIRS (albeit in defective noncompliance) under Subcontract 65349DGE2S for 32 NPOESS 100 Level Major Subsystem Senor Units, as follows:

421310-100, 414505-110, 416960-100, 415652-100,
415695-100, 415620-100, 415655-100, 415650-100,

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

1   415640-100, 414505-100, 415750-1 (2 Units), 415750-2 415660-100,

2   415630-100,415670-100, 415709-100,

3   415701-100, 415700-100, 415610-100, 415680-100,

4   415690-100, 417350-100, 417700-110, 417680-110,

5   418200-110, 418300-110, 418000-110, 418700-110 (Numerous Sub-Assys

6   FU1-6 Units), 426300-100, 426350-100,

7   418700-110, 414505-110, 414505-110.

8   (D) The Statement of Work for the VIIRS Day/Night Band Module

9   Assembly, P/N 417350-100 was but one of a total of 32 NPOESS 100 Level

10   Subsystem Sensors required to be produced and tested by RAYTHEON NPOESS

11   governing documents to comply with NGIID D31418, Revision A.

12                                    18.

13                  VIIRS NON-FLIGHT FPA EDU2, FPIE AND DNB

14              FLIGHT UNIT NONCONFORMANCE CHRONOLOGY.

15   One of the "Quality Findings" during the first CTI meeting held July 30,

16   2004 was the discovery that RAYTHEON Test Specifications TP154640-760

17   (Functional Acceptance Testing) and    TP154640-764 (Vibration Acceptance

18   Testing) were not "Baseline" released, and the RAYTHEON STE (Special Test

19   Equipment) Rack had not been pre-qualified prior to hook-up and use in

20   Acceptance Testing of VIIRS Flight hardware in violation of VIIRS Program

21   Quality Requirements. It was during this subsequent STE Qualification that the

22   VIIRS integrity exposures occurred.

23   During one of the Cold-Box (Dewar) STE Qualification tests, it was

24   necessary to configure the Downgraded Non-Flight FPIE Emulator (S/N 001) and

25   the Non-Flight FPA EDU2 (Engineering Demonstration Unit #2) in combination

26   into the Cold-Box (Dewar) in a simulated DNB Flight configuration. The Non-

27   Flight FPA EDU2 rigid-flex cable is approximately 2.00" shorter than the Flight

28

version. This caused excessive strain to be placed on the rigid-flex cable while stretching to make the mate with the FPIE Emulator J1 and J2 Connectors. Later this same strain would be placed on the FPIE Flight Unit and would become the source of damage to the FPIE Chassis Mounting Feet (bent while mounting Rigid Flex Cables).

The FPA EDU2 (Engineering Demonstration Unit #2) had not been assembled as a Flight Unit and was missing the Connector Backshells, it was instead potted as a means of electrical isolation and was a very poor means of mechanical protection against shorting when mating.

As strain was applied during mating, internal pins broke at the FPA EDU2 potted Connectors causing a dead short to occur. The power was switched on and the Downgraded Non-Flight FPIE Emulator and FPA EDU2 Unit circuits were subjected to a dead-shorted condition. Several subsequent analysis tests were performed to determine if the Non-Flight FPIE Emulator circuits had suffered damage. There is no test to determine if a latent defect will manifest itself later.

The VIIRS FPA EDU2 unit was removed and sent to RVS/SBRS (RAYTHEON Vision Systems/Santa Barbara Remote Sensing in Goleta, California) for repairs. Clifford Nichols - RVS Systems Engineer, informed Relator MATESKI that RVS/SBRS had replaced the 100 pin Connector and the 51 pin Connector. When asked why there were no Backshells to protect the Connector pins from breaking and/or shorting, Clifford Nichols replied, "This is the way we've done it for 25 years, we're not going to change now."

Relator MATESKI went to Ronald Estes, RAYTHEON El Segundo Lead Engineer, and demanded he use his authority to have the Backshells installed on the FPA EDU2 Unit in RAYTHEON (RVS) in Goleta, as RAYTHEON El Segundo had just rebuilt all the sub-standard STE cables at tremendous VIIRS Program expense to ensure that this sort of failure would not happen in Acceptance testing.

Ronald Estes, RAYTHEON Lead Engineer in El Segundo, agreed and asked Relator MATESKI to put it in writing, and send it in an Email to him. He agreed to forward it through channels to Clifford Nichols - Lead Engineer RAYTHEON (RVS) Goleta, who finally agreed to install the Backshells.

Clifford Nichols called to inform Relator MATESKI that RAYTHEON (RVS) in Goleta was about to return the FPA EDU2 Unit to RAYTHEON El Segundo. When asked if RAYTHEON (RVS) had buzzed-it-out to determine if any damage had occurred when the pins were shorted together, Clifford Nichols responded that limited probing had been performed but he was not certain what the results meant, and agreed to do some additional point-to-point probe testing. Subsequently a dead short to ground was found and a decision was made to isolate the stage 1B right and left circuits by removing the wire bonds (2 places) at the flex cable to Interface Circuit Board (ICB). When this was done, the dead short was gone, but so was the capability to Acceptance Test the VIIRS FPIE Flight 1 Unit stage 1B right and left gates.

The 421310-100 S/N 002 FPIE Flight 1 Unit was never tested on these circuits. Authorization for the use of this Non-Flight FPA EDU2 Unit (with a non-functioning Stage 1B right and left) for Acceptance Testing of Flight Hardware is not documented anywhere on the VIIRS Flight FPIE book, is prohibited by the VIIRS Program Quality Requirements and Test Procedures.

The RAYTHEON excuse was that the VIIRS FPIE Flight 1 Unit would be tested at the Next Assembly when the Unit is installed in the spacecraft and all system testing gets repeated. To date, and since the rebuild, the VIIRS FPIE (S/N 002) Flight 1 Unit has never had the "Cold" Acceptance Test performed in conjunction with and using a Flight Quality FPA Unit. The VIIRS FPIE/FPA tuning data must be performed as a "Matched Pair" for optimal system performance. If it performs poorly and has to be returned to RAYTHEON El

Segundo for retuning (3-6 month delay minimum),  RAYTHEON will not know this until the VIIRS FPIE/FPA is tested at the spacecraft because this testing was never conducted at the lower DNB (FPIE/FPA) level as required. The reason the Flight FPA was not available, is because the RAYTHEON VIIRS FPIE Flight 1 Unit was rejected in the first attempt at CTI sell-off and delivery. The Flight FPA was integrated into the Next Assembly so the spacecraft could proceed forward while the VIIRS FPIE Flight 1 (S/N 002) Unit was to be rebuilt and retested (all at NPOESS/VIIRS Program expense). The 421310-100 FPIE Flight 1 (S/N 002) Unit has not been tested to the VIIRS Flight (DNB) requirements as defined in TP154640-762, Revision A.

Undisclosed during the IPO and Aerospace Corporation VIIRS review on August 29-30, 2006, RAYTHEON Goleta (RVS) reopened the VIIRS FPIE for retuning and has requested resister selects from RAYTHEON El Segundo, which invalidates the cleaning, bake-out, and all prior VIIRS Lower Level Unit Acceptance Testing, including ambient performance test, protoflight vibration test, and protoflight thermal cycle test at RAYTHEON El Segundo.

19.

RAYTHEON VIOLATIONS OF THE FALSE CLAIMS ACT.

From 2002 to at least 2012, at RAYTHEON El Segundo and Goleta, Defendant RAYTHEON inter alia John Bouregy, Program Manager, M. Pavloff, Program Manager, Ronald Estes, ELS Lead Engineer and Test Director, Michael Haley, Operations Manager, Eugene Jaramillo, Head of Quality Assurance, Thomas James (Retired), Responsible Engineering Authority, Cledith Davis, Program Quality Assurance, Timothy Kilduff, Test Technician, Mario Farr, Shop Supervisor, Bernard Malis (Retired), Manager of Manufacturing, Clifford Nichols, RVS Systems Engineer, Robert Wong, Design Engineer, Mark Ross (Ex-employee), ELS Quality Assurance, Steven Adams, Configuration Management,

Marilyn Medel, RVS Quality Assurance, Richard Julien, RVS Lead Engineer, John Clement, RVS Systems Engineer, Richard Murth, Components Engineer, knowingly in deliberate ignorance and reckless disregard has caused NPOESS/VIIRS false claims, false statements, and false records, which compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure. After RAYTHEON falsely presented claims and received payment by the United States Government for its defective nonconformance workmanship on NPOESS VIIRS, instead of repair or retrofit, RAYTHEON created false waivers of the VIIRS specifications and requirements, alleged with particularity hereinafter.

20.

FALSE RAYTHEON RECKLESS DISREGARD OF SPECIFICATIONS AND REQUIREMENTS RE PROHIBITIVE MATERIALS HAS CAUSED NPOESS SPACE SHUT DOWNS AND ON ORBIT FAILURE ANOMALIES.

Specifications: RAYTHEON CAGE Code 4U884 PS154640-132 Contamination Control Plan and the NPOESS Program Directive NGIID D31418, Revision A.

False Defective Nonconformance: NPOESS VIIRS has 22 Bands including 16 moderate resolution bands (M-bands), 1 sensor (detector) DNB, and 5 imagery bands (I-bands). Band Performance Problems such as early saturation, Near Field Response, Stray Light Rejection, Optical and Dynamic Cross-Talk effects, Ghosting, and many other failures including Band Degradation trending were causing RAYTHEON to seek relief from NPOESS Performance Requirements and Specifications via Waivers for Bands (M1, M2, M5, M6, M7, M8, M11, M12, M13, M14, and Band Pairs I5-I1, I5-I2, and I5-I4) both for current performance as well as end of life where it was known VIIRS will not meet specification based on the already known trending of Band Degradation. VIIRS Band Failures were already well known by RAYTHEON by May 2008, over three and a half years

prior to launch as these were documented in the Oudrari Report where at least 14 of the 22 Bands were operating at nominal or below specification with little or no margin for error as admitted by RAYTHEON. Performance Non-Compliance Waivers including RDW_VIIRS-W024, RDW_VIIRS-W043, RDW_VIIRS-W044, RDW_VIIRS-W046, RDW_VIIRS-W049, RDW_VIIRS-W050, RDW_VIIRS-W051, RDW_VIIRS-W052, RDW_VIIRS-W053, RDW_VIIRS-W054, RDW_VIIRS-W056, RDW_VIIRS-W057, RDW_VIIRS-W058, RDW_VIIRS-W060.

There have been at least two known NPOESS VIIRS On-Orbit shut down failures since launch, one attributed to the "Space Craft Buss", the other attributed to "Mirror Fouling" in the telescope and mirror cavity. Latent defect Prohibited Materials (pure tin, electro-deposited nickel plating) and/or a latent defects such as a key component exposed to ESD stray voltages during build cause "shorting" or "open" conditions that would shut-down the Buss Power to protect the systems. NASA reported that the other On-Orbit failure due to mirror fouling was caused by Tungsten-ion contamination which caused mirror reflective surfaces to "darken" and act as a filter instead of a mirror, causing severe band(s) degradation.

One of the two or more known NPOESS VIIRS On Orbit Failure Anomalies caused NASA scientists to panic and caused the Program Operator to immediately shut-down spacecraft functions, stow equipment, and rotate the spacecraft into survivability mode (sun-pointing safe mode) to prevent further, and feared, total loss of the VIIRS units while the anomaly was studied. In less than the first 100 days of orbit, it had been observed that an accelerated Degradation of Band Performance was occurring, so rapid as to cause Bands I2, M5, M6 and M7 to degrade 20% or more (Status_LANCE_Gleason.pptx VIIRS Anomaly slides 8, 9, and 10). The Guenther_VIIRS_Performance_JACIE_ SPIE.final_.pdf Final Analysis report of the VIIRS On Orbit Anomaly determined that the mirrors had

been coated or exposed to a source of Tungsten ion contamination during the coating process where VIIRS was "Sensitive to UV exposure, and may degrade to about 65% of at-launch throughput." Several other government and university reports support these findings as well. A simple extension of the Band Degradations graphs demonstrates that the VIIRS Unit On Orbit performance is failing and degrading rapidly and can be determined to be over 40% degraded at this time and will likely continue to degrade through complete failure. The Relator alleges that the sources of mirror contamination are caused by an early RAYTHEON error whereby a base plate was constructed using Tungsten material, and subsequently redesigned using Aluminum. RAYTHEON later sought relief for Band-to-Band registration errors as a result of the Tungsten base plate which had now been replaced with an Aluminum base plate on RAYTHEON VIIRS RDW_W-024 waiver. The Relator further alleges that other sources of mirror contamination were caused by outgassing of latent prohibited materials, ionization of those materials as struck by light photons, and then redeposition of electrically charged contaminants on mirror surfaces. These latent prohibitive materials would consist of exfoliated (electrodeposited) Nickel plating, adhesives residue, Tungsten oxide fillers in bonding epoxies, and several other latent Prohibitive Materials alleged with particularity hereinafter.

NASA has used "Blended Data" images composed of data overlays from several other sensors including data from other satellites whereby NASA has been superimposing and creating images to appear that all is well with the NPOESS VIIRS sensor. The images that are put forth to the public and grand-standing VIIRS successes, have been created using just 3 bands MO3, MO4 and MO5 in Red, Green, and Blue colors in the visible spectrum (RGB). NASA has a full-time laboratory as well as several universities, that create those images and openly admits the use of blended data to create NPOESS VIIRS images by laboratory staff.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21.

RAYTHEON FRAUDULENT SCHEME AND PROCESS OF

NONCOMPLIANCE WITH NPOESS VIIRS

SPECIFICATIONS AND REQUIREMENTS.

From 2002 to at least 2012, RAYTHEON has engaged in a fraudulent scheme and process of noncompliance with the NPOESS VIIRS specifications and requirements regarding at least thirty-two NPOESS VIIRS 100 level subsystem units and sensors, which were comprised of hundreds of unique VIIRS High Reliability electronic component part numbers and thousands of VIIRS High Reliability component parts, as alleged with particularity hereinafter, including without limitation:

A. THE RAYTHEON RECKLESS DISREGARD BY SYSTEMATICALLY PLACING VIIRS HIGH RELIABILITY COMPONENTS ON WAIVERS TO CIRCUMVENT DPA TESTING INCLUDED WITHOUT LIMITATION:

After RAYTHEON falsely presented claims and received payment by the United States Government for its defective nonconformance workmanship on NPOESS VIIRS, instead of repair or retrofit, RAYTHEON created false waivers of the VIIRS specifications and requirements.

(1) VIIRS Product Substitution by Placing VIIRS High Reliability Component Parts on Waivers to Circumvent the NGIID and Contamination Control Plan.

(2) Avoiding VIIRS High Reliability component DPA test by placing on waivers, specifically, at least thirty-two VIIRS 100 level subsystem units and NPOESS sensors, which were comprised of hundreds of unique VIIRS High Reliability component part numbers and thousands of VIIRS High Reliability component parts.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

(3) RAYTHEON had only one DPA Test Laboratory which was in El Segundo. RAYTHEON Goleta was required to send Lot Representative samples to El Segundo for VIIRS DPA High Reliability component testing to S1, S2 and S3, and/or R1, R2 and R3 screening levels, but did not do so.

(4) VIIRS DPA tests were attempted to be conducted by RAYTHEON after the High Reliability components were assembled into the VIIRS Units and NPOESS sensors.

(5) There was a RAYTHEON process failure to perform in compliance with the VIIRS NGIID resulting in a latent VIIRS system failure.

B. THE RAYTHEON-NORTHROP WAIVER PDM (PRODUCT DATA MANAGEMENT) PROCEDURE TO PROCESS VIIRS WAIVERS, INCLUDES THE UTILIZATION OF THE RAYTHEON ESIR FORM IN FOUR STAGES:

(1) CREATED: RAYTHEON writes a waiver and posts waiver in the RAYTHEON PDM system in CREATED status, and investigates to verify the nonconformance with the NPOESS VIIRS specifications and requirements. If RAYTHEON validates the nonconformance, then RAYTHEON proposes a solution on a written waiver. Then RAYTHEON changes the PDM waiver status to CONFIRM.

(2) CONFIRM: RAYTHEON enters the waiver and the proposed solution onto the ESIR form to notify NORTHROP of the nonconformance with the NPOESS VIIRS specifications and requirements. RAYTHEON formally sends the ESIR to NORTHROP both notifying and requesting relief from NPOESS/VIIRS specifications and requirements, specifically thirty-four waivers to date: D024, W005, W007, W020A, W021, W022A, W023, W024A, W026, W027, W028, W029, W031, W032, W033, W038, W039, W040, W041, W043, W044, W045, W046, W047, W048, W049, W052, W053, W055, W056, W057, W058, W059, W060. NORTHROP either accepts or rejects the RAYTHEON proposed solution.

Then NORTHROP has actual knowledge of the RAYTHEON admitted VIIRS defective nonconformance with the NPOESS/VIIRS specifications and requirements.

(3) IMPLEMENT: NORTHROP either accepts RAYTHEON proposed solution, or modifies RAYTHEON proposed solution, or rejects RAYTHEON proposed solution, via the ESIR concerning the RAYTHEON waiver of NPOESS/VIIRS specifications and requirements. If NORTHROP agrees with RAYTHEON proposed solution via the ESIR, RAYTHEON changes the PDM waiver status to IMPLEMENT.

(4) CLOSED: When the RAYTHEON VIIRS waiver is signed by NORTHROP and the GOVERNMENT, RAYTHEON changes the PDM waiver status to CLOSED.

NPOESS VIIRS FPA, FPIE DNB and other units waivers written by RAYTHEON and then RAYTHEON assumed the waivers were to be acceptable without prior customer approvals despite their severity, did continue to integrate hardware through final delivery, thereby RAYTHEON granted said waivers to RAYTHEON by forcing their NPOESS customer into the position of accepting said waivers in order to take possession of the VIIRS hardware just prior to delivery, too late to study, dispute, and/or review actual causes and NPOESS Program impact, despite the fact that the VIIRS hardware was and still is defective, does not meet contractual specifications and requirements, constitutes numerous Product Substitutions, which impair the NPOESS VIIRS Mission Assurance, and constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

C. RAYTHEON RECKLESS DISREGARD OF VIIRS WORK PERFORMED IN ADVANCE OF FORMAL RELEASED ENGINEERING DRAWINGS.

RAYTHEON directed employees to perform work prior to release of Engineering Drawings. Relator MATESKI had been asked on numerous occasions to "move-out" and begin work in advance of drawing release on both Flight and Non-Flight programs alike. Upon entering the VIIRS Program, Relator MATESKI discovered that many if not all of the STE cables and much of the STE equipment had been built and/or purchased without regard to a Base-line Drawing Release, using latent defect Prohibited Materials (include dangerous ESD hot-plastics), without design pre-approval, without a Planning Book, or Purchase Order trace. Planning books were dummied-up after-the-fact to match the hardware built once the drawing was released. When operating in this manner, it became impossible to perform a valid configuration check prior to Final Inspect and equally impossible to perform a true Inspection. The RAYTHEON use of contract job shopper Planners, poorly documented and/or convoluted Manufacturing Processes, constant rotation of Planners within assignments, willingness to take shortcuts when stopped for lack of documentation, and failure to provide closed-loop processes coupled with an inventory system and Shop Floor Router system that does not support Basic Manufacturing and Planning needs, has led to numerous Configuration Deltas on the VIIRS Program. These methods were also being employed on several other programs causing similar results. RAYTHEON calls it "Concurrent Engineering" where Engineering Design Drawings were not ready for release, but were released anyway without a formal drawing check process to obtain earned-value payments. Drawings were then constantly corrected on-the-floor in the shop labs using a Red-Line process (a process specifically prohibited for use on VIIRS) causing tremendous additional NPOESS VIIRS program expense and disruption while in the manufacturing cycle. The Engineering Designs are incomplete often forcing out-of-sequence manufacturing work-arounds and thereby compromised the entire NPOESS/VIIRS Unit/System integrity and mission assurance, and will cause the

NPOESS mission downgrade or failure, constituting Product Substitution, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

D. RAYTHEON RECKLESS DISREGARD OF VIIRS DRAWING TREE NONCONFORMANCES.

VIIRS assemblies are drawn on a single drawing despite the fact that many contain Sub-Assemblies or; "Make on Assembly" details which cannot be made as the Assembly is being built, as there is no lead-time allowance associated for these parts. As a result, several of these red-line changes that are not tightly controlled may slip through the cracks as they did on several APL-5 Programs including STSS, AVALON, VIIRS, and NPOESS VIIRS.

This red-line change method with embedded make on assembly components makes it nearly impossible to know if all engineering changes have been captured when the drawing finally rolls to the next revision as all hardware on the DWG, will by default, appear to comply with the new DWG Revision. In Reckless Disregard of Configuration Control Requirements,  it became  impossible for RAYTHEON to demonstrate the pedigree of NPOESS VIIRS in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

E. On August 29-30, 2006, at RAYTHEON Goleta (RVS), the NPOESS Integrated Program Office (IPO) and the Aerospace Corporation Eric Richter, Christopher Pate, and Melvin Cohen, conducted a technical review of the RAYTHEON VIIRS Subcontract 65349DGE2S, with NORTHROP Lead Rick Ikemoto and Billy Callin, as requested by Brig. Gen. Susan K. Mashiko, NPOESS Deputy Systems Program Director. In deliberate ignorance and reckless disregard, RAYTHEON inter alia John Bouregy, RVS Program Manager, Eugene Jaramillo, Program Quality, Mike Haley, Operations Manager, Marilyn Medel, RVS Quality, and Robert Rodau, ESD Engineer, made false statements and created a false record

by the deliberate concealment by RAYTHEON of the VIIRS defective nonconformances with the VIIRS/NPOESS contract specifications, thereby constituting an additional RAYTHEON false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(2), and § (a)(1)(B).  In Deliberate Ignorance and Reckless Disregard, concealed that in another room, RAYTHEON had disassembled the FPIE, which inter alia invalidated all FPIE testing, thereby constituting defective nonconformances with NPOESS VIIRS FPA, FPIE and DNB contract specifications and requirements, which impair the NPOESS/VIIRS Mission Assurance and constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2) and § (a)(1)(A) and (B).

F. RECKLESS DISREGARD BY RAYTHEON OF FALSE FLIGHT AND GSE/STE NONCOMPLIANCE WITH NPOESS VIIIRS SPECIFICATIONS AND REQUIREMENTS.

(1) **FLIGHT:** In Reckless Disregard, RAYTHEON deliberately failed to rectify ESD exposures in disregard of existing specifications and requirements on FLIGHT units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A and Rev B, and Raytheon ESD document RP 10-001 (in El Segundo) and SP80207 (in Santa Barbara) by reviewing the planning BHBs (Build History Books) for the location of the assembly labs where the work was performed. FLIGHT labs must have ESD certifications for humidity, temperature, and in most cases Clean-Room particle counts recorded prior to and during performance of work, to be aware of Ultra-Static Sensitive Components and Devices sensitive to less than 100 volts ESD exposure. That was not specifically identified on the design drawings and assembled in labs where benches were certified and identified to protect to the level of maximum withstand voltage so that components will remain free of latent defect exposure conditions.

**(2) GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify ESD exposures in disregard of existing specifications and requirements on GSE/STE units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A, and RAYTHEON ESD document RP 10-001 (in El Segundo) and SP80207 (in Santa Barbara) by reviewing the planning BHBs (Build History Books) for the location of the assembly labs where the work was performed. GSE/STE: labs must have ESD certifications on humidity, temperature, Clean-Room particle counts recorded prior to and during performance of work. GST/STE units that come into contact with FLIGHT hardware must also be clean and free of prohibited materials and processes where ESD or latent defect cross-contamination may occur and result in FLIGHT unit damage.

**(3) FLIGHT:** In Reckless Disregard, RAYTHEON deliberately failed to rectify prohibited materials and processes used in disregard of existing specifications and requirements on FLIGHT units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A and Rev B by reviewing the Lot Trace documents, first from each kitted assembly, and next by reviewing the component receiving documents and their subsequent in-house DPA lab reports requirement for special attention to the dates components were consumed into kits, the lack of QCHR (Quality Control History Record) liens which should have been entered into the back of the planning build books at the time of issue into kits if components were not yet qualified but were to be used as a trace record of "at risk" conditions where possible later unqualification might require subsequent removal from the units. Those conditions were not documented (as they should have been) but were identified on RDWs after the filing of this case where RAYTHEON sought exoneration and relief from false claims via the waiver process.

**(4) GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify prohibited materials and processes used in disregard of existing

specifications and requirements on Test Rack GSE/STE units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A and Rev B. GST/STE consists of cables, connectors, connector savers, test racks and test rack units, packaging, handling, and transport containers and equipment sufficient to ensure protection of  VIIRS FLIGHT and GSE/STE units throughout the manufacturing process and cycle through delivery to end use. GST/STE units that come into contact with VIIRS FLIGHT hardware must also be clean and free of prohibited materials and processes where cross-contamination occurs.

(5) **FLIGHT:** In Reckless Disregard, RAYTHEON deliberately failed to rectify Lack of Two-Way Trace of Components and/or commingled Flight/Non-Flight components used on Flight units in disregard of existing specifications and requirements on FLIGHT units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A, by reviewing the Lot Trace documents, first from each kitted assembly, and next by reviewing the component receiving documents and their subsequent in-house DPA lab reports.

(6) **GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify Lack of One-Way Trace of Components (at a minimum) used on GSE/STE units in disregard of existing specifications and requirements on VIIRS FLIGHT units as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A, by reviewing the Lot Trace documents, first from each kitted assembly, and next by reviewing the component receiving documents. Flight components and materials may be used to assemble GSE/STE equipment where it is cost-effective to do so.

(7) **FLIGHT:** In Reckless Disregard, RAYTHEON deliberately failed to rectify Matched Pair Test Requirements where multiple subassemblies are required to be tested in the "as flown" configuration in Final Acceptance Testing as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A, to

record Serial Numbers of specific subassemblies wherein these same serialized subassemblies and units shall continue throughout Final Acceptance Testing uninterrupted up to and including integration onto the spacecraft. Units that drop-out shall either be repaired and/or replaced and new Final Acceptance Testing shall start over (shall not resume where left off). Units may not be "tuned" or "opened" during or after testing unless "such tuning is part of the test and is written into the test procedure". Units that are "opened" invalidate Acceptance Testing. GST/STE units may not be coupled together with FLIGHT units for Final Acceptance Testing, and STRs (Special Test Requests) may not be used "in lieu of" Acceptance Testing. This can be accomplished by reviewing the planning BHBs (Build History Books) for the lab conditions prior to the start of the test. Units tested must have the part numbers, unit serial numbers, and unit built-to revisions recorded in the BHBs. Test Procedures and Test Software must be (at a minimum) "baseline" released and revisions must be synchronized to the same revision. QA Witness or Surveillance (as defined by the Program Quality Requirements – PQRs) must be recorded prior, during, and at completion of testing including authorizations to "set-up" and "break set-up".

**(8) GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify QA Certified and Calibrated STE Rack equipment prior to the start of the VIIRS FLIGHT Unit Acceptance Tests. Expired calibration certifications preclude the start of test. Calibration of equipment must be sufficient to extend 30 days beyond the estimated time required to complete the test as estimated by the Test Director.

**(9) FLIGHT USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS:** In Reckless Disregard, RAYTHEON deliberately failed to rectify False Signoffs and Certifications violating the PQR (Program Quality Requirements) by reviewing the planning BHBs (Build History Books) wherein

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

work was performed over a period of weeks or months, yet the BHB operations were signed off in a single day or two, and/or signed off by an unqualified assembler, Test Technician, or substitute individual not authorized to perform this function, or shop supervisory help signing off multiple operations in lieu of the person actually performing the work "back-dating" operations with a single ink pen and/or writing style. The individual must signoff work performed, may not "step-over" Quality Inspection points (review dates), and must follow the PQR (Program Quality Requirements) to eliminate shop technicians performing test operations where a Test Technician is required. Test Specifications as well as Test software must be "Baseline" released prior to the start of tests, and if a revision "–" (indicates no change, or Baseline release) was recorded in the BHB test sequence operations prior to their release, constitutes false claims in that it cannot be established what conditions the Test Specification subjected the UUT (Unit Under Test), nor can it be established what "lines of code" were used in automated testing equipment, or if additional lines of code have been added (but not used on the UUT) prior to the "Baseline" release of the Test Specification and Test software. Additionally, untested, unqualified Hi-Rel components are required to have a lien entered in the back of each planning build history book in the (QCHR) Quality Control History Record documenting each component location used by (Ref-Des) Reference Designator to document the "At-Risk" condition of the hardware build. Hi-Rel that failed subsequent testing could then be tracked-down, removed, and replaced with compliant Hi-Rel should it become necessary at a later time. Final Inspection Buy-offs that completed build history books without this "At-Risk" documentation, are false certifications of compliance where no compliance exist.

**(10) GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify False Signoffs and Certifications violating the PQR (Program Quality Requirements). This can be accomplished by reviewing the GSE/STE planning

BHBs (Build History Books). Although requirements for GSE/STE build are greatly relaxed, the individual must signoff work performed, may not "step-over" Quality Inspection points (review dates), and must follow the PQR (Program Quality Requirements).

**(11) FLIGHT:** In Reckless Disregard, RAYTHEON deliberately failed to rectify Lack of Independent Primary and Redundant Power Supply Connectors and circuitry used on Flight units in disregard of existing specifications and requirements as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A and Rev B. This can be accomplished by reviewing the Design Drawings for Power Supplied to, as well as Power Connectors (and connections) for units containing both Primary and Redundant (back-up) systems. Units of this nature must have designated power connectors where Connector "X" would be Primary Connector "XA" and Redundant Connector "XB".

**(12) FLIGHT / GSE/STE:** In Reckless Disregard, RAYTHEON deliberately failed to rectify EM (Engineering Model) units to ensure they are of like design and truly represent the FLIGHT units in that these are used to certify the GSE/STE Rack and Test software in preparation for Acceptance Testing of FLIGHT hardware. In the case of the FPIE EM, a substantial difference of design rendered it as unqualified to perform this critical function (the unit was of an entirely different design requiring another set of test cables to be used) and the FPA EM was subsequently damaged and in a "crippled" condition, and could not validate Gate functions.

**(13) FLIGHT Units Connected to STE:** In Reckless Disregard RAYTHEON deliberately failed to assure that VIIRS Flight units may not be connected to STE units for Acceptance Testing. Flight units must be tested in the "as flown" configuration in Final Acceptance Testing as defined by the NPOESS General Instrument Interface Document; D31418, Rev. A and Rev B.

22.

PRODUCT SUBSTITUTION BY NPOESS PROGRAM WIDE DELIBERATE AND SYSTEMATIC CIRCUMVENTION OF QUALIFICATION TESTING REQUIREMENTS OF HI-REL COMPONENTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS INCLUDING VIIRS.

<u>Specifications</u>: NGIID D31418, Revision A, NGIID D31418 Revision B; (NPOESS General Instrument Interface Document) PS154640-132;

(NPOESS/VIIRS Contamination Control Requirements Specification),The Perry Directive (1994);

Upscreening of COTS Hi-Rel Components for Use in Space Applications.

<u>False Defective Nonconformance</u>: The RAYTHEON PMI/PME (Prohibited Materials Inspection / Prohibited Materials Exoneration) process was implemented late in the VIIRS program (as admitted in RAYTHEON Unauthorized Waivers RDW_VIIRS-W012A, RDW_VIIRS-W014 "Attach A - Description" violations of NGIID D31418 Revision A and B, and RAYTHEON Invision Issue 25, April/May 2006 page 5 article "Mission Assurance in Action - Taking a Deliberate Approach to Prohibited Materials on VIIRS"). While the restriction on the use of Prohibited Materials in space has been known for over 29 years (Mil-Hdbk 1547A), RAYTHEON has only implemented their Prohibitive Material Plan in mid-2005. Because use of Prohibited Materials is clearly warned against in the NPOESS/VIIRS Contamination Control Requirements Specification PS154640-132, Paragraph 4.4 (Design considerations), Paragraph 4.4.1 (Design constraints), Paragraph 4.6 (Materials and processes selection), Paragraph 4.6.1 (Metallic materials selection), and Paragraph 4.6.3 (Forbidden materials), RAYTHEON continued to design-in and consume these materials in VIIRS Flight Units. After extensive rework, the VIIRS FPIE Flight 1 Unit still has Prohibited Materials

onboard (debris generating fastener hardware and; pure Tin plated components), and uses prohibited processes (Electro-deposited Nickel plating). Prohibited material and processes are still listed in the VIIRS Engineering Drawing Notes and Parts Lists. In addition to the VIIRS FPIE, numerous other VIIRS Units/systems are in a comparable compromised condition as documented in the following NCMRs and/or Unauthorized Waivers;   NCMR EIS69006, NCMR EIS74862, NCMR EIS77143-1, NCMR EIS77144-1, NCMR EIS77169-1, NCMR EIS77511, NCMR EIS76924, NCMR EIS77819, RDW_VIIRS-W010, RDW_VIIRS-W012A, RDW_VIIRS-W014, RDW_VIIRS-W015, RDW_VIIRS-W020A, RDW_VIIRS-W021, RDW_VIIRS-W022A, RDW_VIIRS-W023, RDW_VIIRS-W026, RDW_VIIRS-W027, and RDW_VIIRS-W028.

The   RAYTHEON Reckless Disregard by systematically placing VIIRS components on waivers to circumvent DPA testing included without limitation:

(1) VIIRS Product Substitution by Placing VIIRS Component Parts on Waivers to Circumvent the NGIID and Contamination Control Plan.

(2) Avoiding VIIRS component DPA test by placing on waivers, specifically, at least thirty-two VIIRS 100 Level subsystem units and NPOESS sensors, which were comprised of hundreds of unique VIIRS part numbers and thousands of VIIRS component parts.

(3) RAYTHEON had only one DPA Test Lab which was in El Segundo. RAYTHEON Goleta was required to send Lot Representative samples to El Segundo for VIIRS DPA component testing to S1, S2, and S3, and/or R1, R2, and R3 screening levels, but did not do so.

(4) VIIRS DPA tests were attempted to be conducted by RAYTHEON after-the-fact, where components were already assembled into the VIIRS units.

(5) There were numerous VIIRS system failures to perform in compliance with the NGIID.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1      In early 2005, Relator MATESKI discovered during discussions with John
2  Bouregy, RVS Program Manager, and Marilyn Medel, RVS Quality, RAYTHEON
3  Goleta, that there was no DPA Test Lab in the RAYTHEON Goleta Facilities, and
4  that from the inception of the NPOESS Program, it was planned that most or all
5  purchasing and procurement of Hi-Rel Components was to be carried out by the El
6  Segundo RAYTHEON Facility mainly because an early understanding and
7  agreement had been reached by the RAYTHEON Facility leaders in that since there
8  was a DPA Test Facility at El Segundo, it was to be utilized to Test and Qualify Hi-
9  Rel Components per the NPOESS Program Requirements, for all RAYTHEON
10 Facilities working the NPOESS Program, including but not limited to: Real-time X-
11 Ray, DPA (Destructive Physical Analysis), EDX Testing (for discovery of Pure Tin
12 and/or other contaminants), RLAT (Radiation Lot Acceptance Testing), as well as
13 provisions for additional Burn-in Times as required by the Perry Directive of 1994
14 which allows for the use of COTS (customer off the shelf) Hi-Rel, and PEMS
15 (Plastic Encapsulated Micro Circuits) in Space Applications by adding additional
16 Test Requirements and burn-in times to meet Space Qualification Levels for
17 Commercial Components that would otherwise not be acceptable for use in such
18 Space Applications.

19     The Perry Directive came about as a result of an industry wide change where
20 several foundries that had formerly produced Ceramic Body Integrated Circuits
21 (Hi-Rel) in clean rooms, were no longer doing so, but had either gone out of
22 business, or were now producing or planned to produce PEMS which were cost
23 effective for Hi-Rel Components used on automotive, industrial and personal
24 computers. Defense programs were no longer the largest user of Hi-Rel
25 Components and this created a dilemma for those in Supply chain positions still
26 required to procure Hi-Rel Components for the remaining and ever diminishing
27 Space Programs, thus the need for, and the birth of the Perry Directive of 1994.

28

There were hundreds of unique part numbers and literally thousands of parts that were to be Lot Acceptance Tested for the entire NPOESS Program, including at least thirty-two VIIRS 100 Level subsystem units and NPOESS sensors, which were comprised of hundreds of unique VIIRS part numbers and thousands of VIIRS component parts. After testing of a given Lot Number (Production Lot Run), the Basic Part Number of a given Hi-Rel Component (all components within that Tested Lot), are reidentified adding a suffix identifier.

All of this was occurring while GIDEP Alerts were being issued warning of counterfeit parts in circulation, including parts made in China, but circulated world-wide, sold as authentic Hi-Rel by unscrupulous resellers and dealers. Some of these components were merely commercial grade components that had been remarked to appear as Mil-Spec Hi-Rel components, and sold at the higher prices.

A Suffix Letter/Numbering scheme is the generally accepted and used practice to identify the Lot that had completed a given series of tests. An S1 Suffix might indicate that the particular component had undergone DPA Testing, an S2 suffix might indicate DPA and EDX testing had been completed. An S3 might indicate DPA, EDX, and Burn-in had been completed to specific required levels necessary to qualify that Hi-Rel Component for use in Space Applications (Ref: Perry Directive, 1994). Additional RLAT testing is required for some components in that they are extremely susceptible to degradation by exposure to radiation in space. Testing of this sort includes Real-time X-Ray exposures to determine "rates of degradation" wherein it may be discovered that additional "radiation-shielding" may be required such as bonding of Tantalum Sheet Metal to components or System Unit covers to limit radiation exposures during the life of the space craft, literally extending the life of the Hi-Rel to meet the life expectancy of the mission. These Hi-Rel Components might have an R1, R2, or R3 Suffix added to the Basic Part Number of the component indicating it had gone through all other test as well

1  as the RLAT testing required to establish degradation and life expectancy.

2  Units for the VIIRS Flight 1, 2, 3, and 4 have been assembled using

3  Components where zero Lot inventory remains whereby no Lot Representative

4  Component pieces are available for testing, have not been tested for Prohibited

5  Materials and/or Prohibited Processes, have not been reidentified using the accepted

6  practice of modifying the Basic Part Number with a Suffix (post test) to segregate

7  and prevent intermingling of untested Hi-Rel within the Inventory System, and

8  have been systematically accepted for Space Flight use by unapproved false RDWs

9  (Request for Deviation Waivers) thereby jeopardizing system performance and

10 Mission Assurance for Flight 1 as well as cancelled NPOESS VIIRS Flight

11 Missions 2, 3, and 4 where partial assembly has already begun under comparable

12 conditions. Requirements have been circumvented by RAYTHEON VIIRS RDWs,

13 including but without limitation to these NPOESS Major Sub-System Sensor Units:

14     421310-100 (Numerous Components FU1) RDW_VIIRS-W015
15     414505-110 (Numerous Components FU1) RDW_VIIRS-W020A
     416960-100 (Numerous Components FU1) RDW_VIIRS-W020A
16     415652-100 (Numerous Components FU1) RDW_VIIRS-W020A
17     415695-100 (Numerous Components FU1) RDW_VIIRS-W020A
     415620-100 (Numerous Components FU1) RDW_VIIRS-W020A
18     415655-100 (Numerous Components FU1) RDW_VIIRS-W020A
19     415650-100 (Numerous Components FU1) RDW_VIIRS-W020A
     415640-100 (Numerous Components FU1) RDW_VIIRS-W020A
20     414505-100 (Numerous Components FU1) RDW_VIIRS-W020A
21     415750-1 (Numerous Components FU1 - 2 Units) RDW_VIIRS-W020A
     415750-2 (Numerous Components FU1) RDW_VIIRS-W020A
22     415660-100 (Numerous Components FU1) RDW_VIIRS-W020A
23     415630-100 (Numerous Components FU1) RDW_VIIRS-W020A
     415670-100 (Numerous Components FU1) RDW_VIIRS-W020A
24     415709-100 (Numerous Components FU1) RDW_VIIRS-W020A
25     415701-100 (Numerous Components FU1) RDW_VIIRS-W020A
     415700-100 (Numerous Components FU1) RDW_VIIRS-W020A
26     415610-100 (Numerous Components FU1) RDW_VIIRS-W020A
27     415680-100 (Numerous Components FU1) RDW_VIIRS-W020A
     415690-100 (Numerous Components FU1) RDW_VIIRS-W020A
28

417700-110 (Numerous Components FU1) RDW_VIIRS-W021
417680-110 (Numerous Components FU1) RDW_VIIRS-W021
418200-110 (Numerous Components FU1) RDW_VIIRS-W022A
418300-110 (Numerous Components FU1) RDW_VIIRS-W022A
418000-110 (Numerous Components FU1) RDW_VIIRS-W022A
418700-110 (Numerous Sub Assys FU1-6 Units) RDW_VIIRS-W022A
426300-100(-1) (Numerous Components FU1) RDW_VIIRS-W023
426350-100(-1) (Numerous Components FU1) RDW_VIIRS-W023
418700-110(-1) (Numerous Components FU1) RDW_VIIRS-W023
414505-110 (Numerous Components FU1) RDW_VIIRS-W026
414505-110 (Numerous Components FU1) RDW_VIIRS-W027

From 2002 to at least 2012, Defendant RAYTHEON knowingly and in deliberate ignorance and reckless disregard of established Contamination Control Design specifications and Prohibited Material constraints have invoiced NPOESS and caused VIIRS false claims regarding at least (32) thirty-two VIIRS 100 Level subsystem units and NPOESS sensors, which were comprised of hundreds of unique VIIRS part numbers and thousands of VIIRS component parts, which compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and will cause the NPOESS mission downgrade or failure, constituting Product Substitution in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

23.

RAYTHEON RECKLESS DISREGARD OF INOPERATIVE VIIRS DPA TEST LAB, AND TESTING OF INSTALLED VIIRS COMPONENTS PARTS AFTER INSTALLATION BY COUPLING OF TESTS RESULTS FROM NON-LOT REPRESENTATIVE SAMPLES OF COMPONENT PARTS ATTEMPTING TO QUALIFY UNTESTED LOTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification: NGIID D31418, Revisions A and B.

False Defective Nonconformance: While RAYTHEON had a functional DPA test lab, it was inoperative in that no DPA testing had been performed on VIIRS as well

- 36 -

1   as numerous other programs located at the APL5 Facility. In early 2005, Relator
2   MATESKI was assigned to work these programs and subsequently discovered that
3   little to no component parts qualification testing had been performed, especially in
4   the area of discovery and elimination of Prohibited Materials and component
5   qualification through a process known as DPA (Destructive Physical Analysis)
6   testing. After RAYTHEON was informed by the Relator MATESKI of the absence
7   of required component parts qualification testing on these programs, and
8   subsequently again via the MATESKI *Qui Tam* Complaint, Cledith Davis, QAE
9   (Quality Assurance Engineer) headed the reactivation of the DPA test lab team for
10  all systems, which consisted of a Core Team of seven RAYTHEON employees,
11  established solely for the purpose of identifying and mitigating risks after-the-fact,
12  if possible. Armed with a new understanding of pre-existing program requirements
13  for the first time, and some moderate support from RAYTHEON management,
14  additional personnel were added for the task of pulling Lot-Representative samples
15  from Flight Stores for testing, it became clear that additional help was required.
16  RAYTHEON Test Technicians were reassigned and/or hired.

17       As RAYTHEON began the task of identifying already installed/consumed
18  Lots of components, it became clear that several component Lots had been
19  consumed 100%. A new strategy was formed in which similar (but not identical)
20  Lots were procured from suppliers in which the DPA testing would be performed.
21  In an attempt to appease the customer, several strategies were employed attempting
22  to "Link" the DPA test results and findings of the substitute similar Lots to the
23  Original and unavailable consumed Lots.

24       One strategy was to test similar Lots and report their findings, another
25  strategy was to review supplier Lot-Test Results and group or "couple" all prior
26  tests results in an overall "Blanket" statement, to wit; xyz vendor has produced 11
27  lots of this component with minimal failures, therefore this 12th Lot must be

28

acceptable. At the same time, numerous component resellers were either knowingly or unknowingly hocking counterfeit components *inter alia* made in China wherein it became necessary for GIDEP Alerts to be issued warning Hi-Rel (High Reliability) components Supply Chain Procurement personnel of the potential of buying faulty components, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

There were several publications thereon by RAYTHEON, including a FMEA (Failure Mode Engineering Analysis) report, ENB (Engineering Notebooks), and Non-Conformance reports that *inter alia* were created by RAYTHEON to disclose these Program-Wide Defective Non-Conformances to the customer, as required by contract. RAYTHEON created the FMEAs and ENBs in the hope it could somehow con the customer into signing-off on these Nonconformance Tags and accept these defects when the hardware would ultimately be delivered, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

24.

FAILURE TO MAINTAIN AN ACCURATE VIIRS BUILD RECORD, FAILURE TO MAINTAIN CONFIGURATION, FAILURE TO MAINTAIN TWO-WAY SPACE TRACE REQUIREMENTS OF HI-REL AND HARDWARE COMPONENTS, FALSIFICATION OF BUILD RECORD SIGNOFFS, FALSIFICATION OF VIIRS BUILD RECORD ENTRIES ENTERED "AFTER THE FACT" IN PLANNING BUILD BOOK SCRUBBING PARTIES WHEREIN ENTRIES WERE MADE LONG AFTER THE WORK WAS COMPLETED, BUT JUST PRIOR TO PRESENTING THE VIIRS BUILD BOOKS FOR UNIT DELIVERY SELL-OFF IN ALL NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification:   RAYTHEON QR-FE94, NGIID D31418, Revision A, NGIID D31418 Revision B;

<u>False Defective Nonconformance</u>: The Coplaintiff Relator Mateski has conducted an analysis of the RAYTHEON VIIRS Planning Books which uncovered RAYTHEON false and forged VIIRS certifications, to wit:

(1)   VIIRS Flight 1 Signoff Deltas description of RAYTHEON false and forged certifications.

(2)   VIIRS Flight 2 and 3 Deltas CaWEB3797 description of RAYTHEON false and forged certifications.

As expertly observed, if the government does not have valid VIIRS certifications, the government has nothing.

When the Relator MATESKI was first introduced to the VIIRS Team at RAYTHEON EL Segundo in 2004-2005, he was instructed to begin work on a Unit that appeared to be fully assembled, yet the BHBs (Build History Books) were in a state of partial completion. Many of the sequences where entries were required as the build progressed had never been filled-out, Inspection points had been missed or stepped over. Further, the Planning Record was severely lacking in that many Planning and Quality Requirements as well as basic assembly instructions were not included. As Relator MATESKI began to ask questions, he was told that the Unit had been built, tested, and an attempt at sell-off had occurred, but that the Customers were displeased with the poor Unit performance, poor Build History Book Documentation of the Assembly, Poor Test Record documentation, etc. Relator MATESKI was told that he was chosen to help with the VIIRS rebuild and documentation effort due to his outstanding record of previous deliveries which were very well documented on the AVALON Program. In short, RAYTHEON wanted to bring the quality level of the NPOESS Units to the same quality level that Relator MATESKI had performed to on other prior programs while at RAYTHEON.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

- 39 -

In discussions with Bernard Malis (Retired), Manager of Manufacturing, Thomas James (Retired), Engineering Authority, Ronald Estes, Test Director, and Mark Ross, (Ex-employee), ELS Quality Assurance, it was discovered that the NPOESS Units had been presented to the customer on or about the end of June 2004 in a sell-off meeting. At that time the customer(s) were so displeased with RAYTHEON performance et-al, that the customers demanded that Non-Conformance tags be written at that sell-off meeting, documenting illegal rework. Additionally, the customer required the Program Quality Representative present, Mark Ross to generate a "Lien List" in that the quality findings were too numerous to address at one meeting. There were approximately seventy (70) Quality Findings found at that time. When Relator MATESKI was told of the "Mark Ross Lien List" as it was later referred to, Relator MATESKI began trying to rectify the Quality Findings, and while doing so, did perform a Planning Audit on all of the Build History Books generated to that time finding additional Quality Findings totaling about 340, and this only on the BHBs presented to the Relator on VIIRS Units. NOTE: Many other System Unit Level BHBs have not been looked at in a comprehensive Planning Audit. Many False entries were found, signoffs all made and dated the same day where the work actually occurred over a period of weeks or even months. Signoffs were made by individuals who did not perform the work, for those individuals not present to sign the BHB sequences. Test Specification Revision levels were recorded as Rev "-" (equivalent to Base Line No Change Release) where it was known that the Test Specifications were not Baseline Released, thus later changes added to the Test Specification would appear to have already been tested into the Unit prior, when subsequently reviewing the BHBs for the Units in question. Cure times and Oven Temps were entered at what was referred to as a "Planning Book Scrub Party" by the RAYTHEON employees at large. This occurred on other programs worked by the Relator as well. In several

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1   cases, where information or sign-offs were incomplete, yet the QA Inspection

2   Sequence had been bought-off, it is clear to the Relator that RAYTHEON Quality

3   et-al, did not understand the tasks and requirements which require QA to inspect

4   and verify all prior sequences and operations for completeness and accuracy of

5   entries from the present Inspection Sequence back through all prior sequences to

6   the last successful Inspection buy-off. The Quality Group appears to have been

7   "missing in action" throughout the entire life of the NPOESS Program.

8       Hardware components were issued through Flight Stores to BHB Work

9   Orders (in the RAYTHEON MAN-MAN inventory system) where work was

10   completed that should have altered the Part Number after completion of the work,

11   had the Work Order been completed to the NHA (Next Higher Assembly) or been

12   closed back to stores. The Relator found numerous instances where the components

13   had been issued to a Work Order BHB, work was completed, and components were

14   actually "reverse-issued" back to stores as the original component part number

15   effectively "Breaking the Trace" by separating the written record of work (on the

16   BHB) from the Work Order Lot Trace Number now reversed back to stores. Most

17   of these transactions were handled at the request of Mario Farr Shop Supervisor (in

18   the Non-Flight STE Lab) in lieu of RAYTHEON Planning or Production Control,

19   which compromise the NPOESS/VIIRS Unit/System integrity and mission

20   assurance, and will cause the NPOESS mission downgrade or failure, constituting

21   Product Substitution in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

22   and (2), and § (a)(1)(A) and (B).

23                        25.

24       RAYTHEON RECKLESS DISREGARD OF VIIRS QUALIFICATION

25   TEST OBSERVANCE AND VERIFICATION ON ZAPPED TEST OF VIIRS

26   SYSTEMS LEVEL UNIT FOR FLIGHT 1.

27   Specification: NGIID D31418, Revisions A and B.

28

<u>False Defective Nonconformance</u>: A VIIRS systems level unit for Flight 1 (which includes the DNB serial number 2 unit as a part of that unit) was zapped in excess of 400 volts. That excessive voltage was applied during testing by two RAYTHEON Manufacturing Assembly Technicians known only by the names of Raoul and Kelly, who are believed to be unqualified as Test technicians, working under direction by RAYTHEON Engineering to perform the zapped test.

Not only does a VIIRS system level unit test have to be conducted and performed in compliance with released engineering test procedures but that a QAE (Quality Assurance Engineer) is required to observe and perform a test readiness review and verification of lab and test set-up conditions prior to testing, including lab conditions (i.e., temperature, humidity, and equipment calibration), qualification certification(s) of personnel performing the testing, test set-up (i.e., cable hook-up and test-rack voltage parameters) witness of test-rack boot-up, and finally signoff that all conditions are "GO" prior to test start. These requirements are clearly spelled-out in the engineering test procedure. By reading the test procedure, one can clearly determine the requirements. By following those requirements, voltage set-point parameters would have been verified and properly set. The 400 voltage condition would have been visible from the front of the test stand as is required.

During testing, the QAE is required to perform "test surveillance" looking in on the test technicians from time-to-time to ensure proper sequential test procedures are followed, as well as whenever it is necessary to break or modify the test set-up configuration(s). Finally, when the test is complete, and prior to ending the test, the QAE must verify all test modules planned have been run, all test output(s) measured are within expected tolerances with no anomalies. If all is well, the QAE will sign-off and grant permission to "Break" test set-up configuration and stow the equipment, all of which was ignored in Reckless Disregard by RAYTHEON in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A)

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1    and (B).

2         A "Latent Failure" has occurred on the visible Infrared Imaging Radiometer

3    Suite ("VIIRS") instrument, discovered after Integration at Ball Aerospace while

4    performing Final Acceptance Testing at the Space Craft Level. VIIRS sensors are

5    designed to measure at least 22 different parameters including Day-Night Band, ice

6    cover, cloud cover, and forest cover. One thing VIIRS will not measure accurately

7    is ocean color, because one of the filters responsible for the job is faulty. Ocean

8    color data is critical for measuring primary productivity and sedimentation, among

9    other things. Researchers are concerned that if the problem is not fixed, a data gap

10   will emerge in the time series of ocean color data. There are "about a dozen" visible

11   channels, after learning that there was a problem with the filter on one of NPPs

12   instruments VIIRS, which will prevent it from accurately measuring ocean color,

13   the problem also causes both a failure to measure the spectra as well as distort the

14   accuracy of the results, thereby compromising the NPOESS/VIIRS System integrity

15   and mission assurance.

16                                        26.

17        FALSE RAYTHEON RECKLESS DISREGARD BY ENGINEERING

18   DESIGN FAILURE TO COMPLY WITH NPOESS VIIRS CONTAMINATION

19   CONTROL SPECIFICATIONS CAUSING PRODUCT SUBSTITUTION.

20   Specification: VIIRS PS154640-132, Paragraph 4.4 (Design considerations),

21   Paragraph 4.4.1 (Design constraints), Paragraph 4.4.4 (Corrosion prevention),

22   Paragraph 4.6 (Materials and processes selection), Paragraph 4.6.1 (Metallic

23   materials selection), and Paragraph 4.6.3 (Forbidden materials).

24   False Defective Nonconformance:  In deliberate ignorance and reckless disregard,

25   RAYTHEON Engineering designed-in use of Prohibited Materials (pure Tin), use

26   of Prohibited Metallic materials known to cause corrosion (Galvanic Effects) when

27   used together, use of Debris shedding locking fasteners (locking Heli-Coils), use of

28

Prohibited Materials and processes selected (Electro-deposited Nickel plating), and Failure to identify "Class 2 Rigid ESD Controls" protection for electronic components easily damaged by ESD conditions exceeding their "Maximum Withstand Voltage Ratings" for use in Flight Units, which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, resulting in NPOESS mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

27.

FALSE RAYTHEON RECKLESS DISREGARD BY USE OF PROHIBITED MATERIALS IN PRODUCTION OF THE VIIRS CHASSIS AND BOTTOM COVER AND FAILURE TO DOCUMENT.

Specification:   RAYTHEON CAGE Code 11323 Specification PS154640-132, Paragraph 4.6.3, sub-section "I" of the Contamination Control Requirements Specification for the VIIRS (Visible/Infrared Imager Radiometer Suite) specifies: The use of the following materials on the VIIRS sensors is forbidden:

    I. Plated, threaded fasteners, including connectors, where rotational
    engagement may generate metal debris.

False Defective Nonconformance:  Units for the VIIRS FPIE Flight 1, 2, 3, and 4 have been designed using Prohibited Materials including without limitation:

421312 FPIE Chassis - 421312 Drawing F/Ns 2 & 3 (69 places total)

421314 FPIE Top Cover - 421314 Drawing F/N 2 (6 places total)

    In RAYTHEON deliberate ignorance and reckless disregard, prohibited material and processes are still listed in the VIIRS Engineering Drawing Notes and Parts Lists.

    Locking Heli-Coils are designed to interrupt the Major Diameter of the Screw thread during installation. As the fastener rotational installation is made, the

Major Diameter of the Screw thread displaces the Heli-Coil interrupted thread flats (3 places each) causing the interrupted thread to expand the seize the Screw. This additional friction causes metal galling to occur providing the locking action. Each time the fasteners are installed or removed, metallic dust and debris are generated within the fastener holes. Inserts and attach screws are fabricated of similar hardness corrosion resistant (CRES) materials exacerbating the failure. The 421310-100 FPIE Flight 1 Unit has a total of 75 Undocumented Debris Generating Design Deficiency locations. As Screws are installed and/or removed, metallic debris is generated contaminating CCAs (Circuit Card Assemblies) Conformal Coatings, and surrounding hardware. Final connection of J1 & J2 Connectors made on the Spacecraft Next Assembly will contaminate surrounding systems upon final attach in the clean room. In a zero-gravity environment, metallic particles are free to migrate, bridge, and short-out electronic components, and/or redeposit on the optics surfaces severely limiting and/or degrading performance. RAYTHEON knowingly failed to disclose a total of 75 known but undocumented Debris Generating locations so that the VIIRS Units are unfit for integration into the next assembly as integration compromises the NPOESS/VIIRS Unit/System integrity and mission assurance resulting in mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A)(2) and § (a)(1)(A) and (B).

28.

FALSE   RAYTHEON   RECKLESS   DISREGARD   BY   USE   OF PROHIBITED MATERIALS IN PRODUCTION OF THE VIIRS AND USED IN 31 OTHER NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification:   RAYTHEON CAGE Code 11323 Specification PS154640-132, Paragraph 4.6.3, sub-section "D & E" of the Contamination Control Requirements Specification for the Visible/Infrared Imager Radiometer Suite VIIRS) specifies:

The use of the following materials on the VIIRS sensors is forbidden:

    D.  Tin plating unless subsequently fused or reflowed.

    E.  Pure, unalloyed Tin (greater than 99.1% Sn).

False Defective Nonconformance:   The J7 Power Connector is wired with forbidden ("D & E") materials of pure Tin plated wire (421327 Drawing F/N 53), and Resistors M55342H06B6E65S End Bells (421331 Drawing F/N 55) were found to be pure Tin dipped (NCMR ELS69006). RAYTHEON has falsely stated (RDW_VIIRS-W014) that the pure Tin plated wire would be acceptable for flight use despite the failure to pot the J7 Power Connector per 421327 Drawing Note 33. The J7 Power Connector is the VIIRS FPIE Primary Power Connector. There is no other Redundant Power Connector. If the J7 Power Connector shorts, the DNB shuts down to cause an NPOESS/VIIRS catastrophic failure compromising the NPOESS/VIIRS Unit/System integrity resulting in mission downgrade or failure.

    In RAYTHEON deliberate ignorance reckless disregard, several other VIIRS Units/Systems extensively identified in the following RAYTHEON VIIRS RDWs either use prohibited materials and/or, were never tested for prohibited materials and have been systematically accepted for VIIRS Flight use on false RAYTHEON Waivers including but not limited to: RDW_VIIRS-W010, RDW_VIIRS-W012A, RDW_VIIRS-W014, RDW_VIIRS-W015, RDW_VIIRS-W020A, RDW_VIIRS-W021, RDW_VIIRS-W022A, RDW_VIIRS-W023, RDW_VIIRS-W026, RDW_VIIRS-W027, and RDW_VIIRS-W028, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A)and (B).

29.

    FALSE  RAYTHEON  RECKLESS  DISREGARD  BY  USE  OF PROHIBITED PROCESSES IN PRODUCTION OF THE VIIRS MATERIALS.
Specification:   RAYTHEON CAGE Code 11323 Specification PS154640-132,

1  Paragraph 4.6.3, sub-section "W" of the Contamination Control Requirements
2  Specification for the Visible/Infrared Imager Radiometer Suite VIIRS) specifies:
3  The use of the following Process materials on the VIIRS sensors is forbidden:

4        W. Electrolytic nickel plating unless an Electroless process is employed, or
5        electrolytic nickel is used on a non-optical surface as an underplate, diffusion
6        barrier or coating.

7  Specification: NPOESS General Instrument Interface Document (NGIID D31418,
8  Revision A), Interface Control Document IF231780 Nickel Plating Requirements:
9  Nickel Plaiting shall not be used (unless an electroless process is employed) in any
10 instrument design.

11 False Defective Nonconformance:   The VIIRS FPIE hardware is plated with
12 forbidden ("W") materials consisting of Electro-deposited Nickel as follows:

13                  Chassis, FPIE, (421312 Drawing, Note 3)
14                  Top Cover, FPIE, (421314 Drawing, Note 3)
15                  Bottom Cover, FPIE, (421317 Drawing, Note 3)
16                  PWB, A/D Board, (421328 Drawing, Note 12)
17                  PWB, Clock Board (421332 Drawing, Note 12)
18                  Spacers, J8 (421327 Drawing, Note 34)

19        The J7 Power Connector is the VIIRS FPIE Primary Power Connector. There
20 is no other Redundant Power Connector. If the J7 Power Connector shorts, the
21 DNB shuts down to cause a NPOESS/VIIRS catastrophic failure. The J7 Power
22 Connector was never potted and sealed to mitigate venting through the mating
23 connector to the atmosphere thus creating an open uncontrolled leak to the
24 environment (NCMR N00015) as opposed to the controlled top cover venting.
25 Outgassing, flaking, debris shedding Electro-deposited Nickel plating (from
26 unpainted FPIE internal surfaces) and metallic debris (generated by locking attach
27 hardware) are free to migrate forward between the "J7" Power Connector pins and

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1   the Connector Pin Spacing Header (approximately 5 mil gap at each pin 25 places

2   total).

3       In March 2005, Relator MATESKI raised questions regarding the

4   RAYTHEON use of unsealed connectors on the FPIE Unit with Bernard Malis

5   (Retired), Thomas James (Retired), Mario Farr, Ronald Estes, and Timothy Kilduff

6   present in the daily team meeting. Comments were made by Mario Farr and

7   Thomas James (Retired) that all Connectors used were of the prepotted (sealed)

8   design and that the concern was unfounded. Later it was discovered by Relator

9   MATESKI that the J7 Power Connector was of an unsealed design jeopardizing the

10  FPIE Unit and the entire VIIRS system. Raising the issue again in several daily

11  team meeting discussions, Relator MATESKI was able to convince the team that

12  this J7 Connector should be potted and a drawing change was made. Bernard Malis

13  (Retired), Thomas James (Retired), and Ronald Estes independently made the

14  decision to omit the potting of the J7 Power Connector on the FPIE Flight 1 Unit

15  due to schedule constraints. Relator MATESKI protested but was overruled and the

16  J7 Connector remains unpotted to this day (NCMR N00015). This Major Defect

17  was never presented to the customer in the form of a RAYTHEON VIIRS Waiver

18  nor raised as a concern in RAYTHEON RDW_VIIRS-W012A.

19      RAYTHEON has falsely stated (RDW_VIIRS-W012A) that the Electro-

20  deposited Nickel plating would be acceptable for VIIRS flight use because the

21  VIIRS FPIE Flight 1 Unit was painted with an Epoxy-based paint effectively

22  sealing most of the debris-shedding plated surfaces. RAYTHEON falsely stated

23  that the remaining unpainted surfaces posed a minimal threat as the VIIRS FPIE

24  Flight 1 Unit was not in the direct line of the optics. In RAYTHEON deliberate

25  ignorance and reckless disregard, prohibited materials and processes are still listed

26  in the VIIRS Engineering Drawing Notes and Parts Lists in RAYTHEON knowing

27  noncompliance with VIIRS contract specifications.

28

The use of Electro-deposited Nickel plating causes Hydrogen Embrittlement to occur during the plating process trapping Hydrogen gas at the plated surfaces. The Covers-to-Chassis design did not allow for a Chromerics EMI/EMC gasket seal installation preventing RAYTHEON from painting the unit at the very end of build after testing. This required an early out-of-sequence application of paint topcoat (prior to build-up) causing the paint finish to endure several cleaning and bake-out steps along the assembly build process. The final result was that the paint broke-down and degraded no longer meeting the workmanship requirements of the HP 4-143 Paint Specification (numerous pin holes, scrapes, wear-thin spots,. and other defects NCMR 70705).

RAYTHEON Design Engineering misapplication of Electro-deposited Nickel plating caused Hydrogen outgassing through paint surfaces creating numerous pinholes contributing to paint topcoat failure. Pin holes in the painted surfaces allow numerous paths for Electro-deposited metallic particles and degrading paint particles shedding from plated surfaces to migrate and contaminate surrounding systems and equipment.

Reckless disregard design use of prohibited Electro-plating processes, early out-of-sequence application of paint topcoat, and subsequent cleaning and bake-out processes have caused the Epoxy-based paint to fail while the VIIRS FPIE is still on the ground.  The perfect vacuum of a space environment can only serve to worsen that condition.

Only the VIIRS FPIE Flight 1 Unit outer Chassis surfaces are partially painted and none of the Chassis inner surfaces, or Top and Bottom Cover inner surfaces are painted. This represents a tremendous risk as particles migrate through the J7 Power Connector spacing header to create a short, and/or migrate through unsealed Chassis to Covers edges and/or the Top Cover Vent Screen to redeposit on the optics surfaces severely limiting and degrading the VIIRS Unit and/or System

performance, or in a worst-case scenario, produce a latent defect causing catastrophic failure compromising the NPOESS/VIIRS Unit/System integrity and mission assurance resulting in NPOESS mission downgrade or failure.  Several other Units/Systems Extensively named in the following RAYTHEON RDWs use prohibited processes (Electro-deposited Nickel plating) and/or, were never tested for prohibited processes and/or materials and have been systematically accepted for VIIRS Flight use as documented in false RAYTHEON Waivers, including without limitation,  RDW_VIIRS-W010,  RDW_VIIRS-W012A,  RDW_VIIRS-W014, RDW_VIIRS-W015,  RDW_VIIRS-W020A,  RDW_VIIRS-W021,  RDW_VIIRS-W022A,  RDW_VIIRS-W023,  RDW_VIIRS-W026,  RDW_VIIRS-W027,  and RDW_VIIRS-W028, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)and  (2), and § (a)(1)(A) and (B).

30.

FALSE  VIIRS  ESD  EXPOSURES,  MULTIPLE  ESD  EXPOSURES, RISKING LATENT DEFECTS.  FALSE RAYTHEON RECKLESS DISREGARD OF VIIRS ESD PROTECTION OF FLIGHT QUALITY HARDWARE DURING ASSEMBLY.

<u>Specification</u>:   RAYTHEON  CAGE  Code  4U884  Specification  RP  10-001/2, Paragraph 3.2.9 ESDS item protection provides; ESDS items shall be individually or collectively protected using ESD protective coverings or packaging enclosures when not being worked on, during movement or when handled outside of ESD protected areas.

Paragraph 3.2.9.1 Work in process protective covering enclosures provides; On site work-in-process (WIP) protection of ESD items designated for Normal Controls (RP 10-001/1) shall include enclosures in protective covering containers and/or static shielding packaging (Ref: Paragraph 3.2.9.2.).

Paragraph 3.2.9.2 Protective packaging, provides; Transportation of ESDS items (shipped by suppliers or moved between sites) and ESDS items designated for Rigid Controls (RP 10-001/2) shall be enclosed in static shielding type packaging materials for Preparation for Delivery, (Ref: Paragraph 5.0). Static shielding packaging materials shall conform to one or more of the following:

a. Shielding bags, pouches and bulk films shall meet the requirements of MIL-PRF-81705, Type I or Type III barrier materials.

b. Shielding bags and pouches shall be capable of a minimum 90 percent charge attenuation when evaluated per the ANSI/EIA-541 two probe capacitance test method.

Specification:  RAYTHEON CAGE Code 4U884 RP 10-001/2, Paragraph 3.2.4.2. Rigid controls category, specifies:

Materials and equipment capable of generating more than the ESD sensitivity or withstand voltage limits of the most sensitive ESDS items being handled, shall not be permitted within the ESD protected area. Verification checks shall be performed no less than every 12 months or upon designating a SSWS with Rigid Control voltage limits. ESD threshold signs shall be placed on the individual workstations and/or work areas identifying ESD sensitivity or withstand voltage limits based on the sensitivity of the ESDS items being handled. For example, a Rigid Controls ESD threshold sign is shown in RP 10-001, (Fig 3.)

False Defective Nonconformance:  The VIIRS FPIE Flight 1 (S/N 002) Unit was routinely disassembled and worked on (after attempted delivery at the first CTI sell-off meeting on July 30, 2004) in a Non-Flight STE Laboratory / Machine Shop environment located at E01/Rm C1250/Laboratory 22 and moved between Labs for bonding, cleaning, bake-out, and testing operations. As of February 2005, the Circuit Card level rework and Unit level assembly operations were carried out in a

Non-Flight STE Laboratory / Machine Shop environment under conditions not following basic ESD grounding requirements: CCAs (Circuit Card Assemblies) awaiting work were not double ESD bagged, tote boxes had larger lids simply resting on the boxes without the ability to positively lock, and some of the kit box tote lids were not present. As kits awaiting work were pulled for work, lids were swapped with remaining kits stored on the incoming work rack. There were not enough lids for all of the tote boxes present. Work stations/areas were not identified with ESD sensitivity or withstanding voltage limits based on the sensitivity of the ESDS items being handled in violation of RAYTHEON Specification RP 10-001, Paragraph 3.2.9 ESDS item protection, Paragraph 3.2.9.1 Work in process protective covering enclosures, Paragraph 3.2.9.2 Protective Packaging, and Paragraph 6.2.2 Rigid Controls.

VIIRS FPIE Unit Part Numbers 421310-100 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 (consisting of Circuit Card Assembly 421327 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 and 421331 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 respectively) have been exposed to Latent ESD Defect Failure conditions (multiple occurrences), which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, resulting in NPOESS mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

31.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO INSTALL SHORTING PLUGS OR ESD DUST CAPS ON CONNECTORS WHILE NOT IN USE TO PROTECT VIIRS HARDWARE DURING ASSEMBLY AND HANDLING PER VIIRS FE94 PROGRAM QUALITY REQUIREMENTS.

Specification: Program QR (Quality Requirements) FE94, Line 9.4.A (9 & 10)

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

specifies;

(9)  Dust caps shall be used at all times when connectors are not in use.

(10)  Shorting plugs or Conductive Dust Caps shall be used if directed by Engineering or Manufacturing.

False Defective Nonconformance:   The FPIE Flight 1 Unit was routinely disassembled and worked on (after attempted delivery at the first CTI sell-off meeting on July 30, 2004) in a Non-Flight STE Laboratory / Machine Shop environment located at E01/Rm C1250/Laboratory 22 and moved between Labs for bonding, cleaning, bake-out, and testing operations. During the course of assembly and Workmanship Thermal Cycle Testing, the CCAs (Circuit Card Assemblies) should have Shorting Plugs or ESD Dust Caps applied to all connectors to prevent stray ESD (Electro Static Discharge) voltages from entering through open connectors "zapping" the hardware during build-up and testing as directed by Engineering (421327 CCA Drawing Notes 3, 30 and 421331 CCA Drawing Notes 3, 34 and 421310-100 FPIE Assembly Drawing Notes 6, 7, 22). Shorting Plugs and ESD Dust Caps were not in use throughout the entire initial build-up and testing of the VIIRS hardware from the beginning of the program through the end of the first Acceptance Test. Shorting Plugs were then installed on the completed FPIE Unit and the first attempt to sell-off the Unit was made at the Goleta, California CTI sell-off meeting on July 30, 2004.

After the hardware was rejected at the first sell-off CTI (Consent to Integrate) meeting, numerous findings required subsequent rework in RAYTHEON El Segundo, California. Shorting Plugs were removed and the hardware underwent additional disassembly, rework and handling in this unprotected condition until just prior to post-rebuild Acceptance Testing in mid-September 2005. The RAYTHEON El Segundo facility stocks ESD Dust Caps for Sub-D connectors in the Cable Laboratory (such as the FPIE J7 Power Connector) but does not stock

ESD Dust Caps for Micro-D Connectors (as are used in the FPIE J1, J2, J3, J4, J5, J6, J8, and P8 Connectors. New ESD Protective Dust Caps were added to the Drawing on 9/09/05 (Ref: 225741 Drawing, Rev. A Parts List as shown below, and Note 22 was added to 421310-100 Drawing). Micro-D ESD Dust Caps were subsequently purchased for use on the hardware approximately mid-September 2005 (Ref: 225741 Drawing, Rev. A Parts List):

| Item | Qty | Cage Code | P/N | Description |
|------|-----|-----------|-----|-------------|
| F/N 19 | 1 | 99017 | DCC-13 | ESD Dust Cap |
| F/N 20 | 2 | 10400 | MD051RS | ESD Dust Cap |
| F/N 21 | 1 | 10400 | MD051RP | ESD Dust Cap |
| F/N 22 | 1 | 10400 | MD100RP | ESD Dust Cap |
| F/N 23 | 2 | 10400 | MD100RS | ESD Dust Cap |
| F/N 24 | 1 | 10400 | MD037RP | ESD Dust Cap |
| F/N 25 | 1 | 10400 | MD037RS | ESD Dust Cap |

The FPIE Unit Part Number 421310-100 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 (consisting of circuit card assembly 421327 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 and 421331 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 respectively) have been exposed (multiple occurrences) to Latent ESD Defect Failure conditions, which compromise the NPOESS/VIIRS Unit/System integrity and mission assurance resulting in NPOESS mission downgrade or failure. There is no test to determine if a VIIRS latent defect will manifest itself later throughout NPOESS/VIIRS launch, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

32.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO MAINTAIN ESD PROTECTION OF VIIRS FLIGHT QUALITY HARDWARE DURING WORKMANSHIP THERMAL CYCLE TESTING.

Specification:   RAYTHEON CAGE Code Specification RP 10-001, § 3.0.1 End product requirements - Workmanship, specifies:

> Electrostatic Discharge Sensitive (ESDS) items covered by this Specification shall be designed and handled to provide protection against Exposure(s) to damaging electrostatic fields, static discharges, and electrical transients. Protection shall be maintained continuously for all ESDS items from initial component receipt through assembly, test, system integration, and final shipment.

False Defective Nonconformance:   During STE Rack (Dewar) Qualification the Non-Flight FPA EDU2 Unit had failed due to broken connector pins. The Non-Flight FPIE Emulator (Unit S/N 001) had been disassembled (for circuit damage analysis) and CCAs were installed into a test fixture Part Number 225741 (nick-named "The Butterfly Fixture"). The Butterfly Fixture was designed to be black anodized as shown per STE Drawing 225741, Sheets 2 and 3.

Subsequent to the first CTI sell-off meeting on July 30, 2004, Relator MATESKI was notified by the Test Technician, Timothy Kilduff, that the Butterfly Test Fixtures anodic coating was preventing the achievement of ground and the test had been halted. After additional investigation, it was discovered that the anodic coating extended to all frame and fixture surfaces as well as threaded screw attach holes. It was discovered that RAYTHEON had a spare "Butterfly Test Fixture" that had not been completed (anodized) per STE Drawing 225741, Sheets 2 and 3 and was still in the "bare" aluminum condition. This "bare" fixture was substituted in and the test was resumed.

The FPIE CCA (Circuit Card Assembly) 421327 and CCA 421331 are required to be Workmanship Thermal Cycle Tested per their respective drawings (Note 10) at the CCA level. These CCAs are first mounted into "The Butterfly Fixture".

The anodized Butterfly Fixture was used on the FPIE Flight Unit S/N 001, 002, and 003 CCAs for Workmanship Thermal Cycling (prior to the first CTI sell-off meeting date 7/30/04), which without the ability to obtain "a continuous ground", violated RAYTHEON procedures by Failure to Maintain Hard ESD Protection throughout the manufacturing cycle per RAYTHEON Specification RP 10-001, Paragraph 3.0.1 End product requirements-Workmanship.

The FPIE Unit CCA 421327 S/Ns 001, 002, & 003 and CCA 421331 S/Ns 001, 002 & 003 (used in the FPIE Unit 421310-100 S/N 001, 002 & 003 respectively) have been exposed to Latent ESD Defect Failure conditions (multiple occurrences) including Workmanship Thermal Cycle Testing which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance resulting in NPOESS mission downgrade or failure of Flights 1, 2, and 3, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

33.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO OBTAIN PRIOR VIIRS ESD DESIGN APPROVAL FOR MATERIALS AND EQUIPMENT USED IN COMPLIANCE WITH ESD PROTECTION REQUIREMENTS FOR VIIRS FLIGHT HARDWARE (THERMAL CYCLE TESTING EQUIPMENT - BUTTERFLY FIXTURE).

Specification:   RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment, specifies: ESD control protective materials and equipment used to meet the requirements of

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1   this standard shall be approved by the ESD Site Coordinator/Team. An approved

2   materials and equipment list may be included in site specific documentation, or

3   attached as an exhibit to this document.

4   False Defective Nonconformance:   In RAYTHEON deliberate ignorance and

5   reckless disregard, the unapproved design of the anodized Butterfly Fixture was

6   used on the VIIRS FPIE Flight Unit S/N 001, 002, and 003 CCAs for Workmanship

7   Thermal Cycling (prior to the first CTI sell-off meeting date 7/30/04), which

8   without the ability to obtain "a continuous ground", violated RAYTHEON

9   procedures by failure to obtain an ESD design approval per RAYTHEON

10  Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and

11  equipment, thereby constituting Product Substitution and false claim violations of

12  the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

13                                   34.

14      FALSE RAYTHEON RECKLESS DISREGARD OF ESD PROTECTIONS

15  OF  VIIRS  FLIGHT  QUALITY  HARDWARE  DURING  ACCEPTANCE

16  TESTING.

17  Specification:    RAYTHEON CAGE Code 4U884 Specification RP 10-001,

18  Paragraph 3.0.1 End product requirements-Workmanship, specifies:

19      Electrostatic discharge sensitive (ESDS) items covered by this specification

20  shall be designed and handled to provide protection against Exposure(s) to

21  damaging electrostatic fields, static discharges, and electrical transients. Protection

22  shall be maintained continuously for all ESDS items from initial component receipt

23  through assembly, test, system integration, and final shipment.

24  False Defective Nonconformance:   The 421310-100 FPIE Unit is required to be

25  Acceptance Tested per drawing (Note 17). The FPIE Unit is first connected using

26  STE (Special Test Equipment) Cables (Ref: 225742-100 Interface Cable Drawing).

27  The STE Cables were constructed of ESD unapproved materials "Hot Plastics"

28

(Nylon Sleeving and plastic ID Marker tags) capable of building and storing excessive electrical charges. These cables were completely rebuilt using ESD approved materials (Ref: "Before and After" STE Cable redesign Drawings and rework VIIRS planning books), including without limitation:

STE Cables "Hot Plastics"

| | | |
|---|---|---|
| 228343 W1 | Rev - vs; Rev A |
| 228344 W1A | Rev - vs; Rev C |
| 228345 W2 | Rev - |
| 228346 W2A | Rev - vs; Rev A |
| 228349 W4 | Rev - vs; Rev A |
| 228351 W6 | Rev - vs; Rev A |
| 228352 W7 | Rev - vs; Rev A |
| 228355 W11 | Rev - vs; Rev B |
| 228359 W15 | Rev - vs; Rev C |
| 228360 W16 | Rev - vs; Rev C |
| 228361 W17 | Rev - vs; Rev C |
| 228362 W18 | Rev - vs; Rev B |
| 228364 W101 | Rev - vs; Rev A |
| 228365 W102 | Rev - |
| 228367 W104 | Rev - vs; Rev B |
| 228369 W106 | Rev - vs; Rev A |
| 228370 W107 | Rev - vs; Rev A |
| 228371 W108 | Rev - vs; Rev A |
| 228372 W109 | Rev - vs; Rev A |
| 229709 W110 | Rev - vs; Rev A |
| 229926 W19 | Rev - |

The 421310-100 S/N 001 & 002 FPIE Unit and FPIE Unit CCAs 421327 S/Ns 001, 002, & 003, and CCA 421331 S/Ns 001, 002, & 003 Lower Level Thermal Cycle test, had been tested prior to the first CTI using the STE Cables in the ESD unapproved condition. It is necessary to "break test configuration" and make a new test set-up several times when the Acceptance Test is run. The STE Cables are first connected in the "Primary" configuration, and then broken down and reconfigured into the "Redundant" configuration, to test both Primary and Redundant (back-up) systems, each time exposing the "opened" Unit connectors to

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

stray accumulated static charges built-up on the STE Cables "Hot Plastics". Exposure occurs when the STE Cable connections are disconnected (opened) and reconnected (closed). Prior to the STE Cable rebuild effort, many ESD Exposures to the VIIRS FPIE Flight 1 Unit have occurred (Ref: Mate/Demate logs), which violated RAYTHEON procedures by failing to maintain continuous ESD protection throughout the manufacturing cycle per RAYTHEON Specification RP 10-001, Paragraph 3.0.1 End product requirements-Workmanship. The FPIE Unit CCA 421327 S/Ns 001, 002 & 003 and CCA 421331 S/Ns 001, 002, & 003 (used in the FPIE Unit 421310-100 S/N 001, 002 & 003 respectively) have been exposed to Latent ESD defective failure conditions (multiple occurrences) which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, and causes the NPOESS mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

35.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO OBTAIN PRIOR VIIRS ESD APPROVAL FOR MATERIAL AND EQUIPMENT USED IN MEETING ESD PROTECTION REQUIREMENTS FOR VIIRS FLIGHT HARDWARE ACCEPTANCE TESTING EQUIPMENT FOR STE CABLES.

Specification:   RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment, specifies:

> ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

False Defective Nonconformance:   In RAYTHEON deliberate ignorance and reckless disregard, the unapproved Design STE Cables were used on the FPIE Flight Unit S/N 001, 002, and 003 CCAs for Workmanship Thermal Cycling (prior to the first CTI sell-off meeting date July 30, 2004), which without the ability to obtain "a continuous ground", violated RAYTHEON procedures by failure to obtain prior ESD design approval per RAYTHEON Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment.

The STE Cables were constructed of ESD unapproved materials "Hot Plastics" (Nylon Sleeving and plastic ID Marker tags) capable of building and storing excessive electrical charges. These cables were completely rebuilt using ESD approved materials (Ref: "Before and After" STE Cable redesign Drawings and rework VIIRS planning books), including without limitation:

STE Cables "Hot Plastics"

| | |
|---|---|
| 228343 W1 | Rev - vs; Rev A |
| 228344 W1A | Rev - vs; Rev C |
| 228345 W2 | Rev - |
| 228346 W2A | Rev - vs; Rev A |
| 228349 W4 | Rev - vs; Rev A |
| 228351 W6 | Rev - vs; Rev A |
| 228352 W7 | Rev - vs; Rev A |
| 228355 W11 | Rev - vs; Rev B |
| 228359 W15 | Rev - vs; Rev C |
| 228360 W16 | Rev - vs; Rev C |
| 228361 W17 | Rev - vs; Rev C |
| 228362 W18 | Rev - vs; Rev B |
| 228364 W101 | Rev - vs; Rev A |
| 228365 W102 | Rev - |
| 228367 W104 | Rev - vs; Rev B |
| 228369 W106 | Rev - vs; Rev A |
| 228370 W107 | Rev - vs; Rev A |
| 228371 W108 | Rev - vs; Rev A |
| 228372 W109 | Rev - vs; Rev A |
| 229709 W110 | Rev - vs; Rev A |
| 229926 W19 | Rev - |

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1    The RAYTHEON defective nonconformance VIIRS Flight hardware ESD

2  exposures constitute Production Substitution and false claim violations of the False

3  Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

4                                              36.

5       FALSE RAYTHEON RECKLESS DISREGARD TO MAINTAIN ESD

6  PROTECTION OF VIIRS FLIGHT QUALITY HARDWARE DURING COLD

7  ACCEPTANCE TESTING.

8  <u>Specification</u>:    RAYTHEON CAGE Code 4U884 <u>Specification</u> RP 10-001,

9  Paragraph 3.0.1 End product requirements-Workmanship, specifies:

10      Electrostatic discharge sensitive (ESDS) items covered by this specification

11      shall be designed and handled to provide protection against Exposure(s) to

12      damaging electrostatic fields, static discharges, and electrical transients.

13      Protection shall be maintained continuously for all ESDS items from initial

14      component receipt through assembly, test, system integration, and final

15      shipment.

16  <u>False Defective Nonconformance</u>:  The 421310-100 FPIE Flight 1 Unit is required

17  to be Acceptance Tested at various "cold" temperatures as a part of the Acceptance

18  Test per drawing (Note 17). The FPIE Unit is mounted in a "Dewar" (cold-box,

19  Drawing 229030) configuration with the FPIE Unit mounted on thermally isolated

20  pedestals (which also meant electrically isolated). When Relator MATESKI

21  discovered the grounding scheme did not include grounding of the FPIE and related

22  FPA equipment, Relator MATESKI directed Design Engineering to add two

23  ground straps to the FPIE configuration at opposite corners and one ground strap to

24  the FPA configuration inside the "Dewar" (cold-box, Drawing 229030, Ref: EO

25  Y5216) to prevent charge buildup on Unit surfaces. This prior design violated

26  RAYTHEON procedures by Failing to Maintain Hardware ESD Protection

27  throughout the manufacturing cycle per RAYTHEON Specification RP 10-001,

28

Paragraph 3.0.1 End product requirements-Workmanship. Prior testing without these ground straps using the STE Cables built with ESD unapproved "Hot Plastic" materials exposed the FPIE Unit 421310-100 S/N 001 and 002 to Latent ESD Defect Failure conditions (multiple occurrences) which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, and causes the NPOESS mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

37.

FALSE VIIRS COLD ACCEPTANCE TESTING ESD EXPOSURES. FALSE RAYTHEON RECKLESS DISREGARD TO OBTAIN PRIOR VIIRS ESD DESIGN APPROVAL FOR MATERIALS AND EQUIPMENT USED IN MEETING ESD PROTECTION REQUIREMENTS FOR VIIRS FLIGHT HARDWARE.

Specification:   RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.2.10 Approved ESD Protective Materials and Equipment, specifies: ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

False Defective Nonconformance:   The Unapproved ESD Design of the "Dewar" (cold-box, Drawing 229030) configuration with the FPIE Unit mounted on thermally and electrically isolated pedestals without an approved grounding scheme was a failure to obtain a prior ESD design approval per RAYTHEON Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment, thereby constituting Production Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

38.

FALSE RAYTHEON RECKLESS DISREGARD TO IDENTIFY AND IMPLEMENT VIIRS ESD RIGID CONTROLS REQUIREMENTS ON THE DRAWINGS.

<u>Specification</u>:    RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.1.2.3, specifies:

> Class 1 ESDS parts, assemblies and equipment, including ESDS items in assembly parts lists, requiring Rigid Controls shall be identified as follows:
>
> a.    If a specification or drawing indicates an ESDS part, assembly or equipment requiring Rigid Controls, it shall be identified by an assembly note stating the representative ESD sensitivity or withstand voltage limit (6.2.2.).
>
> b.    If ESDS item(s) requiring Rigid controls are included in the assembly drawing parts list, these items shall be identified in the Nomenclature or Description column, or the Notes column as ESDS (XX) with a representative ESD sensitivity or withstand voltage limit shown parenthetically in volts. The items shall be cross referenced to an assembly note.

<u>Specification</u>:    RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 6.2.2 Rigid Controls, specifies:

> a.    If a specific ESDS part, assembly or equipment requires Rigid Controls, the drawing note shall read:
>
> HANDLE AND PROTECT ELECTROSTATIC DISCHARGE SENSITIVE (ESDS) ITEM REQUIRING RIGID CONTROLLED EXPOSURE(S) TO LESS THAN (XX) VOLTS, TO THE REQUIREMENTS OF RP 10-001/2.
>
> b.    If used as a reference to the parts list Nomenclature or Description Column or Notes column as requiring Rigid Controls, the drawing note shall

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

read:

HANDLE AND PROTECT ELECTROSTATIC DISCHARGE SENSITIVE (ESDS) ITEM(S) TO THE REQUIREMENTS OF RP 10-001/2 REQUIRING RIGID CONTROLLED EXPOSURE(S) TO LESS THAN THE VOLTAGE IDENTIFIED: "ESDS (XX)".

<u>False Defective Nonconformance:</u>   The FPIE Unit Part Number 421310-100 (consisting of one circuit card assembly 421327 and one circuit card assembly 421331) contains devices that require "Rigid" ESD Controls (Class 2, able to withstand less than 100 volts [approx 20 volts actual]). Drawing 421310-100 Notes 6 and 7, Drawing 421327 Note 3, and Drawing 421331 Note 3, all callout RP 10-001 without a Class requirement defaulting to Class 1 per specification. This default is considered "Normal" ESD controls (Class 1, able to withstand greater than 100 volts).

Work stations are required to be identified as dedicated for the installation of Class 2 components when Rigid Controls are necessary to protect components. The FPIE has numerous components that should be identified as "Rigid" ESD Controls (Class 2) (Ref: 421310-001, 421331, and 421327 Drawings), which has been confirmed in a conference on June 5, 2006 with Gundurao Prabhakar, El Segundo Principal Electrical Components Engineer, Matthew Lee, Active Components Technician, and the Relator MATESKI.

The FPIE has numerous components that should be identified as "Rigid" ESD Controls (Class 2): (Ref: 421310-001, 421331, and 421327 Drawings (Ref: Active Components):

R10002396-0001
R10003046-0001
R10003047-0001
R10003048-0001
5962R583403VXA
5962-8859301VPA

5962-9560401VXA
5962R9655801VXA
5962R9583403VXA
5962R9583303VXA
JANSR2N7389
JANS1N6642U
JANS1N6677UR-1

Sensitive components used in the FPIE Unit Part Number 421310-100 S/Ns 001, 002, 003, 004, and S/N 005 (consisting of circuit card assembly 421327 S/Ns 001, 002, 003, 004, and S/N 005 and 421331 S/Ns 001, 002, 003, 004, and S/N 005 respectively) should have been identified as "Class 2" (Rigid Controls) and were not. These Circuit Card Assembly components have been exposed to Latent ESD Defect Failure conditions exceeding their "Maximum Withstand Voltage Ratings" which will compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure, thereby constituting Product Substitution false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

39.

FALSE RAYTHEON RECKLESS DISREGARD BY CIRCUMVENTION OF VIIRS TEST SPECIFICATIONS, FIRST ARTICLE TESTING, AND TEST PROTOFLIGHT SPECIFICATIONS.

Specification:   Statement of Work For the VIIRS Day/Night Band Module Assembly P/N 417350-100 (Flight Unit 1), Paragraph 5.5.3: Special Test Request, specifies:

During acceptance testing if the need arises to perform engineering evaluation tests, or any special test that may be requested from the customer, program management or engineering that is not in the normal flow of the build/test sequence, a Special Test Request (STR) shall be generated in accordance with FE94.PI3_0 (3.0). The STR shall not be used as a substitute

1   for test procedures when testing flight hardware [for VIIRS].

2   <u>False Defective Nonconformance</u>:  In deliberate ignorance and reckless disregard,

3   RAYTHEON knowingly produced First Article units that have not been test-

4   qualified at specified levels to demonstrate flight worthiness. Previous FPIE testing

5   performed prior to the first attempted delivery at the CTI meeting (Date July 30,

6   2004) had been performed using an Unreleased Test Procedure and an Uncertified

7   STE Rack thereby invalidating all prior Acceptance Testing performed in this

8   condition.

9       RAYTHEON has substituted reduced Special Test Requirements (STR) in

10  lieu of specified testing, which compromises the NPOESS/VIIRS Unit/System

11  integrity and mission assurance, and cause the NPOESS mission downgrade or

12  failure of Flight 1, thereby constituting Product Substitution false claim violations

13  of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

14                                  40.

15      FALSE RECKLESS DISREGARD TO PERFORM 3-AXIS RANDOM

16  VIBRATION PROTOFLIGHT TEST SPECIFICATIONS ON FIRST ARTICLE

17  VIIRS FLIGHT HARDWARE.

18  <u>Specification</u>:   RAYTHEON CAGE Code 11323 Specification TP154640-764,

19  Rev. A, Paragraph 3.1 General Test Requirements, specifies:

20  Paragraph 3.1, General Test Requirements;

21      This section describes the test requirements, test objectives, equipment

22  requirements, and control provisions for the Focal Plane Interface

23  Electronics, referred to as FPIE, vibration test. The detailed steps necessary

24  to carry out this procedure for Protoqualification levels are contained in

25  Section 4. The detailed steps necessary to carry out this procedure for

26  Acceptance levels are contained in Section 5. The detailed steps necessary to

27  carry out this procedure for Workmanship/Penalty levels are contained in

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

Section 6. The FPIE shall be tested to verify the soundness of the units design/assembly and to demonstrate that the unit will survive and perform after being subjected to specified vibration levels. During each vibration test, the FPIE shall be mounted to a vibration test fixture in a manner simulating actual service installation and launch configuration. Prior to each test, the vibration test fixture shall be inspected to ensure that the correct mounting hardware is properly installed.  Vibration testing shall be applied separately along the three orthogonal axes defined in Figure 1.

Specification:     RAYTHEON  CAGE  Code  11323  TP154640-764,  Rev.  A, Paragraph 3.1.1 Prerequisites specifies:

Paragraph 3.1.1, Prerequisites;

Prior to commencing specific operations within this procedure, a consent to test meeting to assure the readiness of the FPIE for unit level vibration shall be held. All documentation for the FPIE and its subassemblies shall be reviewed for completeness. Any item that would prevent the FPIE from being tested is resolved prior to testing. In addition, the DNB FPIE integration and test procedures shall have been completed.  The FPIE shall be fully assembled and in unpowered launch configuration, but without any connector savers or shorting plugs attached to the unit connectors.

Specification:     RAYTHEON  CAGE  Code  11323  Specification  TP154640-764, Rev. A, Paragraph 3.1.2 Order of Execution specifies:

Paragraph 3.1.2, Order of Execution;

The normal order of testing is a sequence starting with the X-axis test, then the Z-axis and finally the Y-axis. The order of execution of the axis sequence in this procedure may be altered, as required, by the test director or his designee (The sequence of steps for a given axis to remain as described in this procedure.)

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

Specification:   RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, Paragraph 3.2 Objectives of this Procedure specifies:

Paragraph 3.2, Objectives of this Procedure;

The objective of the tests performed pursuant to this procedure is to demonstrate that the FPIE will survive the vibration levels expected during the launch of the NPP or NPOESS satellite without degrading the performance of the FPIE.

Specification:   RAYTHEON CAGE Code 11323 Specification TP154640-764, Rev. A, Paragraph 3.3.1 [specific] Test Requirements specifies:

Paragraph 3.3.1, [specific] Test Requirements;

The FPIE shall be subjected, separately along each of the three orthogonal axes defined in Figure 1, to resonance search and random vibration excitation. The FPIE shall be subjected to tests at the protoqualification, acceptance or workmanship levels found in PS154640-111 (also in Appendices III, IV and V).

Specification:  NPOESS/VIIRS Program QR (Quality Requirements) FE94, Lines 24/25: Testing specifies:

Lines 24/25: Testing;

1.  Tests must be described and documented before commencing and:

A.  Test procedures shall be a part of the engineering design package.

B.  Test records become part of the assembly traveler.

C.  Must describe in detail the following items:

(1)  Procedure

(2)  Setup

(3)  GSE (STE and OTE)

(4)  Flight hardware to be used

D.  Must be approved by (P.I. 7.6):

(1) REA

(2) Systems or Test Director

(3) QA (HW and SW)

E. At completion:

(1) The data must show pass/fail/conclusion, signature, and date by the test operator, the REA, and Quality.

(2) The documentation must be complete. All blanks and intended information must be filled in. "N/A" is allowable.

F. The whole sequence is considered mandatory after approval and when called out in the AHR unless deleted by one of the above "approval" personnel.

G. Portions may be changed with the approval of any two of the above "approval" personnel.

H. For special tests that are not part of the released engineering, and that use Flight hardware that is mechanically or electrically active, documentation must be prepared and handled per STR P.I. 3.0.

False Defective Nonconformance:  The 421310-100 S/N 002 FPIE Flight 1 Unit was presented as a "complete" unit at the first CTI (Consent To Integrate) sell-off meeting at RAYTHEON Goleta, California on July 30, 2004. One of the "Quality Findings" during the first CTI meeting was the discovery that the RAYTHEON Random Vibration Test Specification TP154640-764 was not 'Baseline' released as required in RAYTHEON Drawing procedures and Program QR (Quality Requirements) FE94. The FPIE Flight 1 Unit was originally tested using an unapproved and unreleased Random Vibration Test Procedure.  This test procedure was first released on July 12, 2005 as Rev.  "-". During the Random Vibe Acceptance preparations for the next CTI sell-off meeting, numerous changes were added and the specification was released as Revision "A" on March 3, 2006.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Previous FPIE testing performed prior to the first attempted delivery at the

2    CTI meeting (Date July 30, 2004) had been performed using an Unreleased Test

3    Procedure and an Uncertified STE Rack thereby invalidating all prior Acceptance

4    Testing performed in this condition.

5    Subsequent to the FPIE rejection at the CTI meeting (Date July 30, 2004),

6    the 421310-100 S/N 002 FPIE Flight 1 Unit was completely disassembled during

7    rework invalidating all previous Random Vibe Protoflight testing. Because this was

8    the first FPIE Flight Unit to deliver, this Unit was required to be Protoflight Tested

9    in 3-Axis as described TP154640-764, Rev. A, Paragraph 3.1, and the Unit was

10   required to be fully assembled as a prerequisite. Although the sequence order of

11   execution could be altered as described TP154640-764, Rev. A, Paragraph 3.1.2 the

12   sequence of steps for each given axis were to be performed as specified, to

13   demonstrate that the FPIE will survive the vibration levels expected during the

14   launch of the NPP or NPOESS satellite without degrading the performance of the

15   FPIE.

16   Because the 421310-100 S/N 002 FPIE Flight 1 Unit was never tested in the

17   completed configuration to an approved and released test procedure (TP154640-

18   764), and was in fact disassembled, reassembled, and tested for the first time in the

19   fully completed configuration to a reduced penalty Test STR-181 (Special Test

20   Requirement, Penalty Test Section 6, VIIRS Statement of Work) at reduced levels,

21   in (one) Y-Axis only, when it should have been tested to the more severe

22   Protoflight levels in 3-Axis (Protoflight Test Section 4) as is required of the first

23   Unit, whereby the 421310-100 S/N 002 FPIE Flight 1 Unit is unfit for launch,

24   which compromises the NPOESS/VIIRS Unit/System integrity and mission

25   assurance, and causes the NPOESS mission downgrade or failure, thereby

26   constituting Product Substitution and false claim violations of the False Claims Act,

27   31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

28

41.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO TEST VIIRS FPA/FPIE UNITS AS A "MATCHED PAIR" TO VERIFY COMPLIANCE WITH THE DNB PERFORMANCE SPECIFICATION.

Specification: RAYTHEON is contracted to build, test, and produce (1 each) Part Number 417350-100 DNB (Day/Night Band) module for each Flight (Paragraph 1 of the Statement of Work). The DNB Module consists of (1) 421310-100 FPIE Unit (built at RAYTHEON El Segundo) and (1) 417360-100 FPA Unit (built at RAYTHEON Goleta). The FPA and FPIE Units must be "tuned" together as a "matched pair". FPA test measurements generate tuning data subsequently provided to RAYTHEON El Segundo from RAYTHEON Goleta. RAYTHEON El Segundo uses this data to determine what value Resistors are to be installed (Ref: 421331 Drawing Note 38 and 421327 Drawing Note 27). "Resistor Select" requirements vary in values due to cumulative tolerance buildup caused by individual part tolerances in any given circuit and unit.

False Defective Nonconformance: In deliberate ignorance and reckless disregard, RAYTHEON knowingly failed to identify the "matched pair" requirements on the drawings which in turn allowed RAYTHEON to test the FPIE Flight 1 Unit with another (Non-Flight) FPA EDU2 Unit. Testing in this manner does not provide Resistor Select value validation at the lower DNB level of production thus covering-up marginal performance findings. Upon FPIE Unit integration at the space craft, subsequent opening of the VIIRS FPIE Unit for "retuning" will be required, invalidating all prior Lower Level Unit Acceptance Testing, which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, and causes the NPOESS mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

1          42.

2          FALSE DEFECTIVE NONCONFORMANCE VIIRS COLD (DEWAR)

3   ACCEPTANCE TESTING. FALSE RAYTHEON RECKLESS DISREGARD TO

4   PERFORM COLD ACCEPTANCE TEST REQUIREMENTS ON FIRST

5   ARTICLE DNB VIIRS FLIGHT HARDWARE.

6   Specification:   RAYTHEON CAGE Code 11323 Specification TP154640-762,

7   Rev. A, Paragraph 1.1 Scope specifies:

8          Paragraph 1.1, Scope:

9          This document describes the Acceptance Test Procedure for the Day Night

10         Band Module, P/N  417350-100, a visible band imaging subassembly of the

11         NPOESS VIIRS sensor suite. The performance test procedures defined

12         herein constitute a sequence of tests to be performed to measure and verify

13         the performance requirements of the DNB Module per PS154640-124.

14   False Defective Nonconformance:   RAYTHEON builds, tests, and produces the

15   421310-100 FPIE Unit using the FPA tuning data provided to RAYTHEON El

16   Segundo from RAYTHEON RVS Goleta. This tuning data is used to determine

17   what "Resistor Select" values are to be installed in the FPIE. Acceptance Testing

18   must be performed using the actual "Matched Pair" Flight Units to validate and

19   confirm the "Resistor Selects" have been properly chosen and the integral system

20   will optimally perform as predicted. The "Matched Pair" of Units must be tested in

21   Flight-like conditions requiring the paired Units to be installed and tested in a Cold-

22   Box (Dewar) configuration to achieve the cold temperatures that the Units will be

23   required to perform in during their mission. Units are cycled over various cold

24   temperatures under power to validate performance as an integral system.

25         The 417350-100 DNB (Day/Night Band) module was retested using (1)

26   421310-100 S/N 002 FPIE Flight 1 Unit (built at RAYTHEON El Segundo) and (1)

27   Non-Flight D417360-100 FPA EDU2 Unit (built at RAYTHEON RVS Goleta) to

28

1 perform testing.

2     The FPIE Flight 1 Unit was Acceptance "Cold" Tested after the first CTI

3 (consent To Integrate meeting on July 30, 2004) for the second time to an

4 abbreviated Acceptance Test (STR-248) using a Non-Flight FPA EDU2 of

5 unknown Drawing revision level and suspect quality. This was done to assist in the

6 closure of test EFRs (Event Failure Reports) that were generated as a result of poor

7 performance in the first test. These were EFRs No. 2183 and 2132. The Non-Flight

8 FPA EDU2 was used because the Flight FPA 417360-100 S/N 001 had already

9 been integrated into the next assembly and was not available to be used in

10 analyzing the failures to close the EFRs.

11     Previous FPIE testing performed prior to the first attempted delivery at the

12 CTI meeting (Date July 30, 2004) had been performed using an Uncertified STE

13 Rack thereby invalidating all prior Acceptance Testing performed in this condition.

14 Subsequent disassembly, rework, and reassembly further invalidated all prior

15 Acceptance Testing.

16     The 421310-100 S/N 002 FPIE Flight Unit 1 has been unnecessarily exposed

17 to a marginally functioning Non-Flight FPA EDU2 (D417360-100 S/N 002) of

18 unknown Drawing revision level and suspect quality, damaged in test when

19 connected to the Non-Flight FPIE Emulator while attempting to qualify the STE

20 (Dewar) Cold-Box, whereby the 421310-100 S/N 002 FPIE Flight 1 Unit integrity

21 has been compromised and must be considered unfit for launch, which

22 compromises the NPOESS/VIIRS Unit/System integrity and mission assurance,

23 and causes the NPOESS mission downgrade or failure, thereby constituting Product

24 Substitution and false claim violations of the False Claims Act, 31 U.S.C. §

25 3729(a)(1), and § (a)(1)(A).

26

27

28

43.

FALSE RAYTHEON RECKLESS DISREGARD TO PERFORM VIIRS THERMAL CYCLING PER ACCEPTANCE TEST REQUIREMENTS ON FIRST ARTICLE DNB FLIGHT HARDWARE.

Specification:    Statement of Work For the VIIRS Day/Night Band Module Assembly P/N 417350-100 (Fit Unit 1), Revision "-"/August 15, 2005, Paragraph 5.5.3: Special Test specifies:

> During acceptance testing if the need arises to perform engineering evaluation tests, or any special test that may be requested from the customer, program management or engineering that is not in the normal flow of the build/test sequence, a Special Test Request (STR) shall be generated in accordance with FE94.PI-3_0 (3.0). The STR shall not be used as a substitute for test procedures when testing flight hardware.

Specification:    Day/Night Band Module Test Procedure Cage Code 11323, TP154640-762, Paragraph 1.1 specifies:

> 1.1 Scope;
>
> This document describes the Acceptance Test Procedures for the Day Night Band Module, P/N 417350-100, a visible band imaging subassembly of the NPOESS/VIIRS sensor suite. The performance test procedures defined herein constitute a sequence of tests to be performed to measure and verify the performance requirements of the DNB Module per PS154640-124.

False Defective Nonconformance:    RAYTHEON El Segundo is contracted to deliver to RVS (RAYTHEON Vision Systems Goleta) a DNB Unit Part Number 417350-100 consisting of (1) RAYTHEON El Segundo built 421310-100 FPIE Unit and (1) RAYTHEON RVS supplied 417360-100 FPA Unit. RAYTHEON is responsible to build, inspect, and test the FPIE, integrate it with the FPA, and perform several additional tests including Thermal Cycling tests still not performed

as required.  The FPIE 421310-100 S/N 002 FPIE Flight 1 Unit was Acceptance Thermal Cycle Tested to a reduced requirement STR-040. Due to VIIRS schedule constraints, the decision was made to issue an STR reducing the overall Thermal Cycling duration to approximately (2) days in lieu of the required Thermal Cycle tests duration of approximately (23) days. This is the first deliverable flight unit which should have been tested using the "Matched Pair" FPA to perform Protoflight Thermal Cycle requirements that would in fact validate and qualify the DNB Module performance.

The 421310-100 S/N 002 FPIE Flight 1 Unit was completely disassembled during rework invalidating all previous Thermal Cycle testing. In that this was the first flight FPIE Unit to deliver, this FPIE Flight 1 Unit was required to be Protoflight Thermal Cycle Tested in flight configuration using a flight FPA as described TP154640-762, Rev. A.

Previous FPIE testing performed prior to the first attempted delivery at the CTI meeting (Date July 30, 2004) had been performed using an Unreleased Test Procedure and an Uncertified STE Rack thereby invalidating all prior Acceptance Testing performed in this condition. Subsequent disassembly, rework, and reassembly further invalidated all prior Acceptance Testing.

In that the 421310-100 S/N 002 FPIE Flight 1 Unit was never tested in the completed configuration to the approved and released test procedure (TP154640-762), and was in fact disassembled, reassembled, and tested for the first time in an incomplete (non-flight) configuration to a Penalty Thermal Cycle Test STR-040 (Special Test Requirement, Penalty Test Section 6, Statement of Work) at reduced levels, when it should have been tested to the more severe Acceptance levels in flight configuration as is required of the flight Units, the 421310-100 S/N 002 FPIE Flight 1 Unit is unfit for launch, because it does compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission

downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

44.

FALSE RAYTHEON RECKLESS DISREGARD TO PERFORM TO VIIRS EMI/EMC TEST REQUIREMENTS ON FIRST ARTICLE DNB VIIRS FLIGHT HARDWARE.

Specification: 417350-100 DNB Drawing, Note 3: Assembly shall meet the Requirements of Module Performance Specification PS154640-124. PS154640-124, Paragraph 3.3.2 defines EMI/EMC Susceptibility requirements. 421310-100 FPIE Drawing, Note 26, Assembly shall meet the Requirements of 421310-500 FPIE Assembly Interface Control Drawing and PS154640-126 (Product Spec. DNB Focal Plane/FPIE VIIRS). PS154640-126, Paragraph 3.3.2 defines EMI/EMC Susceptibility Design requirements.

False Defective Nonconformance. RAYTHEON El Segundo is contracted to deliver to RVS (RAYTHEON Vision Systems Goleta) a DNB Unit Part Number 417350-100 consisting of (1) RAYTHEON El Segundo built 421310-100 FPIE Unit and (1) RAYTHEON RVS supplied 417360-100 FPA Unit. RAYTHEON is responsible to build, inspect and test the FPIE, integrate it with the FPA, and perform several additional tests including visual tests and EMI/EMC (Electro-Magnetic Interference/ Electro-Magnetic Contamination) testing (required for all instruments) which is still not yet performed in reckless disregard by RAYTHEON, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

45.

FALSE RAYTHEON CIRCUMVENTION OF VIIRS PROCUREMENT PROCESSES, QUALIFICATION TESTING OF PROCURED COMPONENTS, AND TRACE SPECIFICATIONS FOR SPACE PROGRAMS. FALSE

RAYTHEON RECKLESS DISREGARD TO PROCURE VIIRS FLIGHT PARTS THROUGH SUPPLY CHAIN CIRCUMVENTING QUALITY.      FALSE RAYTHEON RECKLESS DISREGARD TO MAINTAIN SPACE TRACE REQUIREMENTS ON VIIRS FLIGHT PARTS THROUGHOUT BUILDUP OF VIIRS.

Specification:   PQR (Program Quality Requirements) FE94, Line 6, Purchasing requirements. MIL-STD-975, MIL-STD 981, MIL-HDBK-1547A, MIL-STD-889, and MIL-HDBK-5400, Guideline 22 Parts Control Program as well as the NPOESS Program Directive NGIID D31418, Revision A.

False Defective Nonconformance:   Numerous Capacitors and Resistors were purchased through the El Segundo Facility Experimental Non-Flight "EPP Stores" circumventing the normal Procurement Process violating PQR (Program Quality Requirements) FE94, Line 6, Purchasing requirements (as itemized in Cap-trace2.txt, and Email-Cap-trace.doc dated 2/28/06 Mario Farr, Shop Supervisor). In reviewing the listed components, which were purchased on Flight PO 151804. Actual review of receiving documents reveals these components were purchased through a non-flight experimental "EPP" Stores account as "Engineering" quality level components and later pulled from a non-flight Stores Account, reidentified as Flight components, sent to an outside vendor (American Tape and Reel) under Flight PO 151804 and returned to RAYTHEON to close into Flight Stores. Stores use of "various receipts" has effectively broken the trace from the original PO these parts were purchased on, violating the "Space Trace" requirements of the PQR, FE94 itemized in initial kit-pull trace reports (including wrong CCA serialization) presented at the first CTI date 7/30/04 vs.; corrected kit-pull trace reports presented at the second CTI date of 4/25/06. All of these parts went out to a vendor American Tape and Reel Company to be placed on "Tape & Reels" for use in the Pick-N-Place machine.

| | |
|---|---|
| CWR11JC156KCB | (RAYTHEON Lot # AVT0213PO151804) |
| CWR11MC475KCB | (RAYTHEON Lot # AVT0213PO151804) |
| CWR11MC475KCB | (RAYTHEON Lot # AVT0213PO151804) |
| M123A11BPB102JS | (RAYTHEON Lot # KEM0018A1PO151804) |
| M123A10BPB101JS | (RAYTHEON Lot # KEM0209A4PO151804) |
| M123A12BXB103KS | (RAYTHEON Lot # KEM0212A7PO151804) |
| M123A12BXB104KS | (RAYTHEON Lot # KEM0147A6PO151804) |

In deliberate ignorance, RAYTHEON Mario Farr, Shop Supervisor knowingly circumvented supply chain procurement processes on components purchased for the NPOESS/VIIRS space program resulting in failures to meet the minimum requirements for Quality Inspections, Component Qualification Testing, and Space Trace requirements of Flights 1, 2, 3 and 4. Despite subsequent warning on the VIIRS Program to halt this practice, Mario Farr continued this false practice today on other components recently purchased for another program. RAYTHEON reckless disregard failure to Maintain Component Space Trace requirements, Systematic attempts to conceal and circumvent the standard Procurement and Receiving processes, and attempted delivery of VIIRS Flight hardware in that defective condition at the first CTI sell-off meeting (July 30, 2004), thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

46.

FALSE RAYTHEON RECKLESS DISREGARD BY INITIAL FAILURE TO PERFORM VIIRS QUALIFICATION TESTING, DESTRUCTIVE PHYSICAL ANALYSIS TESTING, RADIATION LOT ACCEPTANCE TESTING, BURN-IN AT SPECIFIED LEVELS, AND PROHIBITIVE MATERIAL INSPECTION ON VIIRS FLIGHT COMPONENTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification: R10002396, R10003046, R10003047, R10003048, R10002340, R10002694, R10002695 Group A, B, D, E, DPA, and RLAT testing as well as

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

Specific Burn-in at designated levels.

False Defective Nonconformance:   The 421310-100 S/N 002 FPIE Flight 1 Unit was presented as a "complete" Unit at the first CTI (Consent To Integrate) sell-off meeting in RAYTHEON Goleta, California on July 30, 2004. After numerous Quality Defective Nonconformances were discovered, the FPIE Flight 1 Unit was rejected at CTI sell-off and returned to El Segundo for rework at tremendous VIIRS Program expense.

As RAYTHEON began to rebuild the FPIE Flight 1 Unit, the Relator MATESKI was told by several RAYTHEON El Segundo VIIRS FPIE Team Members Bernard Malis (Retired), Manufacturing Lead, Thomas James (Retired), Responsible Engineering Authority, Ronald Estes, Lead Engineer, and Steven Adams, Configuration Management RVS Goleta, not to look at Space Trace, Part Revisions, or perform a Configuration Review on the FPIE Unit hardware prior to beginning Acceptance Testing as is required. The Relator MATESKI was told that the FPIE Unit had already been presented at CTI, and therefore, only to rework the Quality Findings and not to reinvent the wheel. Relator MATESKI was instructed to remove the Configuration Verify sequence (Oper B330) and proceed with the FPIE Flight 1 Unit test. When the FPIE Flight 1 Unit testing had been completed, Relator MATESKI began to perform a Final Configuration Review prior to sell-off CII (Complete Item Inspection) as is also required. It was at this time that Relator MATESKI discovered that the previous review findings did not uncover numerous components used in the FPIE Flight 1 Unit had not been Qualification Tested, Burned-in at specified levels, DPA Inspection Qualified, and/or PMI Screened for Prohibited Materials as well as finding numerous Space Trace deficiencies.

The FPIE contains devices that require Group A, B, D, E, DPA and RLAT testing as well as Specific Burn-in requirements that were missed (Ref: Active ICs: R10002396, R10003046, NCMR EIS76525, R10003047, NCMR EIS76515,

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

R10003048), and (Ref: passive RF inductor chip coils; R10002340, R10002694, R10002695) which violates MIL-STD-981, MIL-HDBK-1547A, and MIL-HDBK-5400 Guideline 22 Parts Control Program as well as the NPOESS Program Directive NGIID D31418, Revision A. These very basic component testing requirements were not performed on VIIRS prior to consumption into the product. Testing Records were later created using remaining Lot inventory or; where remaining inventory was zero, a case was presented where similar Die Lot inventory was located through suppliers in an attempt to exonerate defective components after-the-fact.

In deliberate ignorance and reckless disregard, RAYTHEON knowingly circumvented supply chain procurement processes on components purchased for the NPOESS/VIIRS space program resulting in failures to meet the minimum requirements for Quality Inspections, Component Qualification Testing, and Space Trace requirements of Flights 1, 2, 3 and 4 by systematic use of letters of authorization to suppliers allowing them to ship components to RAYTHEON prior to the completion of VIIRS space component qualification testing.

Failure to follow-up and Perform all Component tests prior to falsely allowing commingling unqualified components in Flight Quality stores as specified, constitutes Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

47.

FALSE RAYTHEON RECKLESS DISREGARD OF FAILURE TO PERFORM X-RAY TESTING ON VIIRS FLIGHT PARTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification: R10002340, R10002694, R10002695 devices require (3) views (or more as needed) 100% X-Ray internal image verification screening (for FOD, alignment, wire nicks, wire attach, core damage, etc.).

<u>False Defective Nonconformance</u>: The FPIE contains devices that require 3 views (or more as needed) 100% X-Ray internal image verification screening (for FOD, alignment, wire nicks, wire attach, core damage, etc.) that were never performed (Ref: passive RF inductor chip coils; R10002340, R10002694, NCMR EIS76505, R10002695, NCMR EIS6508). This is required to be performed at the vendor after assembly or may be performed by advance agreement by RAYTHEON. Neither the vendor nor RAYTHEON performed this critical 100% X-Ray of every part as is evidenced by the FOD (Foreign Object Damage) Particles found inside the sample later tested, and also a cracked bobbin core (Ref: R10002694-0001, confirmed on February 28, 2006 with Rick Zelman QAE, and Richard Murth, Components Engineer).

A vendor may not change the process by which it assembles these parts without a prior 30 day notification in writing through RAYTHEON procurement agents. The wire winding attach was made via resistance welding vs; hi-temp solder without prior authorization (DPA Report DA06-0093A). RF Inductors could not meet the required 100% X-Ray testing (3) view requirement as they had already been installed into the FPIE Flight 1 Unit. The 421310-100 S/N 002 FPIE Flight 1 Unit (and Circuit Card Assemblies 421331 and 421327 S/Ns 001, 002, 003 and 004 respectively) have components that have not been X-Ray tested (Ref: R10002694-0001) as defined in the Specification R10002694 whereby the FPIE Flight 1 Unit is compromised and unfit for launch which compromises the NPOESS/VIIRS Unit/System integrity and mission assurance, and causes the NPOESS mission downgrade or failure. RAYTHEON falsely stated that although the representative sample part subsequently tested contained FOD and a cracked bobbin core, and was not assembled using the Hi-Temp solder, that defective VIIRS Flight components already installed were acceptable as-is for VIIRS Flight use, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. §

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

3729(a)(1), and § (a)(1)(A).

48.

FALSE RAYTHEON RECKLESS DISREGARD TO SEGREGATE VIIRS FLIGHT VS. NON-FLIGHT HARDWARE DURING VIIRS ASSEMBLY.

Specification:  VIIRS Program QR (Quality Requirements) FE94, Line 8, Space Trace requirements;

False Defective Nonconformance:   RAYTHEON knowingly stored Flight and Non-Flight quality level components in the same WIP location and intermingled Flight and Non-Flight quality levels of hardware on the same work stations while performing operations, failing to meet the minimum segregation requirements for Space Programs Space Trace requirements of Flights 1, 2, 3, and 4 causing subsequent downgrade of VIIRS S/N 001 & S/N 005 at VIIRS Program expense.

The FPIE Flight 1 Unit was routinely worked on (rebuilt) in a Non-Flight STE Laboratory / Machine Shop environment located at E01/Rm C1250/Laboratory 22. Additionally, this work was performed on work stations not identified as "PRD/PRG Flight Only". Non-Flight hardware remained on the work stations and in close proximity to the Production Flight Hardware under assembly. This STE Laboratory had an abundance of both Non-Flight and Flight components stored together including; Resistors, Capacitors, Thermistors, Jack Posts, Nuts, Screws, Wire, Shrink Sleeving, etc. This is in violation of Program QR (Quality Requirements) FE94, Line 8, Trace requirements. The FPIE Unit Part Number 421310-100 S/N 001, S/N 002, S/N 003, S/N 004 and S/N 005 (consisting of one circuit card assembly 421327 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 and consisting of one circuit card assembly 421331 S/N 001, S/N 002, S/N 003, S/N 004, and S/N 005 respectively) have been exposed and intermingled with Non-Flight hardware, which does compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or

failure.

At the first CTI (Consent To Integrate - July 30, 2004) meeting, an attempt was made by RAYTHEON El Segundo to sell-off the 421310-100 S/N 002 FPIE Flight 1 Unit. The "Space Trace" reports presented (kit pulled reports) did not meet the minimum Space Trace requirements. Documentation and trace were not being kept as parts were changed (NCMR EIS74862, EIS7714301, EIS77144-1, EIS77169-1, EIS77511, EIS 76924, EIS77819). Reference original pulled kit reports (from first CTI delivery attempt) vs; cleaned-up pulled kit reports for comparison.

Since the first CTI (Consent To Integrate) meeting on July 30, 2004, the FPIE Unit S/N 001 has been formally downgraded to Non-Flight (NCMR N00018). It was discovered that there were too many Deltas to complete the Unit "as-built". This S/N 001 Unit was unable to demonstrate both "Space Trace" requirements and Assembly Record documentation and was subsequently disqualified for Flight.

On September 9, 2006 another VIIRS meeting was held to discuss the method of storage for incomplete Flight Units 2 and 3 Circuit Cards in Flight Stores with RAYTHEON employees present: John Adams, Manager Supply Chain, Michael Ord, Stores Representative, Aaron Smith, SAS Management, Michael Haley, Operations Management, and John Pakusich, Management Staff, assembled together with Relator MATESKI. After reaching agreement on the storage of Flight Units, Relator MATESKI announced to all present that he and John Pakusich had been tasked with sorting out remaining inventory in the laboratory. After many unsuccessful attempts to identify individual components, it was discovered that Circuit Card kits S/N 005 had been partially kitted and work (lead forming and pre-tinning) had been started. These components were missing part number identification, PO trace, and commingled with several Non-Flight components in a large tote-tub in the laboratory. There were also several ICs (Integrated Circuits)

both new and used where some appeared to have bonding material residue on them from a previous installation. Further investigation revealed component D8 (F/N 13) was missing from the 421327 S/N 003 kit. There was (1) component missing from this group on the S/N 005 kit and after verifying there was no documented activity to replace the missing D8 component in the S/N 003 original kit, it appears the part was simply taken from the S/N 005 kit and used in the S/N 003 kit without documentation. After disclosing that trace had not been kept on these Flight components, John Adams suggested that kit S/N 005 be downgraded on an NCMR for lack of trace.

Prior attempts made by Material Planners Tracy Keener and Delsenia Lee to clean up the remaining components from the Non-Flight STE Laboratory / Machine Shop located at E01/Rm C1250/Laboratory 22 caused numerous loose components and components on reels to be returned to Non-Flight Stores for lack of trace as these could not positively be identified as Flight quality components (Delsenia Lee Email dated 9/05/2006 @ 11:41 am), thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

49.

FALSE RAYTHEON RECKLESS DISREGARD TO DESIGN TO PROVIDE ESD AND EMI/EMC PROTECTION FOR VIIRS MATERIALS AND EQUIPMENT IN COMPLIANCE WITH ESD AND EMI/EMC REQUIREMENTS FOR VIIRS FLIGHT HARDWARE.

Specification: RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment specifies:

ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be

1  included in site specific documentation, or attached as an exhibit to this
2  document.

3  Specification: NPOESS General Instrument Interface Document (NGIID D31418,
4  Revision A), Interface Control Document IF233295 EMI/EMC Requirements: No
5  floating wires shall be allowed.

6  Specification: NPOESS General Instrument Interface Document (NGIID D31418,
7  Revision A), Interface Control Document IF233300 Spacecraft charging
8  Requirements: The design shall provide reliable electrostatic grounding connections
9  between all conductive elements.

10  Specification: NPOESS General Instrument Interface Document (NGIID D31418,
11  Revision A), Interface Control Document IF233305 Resistance Requirements: The
12  resistance between the grounded elements shall not exceed 100 ohms DC.

13  False Defective Nonconformance: VIIRS Flight Unit 1 Encoding Motor output
14  cable shieldings are not grounded (use of un-terminated "Floating Shields"). In
15  deliberate ignorance and reckless disregard, RAYTHEON failed to design to
16  provide ESD (Electrostatic Discharge) and EMI/EMC (Electromagnetic
17  Interference / Electromagnetic Contamination) shielding protection to surrounding
18  sensitive instruments as required. Comparable to FPIE / FPA - ESD Exposures
19  from "Floating Shields" used on STE Test Cable initial designs. RAYTHEON
20  falsely stated in RDW_VIIRS-W001 ungrounded and unterminated cable shielding
21  would be acceptable for Flight use due to schedule constraints that would require a
22  four (4) week slip in schedule violating NGIID EMI/EMC and ESD exposure
23  requirements, which compromises the NPOESS/VIIRS Unit/System integrity and
24  mission assurance, and causes the NPOESS mission downgrade or failure, thereby
25  constituting Product Substitution and false claim violations of the False Claims Act,
26  31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

27
28

50.

FALSE RAYTHEON RECKLESS DISREGARD BY FAILURE TO DEVELOP AND DOCUMENT SOFTWARE USED IN ACCEPTANCE TESTING OF VIIRS FLIGHT HARDWARE.

Specification:  NPOESS General Instrument Interface Document (NGIID D31418, Revision A, Paragraph 3.4.4), Interface Control Document IF234920, Software Including Databases:

> Instrument software and databases should be developed and managed in accordance with EIA/IEEE J-STD-016 and NOAA S24.806 software standards. EIA/IEEE J-STD-016 will take precedence.

Specification:  NPOESS General Instrument Interface Document (NGIID D31418, Revision A, Paragraph 3.3.11.1.4) Interface Control Document IF233750:

> The instrument contractor will deliver a Software Development Plan (SDP) three months after contract award. The SDP will specify the instrument contractor's processes for developing both instrument and algorithm software. These processes will reflect the complete software development life cycle (i.e., from the generation of software requirements through the verification test of delivered functionality), including all supporting activities (e.g., planning and oversight, software quality assurance, configuration management) and a description of all documentation generated.

Defective Nonconformance:  With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed the admitted VIIRS defective nonconformance of RAYTHEON failures to develop and document software used in Acceptance Testing of VIIRS Flight Hardware, thereby constituting false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

51.

FALSE RAYTHEON RECKLESS DISREGARD BY THE DEFECTIVE NONCONFORMANCE VIIRS CHASSIS J1 AND J2 CONNECTORS.

Specification:  NPOESS General Instrument Interface Document (NGIID D31418, Revision A), Interface Control Document IF230890 Primary and Redundant Power Requirements: Each Power Interface shall consist of Redundant Two (Isolated) Power Feeds Routed via Two Separate Connectors. These Connections are designated as Power Feeds A and B.

DNB Specification:  417350-100 Drawing Revision -, Day/Night Band Module Assembly

FPIE Specification: 421310-100 Drawing Revision C, Focal Plane Interface Electronics Assembly

421312 Drawing Revision B, FPIE Chassis

421327 Drawing Revision B, A □ D Board Assembly

421331 Drawing Revision C, Clock Board Assembly

SC80414 Drawing Revision C, Connectors, Rectangular, Microminiature   with leads

MIL-DTL-83513/3G Connectors, Rectangular, Plug, Class M, Crimp type

MIL-DTL-83513/4G Connectors, Rectangular, Receptacle, Class M, Crimp type

MIL-DTL-83513/5G Connectors, Rectangular, Mounting Hardware

FPA Specification:

417360-100 Drawing Revision A, Focal Plane Assembly

417356 Drawing Revision C, Bezel/CCD Assembly

417351 Drawing Revision G, Bezel/ICB Assembly

417363 Drawing Revision D, Interconnect Board Assembly

417367 Drawing Revision C, Connector, Receptacle, 51 Socket

417368 Drawing Revision C, Connector, Receptacle, 100 Socket

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

1   417340 Drawing Revision B, EMI Backshell, 51 Socket

2   417341 Drawing Revision B, EMI Backshell, 100 Socket

3   <u>Specification</u>:  Backshell mounting holes for the J2 Connector are specified in MIL-

4   DTL-83513 Revision G (Configuration C) as .145" -.150" Diameter nominally, and

5   attach hardware callout is NAS1532C04-4 (or .112" Diameter nominally) causing

6   an excessive clearance of .033" - .038" allowing the connector to be installed,

7   torqued, and bond-staked off center by as much as .019" in any direction exceeding

8   normal cumulative tolerance clearances preventing successful mate on the next

9   assembly.

10       Backshell mounting holes for the J1 Connector are specified in MIL-DTL-

11   83513 Revision G (Configuration B) as .088" - .094" Diameter nominally, and

12   attach hardware callout is NAS1532C02-4 (or .086" Diameter nominally). While

13   within the dimensionally acceptable tolerance range, unshouldered Socket Head

14   Cap Screws are not in compliance with MIL-DTL-83513/5G specification.

15   <u>False Defective Nonconformance</u>. The fit interference VIIRS FPIE/FPA defective

16   nonconformance has been verified at RAYTHEON Goleta (RVS) by Clifford

17   Nichols, RVS Lead Engineer, Nevil Maassen, RVS Mechanical Design Engineer,

18   and by Ronald Estes, ELS Lead Engineer, concerning the VIIRS FPIE (421310-100

19   S/N 002), whereby the attempted RAYTHEON integration of the VIIRS FPIE with

20   the VIIRS FPA (421360-100 S/N 001) has revealed that the J2 Connector will not

21   mate caused by RAYTHEON false design tolerancing in defective noncompliance

22   with the VIIRS contract specifications.

23       The VIIRS FPIE Chassis J2 Connector cutout is undersize exceeding the

24   maximum material condition for the FPA mating P2 Connector causing an

25   interference of .001" to .0015" preventing the mate. The VIIRS defective

26   nonconformance is further aggravated by the VIIRS <u>Specification</u> that the mating

27   hardware for the custom designed FPIE Connectors at the J1 and J2 locations

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1   require the use of shoulder screws as mounting hardware as specified in MIL-DTL-
2   83513 Revision G. These shoulder screws maintain connector alignment in relation
3   to Chassis cutout when installed. The VIIRS FPIE Drawing 421310-100 Revision C
4   callout for the J1 and J2 Connectors mounting hardware is for unshouldered
5   (undersize) Socket Head Cap Screws.

6       A change (correction) in RAYTHEON 421310-100 Drawing will be required
7   to correct mounting hardware callouts at Find Numbers 12, 13, 14, and 15. Another
8   change (correction) in RAYTHEON 421312 Chassis Drawing will be required to
9   correct the undersize J2 cutout.

10       Correction of the undersize J2 Connector cutout in the VIIRS FPIE Chassis
11   will require an NCMR (Non-Conformance Material Report) to be generated and
12   dispositioned for complete FPIE disassembly, remachining of the J2 Chassis cutout,
13   Dahlic Brush-coat Nickel plating touch-up (repair), and repainting should the
14   Chassis paint become damaged during rework. Reassembly of the VIIRS FPIE
15   defective nonconformance will require installation of the circuit cards into the
16   Chassis, torqueing, bond-staking of mounting hardware, bonding of Thermistors,
17   Inspection, photographing of installed cards in the chassis, precision cleaning,
18   "open-chassis" Bake-out, installation of covers, torqueing, bond-staking of cover
19   mounting hardware, Inspection, another precision cleaning, "closed-chassis" Bake-
20   out, and full Acceptance Testing including, Ambient Performance Testing,
21   Vibration Testing, and Thermal Cycle testing as disassembly for rework of the
22   VIIRS/FPIE Unit will invalidate all prior Acceptance Testing, thereby constituting
23   false claim violations of the False Claims Act, 31 U.S.C. § 3730(a)(1) and (2), and
24   § (a)(1)(A) and (B).

25       In deliberate ignorance and reckless disregard, RAYTHEON knowingly
26   failed to design and produce the VIIRS FPIE primary and redundant J7A and J7B
27   power feed connectors, which compromises the NPOESS/VIIRS UNIT/SYSTEM
28

integrity and mission assurance resulting in mission downgrade or failure, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

52.

FALSE RAYTHEON RECKLESS DISREGARD OF THE RAYTHEON MATERIALS AND PROCESS ENGINEERING GROUP DESIGN GUIDE BULLETINS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

The RAYTHEON Materials and Process Engineering Group issues MPE Bulletins documenting "LESSONS LEARNED" to be avoided while in the design process, but were ignored by the RAYTHEON Design Group and caused the RAYTHEON VIIRS defective nonconformances, which have been alleged with particularity herein.

(1)    RAYTHEON MPE Bulletin "STAINLESS STEEL CAN CAUSE CORROSION", Issue 1, June 30, 2003, which documents the RAYTHEON actual knowledge, and the deliberate ignorance and reckless disregard that caused the VIIRS defective nonconformances alleged at Paragraphs 23, 25, 45 and 55 alleged herein, aggravated by the RAYTHEON unauthorized false waiver circumvention and concealment alleged at Paragraph 58 herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(2)    RAYTHEON MPE Bulletin "TIN WHISKERS", Issue 6, September 8, 2003, which documents the RAYTHEON actual knowledge, and the deliberate ignorance and reckless disregard that caused the VIIRS defective nonconformances alleged at Paragraphs 19, 22, 24, 42, 45, 46 and 56 alleged herein, aggravated by the RAYTHEON unauthorized false waiver circumvention and concealment alleged at Paragraphs 58 and 59 alleged herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(3)     RAYTHEON MPE Bulletin "GALVANIC CORROSION", Issue 8, October 6, 2003, which documents the RAYTHEON actual knowledge, and the deliberate ignorance and reckless disregard that caused the VIIRS defective nonconformances alleged at Paragraphs 22, 25, 45, 55, 57 and 59 alleged herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

(4)     RAYTHEON MPE Bulletin "DESIGN TO AVOID FASTENER GALLING", Issue 12, December 1, 2003, which evidences the RAYTHEON actual knowledge, and the deliberate ignorance and reckless disregard that caused the VIIRS defective nonconformance alleged at Paragraph 23 alleged herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

(5)     RAYTHEON MPE Bulletin "COMMON SOFTWARE PROCESS PRACTICE", "Software Quality Engineering", Issue 19, Revision L, April 27, 2001, which evidences the RAYTHEON actual knowledge, and the deliberate ignorance and reckless disregard that caused the VIIRS defective nonconformance alleged at Paragraph 47 alleged herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

53.

FALSE RAYTHEON RECKLESS DISREGARD OF RAYTHEON EVENT FAILURE REPORT 3250 CONCERNING ESD EXPOSURE DISCLOSED IN GIDEP ALERT #GB4-P-06-01A.

On May 25, 2007 at 11:54 A.M., the Coplaintiff Relator Steven Mateski was alerted concerning a NPOESS VIIRS FPIE ESD exposure via email from Michael Haley, RAYTHEON VIIRS Operations Manager, which was not previously alleged in the First Amended Complaint. That email forwarded an email from John "Ed" Clement, RVS VIIRS Technical Director, regarding the RAYTHEON EFR 3250 (Event Failure Report) concerning the ESD exposure(s) in the GIDEP Alert (Government - Industry Data Exchange Program) Alert # GB4-P-06-01A.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

The GIDEP Alert # GB4-P-06-01A dated 21 Oct. 2005 generated by AeroFlex Corp., reports a detailed description of ESD sensitivity levels for the AeroFlex Corp. Part Number UT54LVDSC031 Microcircuit, Linear, LVDS Quad CMOS Differential Line Drive, Monolithic Silicon, also known by reference to device type 03 in the SMD document as Part Number 5962-95833, which constitutes an industry wide advisory issued for all Lot Codes and all Date Codes for the aforesaid components disclosing the ESD sensitivity rating as 250 volts using the Human Body Model (HBM) and 40 volts using the Machine Model (MM). Those values have been established as the result of testing at White Mountain Labs in Phoenix, Arizona. The GIDEP Alert # GB4-P-06-01A recommended a more robust alternate replacement part which was far less sensitive to ESD exposures. Consequently, the aforesaid email from John "Ed" Clement, RVS VIIRS Technical Director, described the failure and the action(s) to be taken as a result of the ESD exposure(s) which occurred during the RAYTHEON "safe-to-mate" procedure, via his Email as follows:

> "EFR 3250 documents probable ESD damage (though not officially accepted by FRB) of the 5V, cold-sparing LVDS line driver ICs in the VIIRS motor/encoder assembly. According to the vendor, UTMC/AeroFlex, any of these parts that have been subjected to our safe-to-mate procedure using a digital multimeter (DMM) should be considered damaged and should therefore be replaced.  We are still investigating a similar potential for the 5V, cold-sparing LVDS differential line receiver ICs.

> "Failure Review Board has made a decision to replace all of the 5V, cold-sparing line driver ICs in the Flight 1 Sensor that have been subjected to this safe-to-mate procedure with the 5V, non-cold-sparing version as recommended in the GIDEP alert.

> "I am further recommending that we also replace the receivers on any

1  assembly that gets retrofit with the new drivers.

2  "Program Office has already authorized the procurement of these ICs and this

3  is in-process.

4  "This email directs you to provide the program office with an emergency

5  BOE to cover the costs of the following activities:

6  "1. Processing of an Engineering/Change - Work Authorization to delete the

7  current cold-sparing ICs and use the non-cold-sparing ICs instead. This work

8  needs to be completed ASAP.

9  "2. Touch labor to open the FPIE, replace all of the subject ICs, and close it

10  up.

11  "3. Recommendation on penalty vibration, and if yes - the cost for this.

12  (Since we have already done this once, we should work with Hans Naeplin to

13  justify not doing it again).

14  "4. Recommendation on penalty electrical testing - since we are not

15  impacting any analog circuitry I would think this can be limited to verifying

16  correct operation of the digital inputs and outputs and not include testing with

17  the DNB FPA-CCD. This latter will still require part of the test set up and

18  running, and the cost associated with that should be included in the BOE."

19  On May 25, 2007, Michael Haley, RAYTHEON VIIRS Operations Manager

20  requested Coplaintiff Relator Steven Mateski to identify and estimate the extent of

21  the damages and provide estimates for removal and replacement of the 26 quantity

22  components affected by the GIDEP Alert # GB4-P-06-01A. The estimate was 331

23  hours of touch labor which did not include the additional Acceptance Testing

24  necessary to requalify the DNB Unit (FPIE/FPA Units) for flight qualification and

25  use. Additionally, the suggested replacement parts would need to be fully tested

26  (DPA, Burn-in, RLAT, etc.) to qualify for "S Level" flight use as well as to be

27  added to the VIIRS Program APL (Approved Parts List), and new replacement part

28

1  numbers added to the Drawings and Schematics (4 drawings total) prior to the
2  procurement and installation of these replacement components into the VIIRS
3  FPIE, which would require a lead time of approximately six months, depending
4  upon part availability.

5  On June 4, 2007 at 5:23 P.M., Coplaintiff Relator Steven Mateski forwarded
6  the estimates to Michael Haley, RAYTHEON VIIRS Operations Manager. On June
7  11, 2007, Steven Mateski was approached by Michael Haley, RAYTHEON VIIRS
8  Operations Manager, and told that RAYTHEON would not be performing the
9  LVDS Rework (for removal and replacement of the ESD exposed components
10  identified in the RAYTHEON Event Failure Report 3250 concerning the GIDEP
11  Alert # GB4-P-06-01A) as was directed by the RAYTHEON Failure Review
12  Board. No reason was given.

13  Highly ESD sensitive component as RAYTHEON Part Number
14  5962R9583303VXA, as well as other equally sensitive components, and their ESD
15  exposures have actually occurred during the production, manufacturing, and testing
16  of the VIIRS FPIE Units.  Further, ESD exposures well in excess of the Maximum
17  Withstanding voltages specified for these Ultra-Sensitive components which will
18  cause Latent Defects and ultimately jeopardize NPOESS Mission Assurance, all of
19  which is in addition to the ESD exposure identified in RAYTHEON Event Failure
20  Report 3250 concerning the GIDEP Alert # GB4-P-06-01A, thereby constituting
21  violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A).
22  and (B).

23  54.

24  FALSE RAYTHEON RECKLESS DISREGARD TO DOCUMENT AND
25  UTILIZE VIIRS FLIGHT HARDWARE TO RELEASED ENGINEERING
26  DURING VIIRS ASSEMBLY.
27  Specification:   VIIRS Program QR (Quality Requirements) FE94, Line 9,
28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

Paragraph 7, QA Monitoring and Process Control;

Specification:   VIIRS Subcontract 65349DGE2S prohibits use of Red-Line Drawing changes.

False Defective Nonconformance:   Illegal Rework prior to and in advance of Engineering Disposition and Quality Engineering Concurrence, and Illegal Work in Advance of Released Engineering;

RAYTHEON performed in advance of Released Engineering documentation. A discovery was made by the Northrop Grumman customer at the first CTI sell-off meeting (July 30, 2004) where attempted delivery of DNB Flight hardware revealed that the FPIE Top Cover P/N 421314 was listed in the kit pull report as Revision "-" where it should have been a later Revision (Revision "-" with an EO) or; Revision "A".

NORTHROP ascertained that prior to the attempted first delivery of the DNB hardware, a fit interference occurred at RAYTHEON El Segundo during integration preventing the FPIE Top Cover from closing. When an Engineering fix was determined (reduction of the Top Cover Boss height 1 place), it was discovered that the fix had been worked without documentation and was performed defectively in noncompliance with VIIRS specifications and requirements.

The NGC customer insisted that an NCMR be written immediately, which was written at the CTI meeting of July 30, 2004.

The reckless disregard rework had been performed by the Non-Flight STE Laboratory / Machine Shop located at E01/Rm C1250/Laboratory 22 on all existing Top Covers jeopardizing scheduled delivery of the FPIE Unit. The interfering Boss had been ground down violating the corrosion barrier plating requirement, violating the "Do Not Break Thru" Drawing note allowing an alternate unauthorized vent path through the Top Cover, and dimensional tolerances were violated.  All work was performed without documentation, planning, or inspections.

After the FPIE Unit was returned to RAYTHEON El Segundo, a formal Engineering Drawing change was generated and the NCMR was voided out. Upon asking how this NCMR could be voided, Bernard Malis (Retired), Manufacturing Manager argued that the cover now met the Engineering design, and therefore, an NCMR was no longer necessary. Ref: Milling of Top Cover Bosses P/N 421314 Drawing Revision "-" vs; Drawing Revision "A". After reviewing the condition of the Top Covers, Relator MATESKI returned to the daily team meeting to announce the deficiencies and ask for a new NCMR, it was granted but for only two of the five quantity due to lack of funds. The New NCMR addressed; 1) Dimensional discrepancies, 2) Violations of the "Do Not Break Thru" requirement and subsequent plugging, 3) Corrosion prevention and plating touch-up. Remaining inventory has not yet been documented or repaired.

At the VIIRS space mission altitude, Atomic Oxygen occurs (O1 vs; O2) which is highly corrosive to unprotected Aluminum. NORTHROP recognized this when it began questioning about the corrosion barrier plating break-thru. There had been noncompliance with the NORTHROP directed NCMR and that RAYTHEON had attempted to avoid processing the NCMR by generating the required drawing change and voiding the NCMR in lieu of documenting actual events as they occurred.

A RAYTHEON illegal installation was performed in advance of RAYTHEON Released Engineering and Released Planning documentation, which had been performed by the installation of the Heli-coils into the Chassis and Top Covers. The Heli-coils had been installed "Dry" which does not protect against corrosion by atmosphere or dissimilar metals. There is no record of who installed these Heli-coils either at the machine shop vendor who sold the Chassis and Top Covers to RAYTHEON nor is there any record of this installation at RAYTHEON. There is no record of "trace" for these Heli-coils at either facility. The dissimilar

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

metals and bare aluminum corrosive condition has not been corrected and has not been documented by RAYTHEON. These Heli-coil inserts should have been "wet-installed" using a zinc-chromate primer (or equivalent) to protect against corrosion.

RAYTHEON illegal work in advance of Released Engineering documentation had been performed by the replacement of Circuit Card components C2 and C170 by component removal and wire shorting of pads with buss wire of unknown size and trace on S/N 001 and S/N 002 CCAs prior to making the necessary drawing changes. The Non-Flight STE Laboratory / Machine Shop located at E01/Rm C1250/Laboratory 22 had an abundance of both Non-Flight and Flight components stored together including: Resistors, Capacitors, Thermistors, Jack Posts, Nuts, Screws, Wire, Shrink Sleeving, etc.

When and where this RAYTHEON illegal Advance rework took place has no documentation to support the actual work. RAYTHEON attempted to document it after-the-fact in the QCHR which lead to the generation of waivers RDW_VIIRS-W015 for inability to meet the Prohibited Materials screening requirement and RDW_VIIRS-W016 for inability to meet the Space Trace requirement, thereby constituting product substitution and false claims violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

55.

RAYTHEON RECKLESS DISREGARD OF RAYTHEON VIIRS FALSE AND FORGED VIIRS CERTIFICATIONS.

Numerous false, forged RAYTHEON VIIRS operator signoffs for the sequential operations in the VIIRS Planning Books which are missing information required to be recorded, and several RAYTHEON VIIRS operator signoffs have been made using the same operator name and/or payroll number, whereby a review of the handwriting style, full name used vs. first initial and last name only; or initials only, reveals obvious forged signoffs by more than the individual who

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

supposedly performed the actual work, which was verified by a study of the formation of handwritten letters and numbers used to record the operators name, payroll number, and the date that the work was performed, as documented in the VIIRS subassembly Planning Books, including without limitation:

421327, S/N 002, QCHR 068530 VIIRS Initial Build; RAYTHEON Operations 60 thru 210 (and others) indicate work was performed by C. Johnson, payroll # 27690, and various dates, and Operation 140 and 150, indicate that operator initials entries clearly do not match. A review during sell-off indicated operation was missing the operators signature and payroll number and was marked with a post-it note. Operation 200 was missing the torque recording, missing the tool calibration due date, and not fully completed. These items were so noted by the affixed post-it notes which were subsequently removed when data was entered after-the-fact. That false certification is prevalent throughout the entire VIIRS Planning Build Book for various other signers as well.

RAYTHEON false issuance of the IST (Inspection Status Tag) for a complete Item Inspection was issued by Quality HAC IP J33 on 10/28/03 as a "Completed Unit" while many operations had not been worked, many sign-offs were missing, required information had not been recorded, etc. RAYTHEON Quality Assurance issued the IST tag for S/N 001 despite the fact that unit under inspection was S/N 002. The tag was completed and paper-washed through Flight Stores as S/N 001 yet the IST tag was altered after-the-fact by some person(s) unknown by simply overwriting the IST S/N 001 turning it into a S/N "002". Additionally, the IST tag configuration recorded differs from the VIIRS Planning Book ECS (Engineering Configuration Summary).

421327, S/N 002, QCHR 035207 Retuning Rework;   RAYTHEON false issuance of the IST (Inspection Status Tag) for a complete Item Inspection was issued by Quality HAC IP J33 on 5/04/04 as a "Completed Unit" while many

operations had not been worked (missing inspect operation after removal of test selects to verify pads not lifted), many sign-offs were missing, required information had not been recorded (oven equip number and cal due dates etc.) RAYTHEON Quality Assurance issued the IST tag for 421327R despite the fact that unit under inspection was 421327. The tag was completed and paper-washed through Flight Stores, yet the IST tag was altered after-the-fact by person(s) unknown by simply overwriting the IST scribbling out the part number 421327 suffix "R" turning it into a 421327 assembly. Additionally, the IST tag configuration recorded differs from the VIIRS Planning Book ECS (Engineering Configuration Summary).

421331, S/N 002, QCHR 068527, Initial Build; Operations 90 thru 250 (and others) indicate work was performed by C. Johnson, payroll # 27690, and various dates, and Operation 90 and 140, indicate operator initials entries clearly do not match. That false certification is prevalent throughout the entire VIIRS Planning Build Book for various other signers as well. A RAYTHEON false issuance of the IST (Inspection Status Tag) for a complete Item Inspection was issued by RAYTHEON Quality Assurance HAC IP J33 on 10/28/03 as a "Completed Unit" while many operations had not been worked, many sign-offs were missing, required information had not been recorded, etc. RAYTHEON Quality Assurance issued the IST tag for S/N 001 despite the fact that unit under inspection was S/N 002. The tag was completed and paper-washed through Flight Stores as S/N 001 yet the IST tag was altered after-the-fact by person(s) unknown by simply overwriting the IST S/N 001 turning it into a S/N "002". Additionally, the IST tag configuration recorded differs from the VIIRS Planning Book ECS (Engineering Configuration Summary).

421331, S/N 002, QCHR 035206 Retuning Rework; RAYTHEON false issuance of the IST (Inspection Status Tag) for a complete Item Inspection was issued by Quality HAC IP J33 on 5/04/04 as a "Completed Unit" while operations had not been worked (missing inspect operation after removal of test selects to

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1   verify pads not lifted), sign-offs were missing, and required information had not

2   been recorded (oven equip number and cal due dates etc.). RAYTHEON Quality

3   Assurance issued the IST tag for 421331R despite the fact that unit under

4   inspection was 421331. The tag was completed and paper-washed through Flight

5   Stores, yet the IST tag was altered after-the-fact by person(s) unknown by simply

6   overwriting the IST scribbling out the part number 421331 suffix "R" turning it into

7   a 421327 assembly.

8          Other RAYTHEON assembly Planning Books include 421310-100, S/N 002,

9   QCHR 035213, FPIE Assembly, Initial Build; RAYTHEON employee "M. Farr"

10  (Mario Farr), payroll number V6134, was the Shop Supervisor in the Non-Flight

11  STE Lab/Machine Shop located at E01/Rm C1250/Laboratory 22. Mario Farr

12  operated outside the authority of his position in that he began to write, modify, and

13  release VIIRS planning to the shop floor despite the fact that he was not a Certified

14  Planner. Mario Farr performed VIIRS assembly operations, although he was not an

15  Assembler, performed workmanship Thermal Cycle Test operations, and was not

16  qualified or certified to perform testing on Flight hardware. Where VIIRS hardware

17  failed to meet VIIRS Engineering Drawing Requirements and was squawked on the

18  QCHR, Mario Farr did MRB disposition QCHR discrepancy conditions, although

19  Mario Farr was not an Engineer nor authorized to perform MRB dispositions.

20  Mario Farr worked (assembled) VIIRS hardware in advance of Released

21  Engineering. Operation 60 and 70 were worked by person(s) unknown but signed-

22  off as E. Hollowell, payroll number 80735 and also signed-off by M. Farr, payroll

23  number V6134, on date 10/30/03, whereby a review of the handwriting style,

24  reveals obvious forged signoffs by more than the individual who supposedly

25  performed the actual work. By comparing the RAYTHEON VIIRS Planning

26  History Record, it can be seen that Mario Farr acted as a Certified Planner revising

27  (ink changing) Operation 60 on 10/27/03 (as well as subsequent numerous other

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

changes). RAYTHEON Quality Control HAC IP X177 closed the VIIRS Planning Book by stamping the bottom of the page closing the permanent record on date 10/31/03. Numerous VIIRS record changes were made to the closed record after-the-fact by M. Farr on 7/21/04 and 11/09/04 to add missing data in an attempt to make the record appear complete.

Review of the 417350-100, S/N 001, QCHR 077084, DNB Assembly, Initial Build; RAYTHEON Planning Book reveals numerous incomplete VIIRS operations, including the Final CII (Complete Item Inspection) which has not been performed as specified. As a result, RAYTHEON falsely prepared the 417350-100, S/N 001, DNB Assembly sell-off package despite the fact that the Unit was never completed nor Final Inspected. That false certification of incomplete operations is prevalent throughout the entire Planning Build book for various other VIIRS operations as well.

Other RAYTHEON Assembly planning books include the remaining S/N 003, S/N 004, and S/N 005 CCAs exhibiting many of the same False Defective Nonconformances, and likewise do not meet the minimum space trace requirements and build history record entries required for VIIRS flight hardware. The review of the STE Equipment planning books (ie; STE Rack, STE Test Cables, STE Break-out and Load Boxes) reveals many discrepancies prior to their rework at VIIRS Program expense, for required pre-qualification to be used in Acceptance Testing of VIIRS Flight Hardware. Significant missing data: operator sign-offs, oven equipment numbers, epoxy trace, cure times, cure temps, etc., are missing forever (Flt_2-3_Delta's.xls separate spreadsheet analysis to determine flight worthiness of these CCAs, Ref: Performance of work on Flight hardware without Certified Planner screening of Planning), and (Flt 1-2-3 signoff Deltas 5-07-07 .xls separate spreadsheet analysis to determine flight worthiness of Flights 2,3, and 4) including false sign-offs falsifying the VIIRS build history records, thereby constituting

Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

56.

RAYTHEON RECKLESS DISREGARD RVS GOLETA AND ELS EL SEGUNDO FALSE UNAUTHORIZED WAIVERS OF NPOESS VIIRS FPIE/FPA DNB SPECIFICATIONS AND REQUIREMENTS WHICH CONSTITUTE ADMISSIONS OF VIIRS DEFECTIVE NONCONFORMANCES USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

After RAYTHEON falsely presented claims and received payment by the United States Government for its defective nonconformance workmanship on NPOESS VIIRS, instead of repair of retrofit, RAYTHEON created false waivers of the VIIRS specifications and requirements.

At least sixty false RAYTHEON false waivers of the NPOESS/VIIRS FPIE/FPA DNB and other units specifications and requirements (including at least eight FPIE/FPA DNB and other units waivers originated by RAYTHEON RVS Goleta), whereby RAYTHEON wrote the waivers, and then RAYTHEON granted the waivers to RAYTHEON without approvals, constitute admissions of the RAYTHEON NPOESS/VIIRS FPIE/FPA DNB and other units defective nonconformances, including without limitation:

RAYTHEON VISION SYSTEMS RVS GOLETA

RDW_VIIRS-D002 MDM prewired Conn Flg Rplcmt - plating contaminated / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D003 HAM & Telescope eliminate 4th pad - for alignment / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D004 add 2.90" hole to -Y cavity - for borescope access / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D005 DNB J1 & J2 wired backwards from PWB vendor - Dwg F/N typo error / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D011 Adds Motor Labels - Dwg error / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D012 Field Baffle Conv Coat finish vs; Blk Anodize - Dwg error / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D013 Remove Blk Anodize finish to obtain ESD ground - Dwg error / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D014 Relief 8yr optics storage rqmt - RFD / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D017 Relief BEI Accuracy tester drift rqmt out of tol's - RFD / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D018 Launch Lock Bushing Blk paint finish vs; Blk Anodize - RFD / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D020 Relief-Eliminate EDU Cryo Rad Vibe Test - RFD / Implement / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-D022 Relief-Eliminate Cryo Rad Bond joint proof-loading NGIID Rqmt - RFD / Create / No NORTHROP or GOVERNMENT Signature Approval

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

RDW_VIIRS-D023 ESIR A07184 CCD Hdwr fabbed w/ozone depleting substances / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RAYTHEON ELS EL SEGUNDO

RDW_VIIRS-W001 Motor Shielding / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W004 Thermal Blankets not grounded / Create / (No longer in PDM system)

RDW_VIIRS-W005 ESIR A04206 Unpassivated Beryllium / Closed by RAYTHEON / ESIR to NORTHROP / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W007 ESIR A04207 Unpassivated Beryllium / Closed by RAYTHEON / ESIR to NORTHROP / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W009C EDU Sub-Assy Not Thermal Cycled / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W010 Cables fabbed w/Electro Dep Ni / Closed by RAYTHEON / NORTHROP Signature but no GOVERNMENT Signature Approval transferred to NGST BER-D004 (RDW_VIIRS-W0010) / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W012A FPIE F1 fabbed w/Electro Dep Ni / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W014 FPIE fabbed w/pure Tin DPA plated wire / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W015 FPIE F1 fabbed w/zero inv no Prohibited Material compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

RDW_VIIRS-W016 FPIE fabbed w/no trace compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W017 FPIE fabbed w/no specialty metals compliance / Create (No longer in PDM system)

RDW_VIIRS-W020A ESIR A06351 Multi-units fabbed w/zero inv-no Prohibited Material compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W021 ESIR A06352 Motors fabbed w/zero inv-no Prohibited Material compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W022A ESIR A06353 Multi-units fabbed w/zero inv-no Prohibited Material compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W023 ESIR A06354 Pin Pullers fabbed w/zero inv-no Prohibited Material compliance / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W024A ESIR A06539 Band-to-Band Relief F1 / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W026 ESIR A06598 Sensor fabbed w/pure Tin DPA / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W027 ESIR A06538 Heater fabbed w/pure Tin DPA / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W028 ESIR A06735 Sensor fabbed w/pure Tin DPA / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W029 ESIR A06710 Sensor (solar impingement) F1 caused by wrong paint / Confirm / No NORTHROP or GOVERNMENT Signature Approval

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

RDW_VIIRS-W030 Optical surface / Create / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W031 ESIR A07141 Hdwr F1 fabbed w/no trace compliance / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W031A Hdwr fabbed w/no trace compliance / Implement / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W032 ESIR A07138 Hdwr fabbed w/ozone depleting substances / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W033 ESIR A07597 Hdwr fabbed w/out use of req'd drill template / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W034 IFOV (Field of View) F1 Performance tolerances / Implement / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W035 FPIE F2 fabbed w/Electro Dep Ni / Create / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W036 FPIE F2 fabbed w/zero inv no Prohibited Material compliance / Create / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W037 ESIR A07492 F1 HRD S/W packets added checksums, no rqmt / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W038 ESIR A07495 F1 duplicate S/W Telemetry packets added to housekeeping / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W039 ESIR A07498 F1 Multi cont Mem loads segm'd packets, partial table uploads / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W040 ESIR A07500 F1 Max Data Rate 41Mbps not met, 16.7Mbps / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W041 ESIR A07502 S/W Telemetry packets u/size / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W042 Insufficient Dewar Vacuum during characterization / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W042A / Insufficient Dewar Vacuum during characterization / Create (No longer in PDM system)

RDW_VIIRS-W043 ESIR A07619 Dual Gain not met, request deviation modify specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W044 ESIR A07630 Multiple bands Neg Perf Margin, RFD modify specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W045 ESIR A07789 F1 heat xfer fail, no thermal anal perf RFD to accept as-is / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W046 ESIR A07755 Spectral bands Perf not met, RFD modify Specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W047 ESIR A07747 IFOV, MTF, & HSR Perf not met, RFD modify specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W048 ESIR A07972 Perf not met, RFD modify specification / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

1   RDW_VIIRS-W049 ESIR A07982 Low Calib Sample Rate Perf not met,
2   RFD modify specification / Confirm / No NORTHROP or GOVERNMENT
3   Signature Approval
4   RDW_VIIRS-W050 F2 Hdwr fabbed w/no trace compliance / Create / No
5   NORTHROP or GOVERNMENT Signature Approval
6   RDW_VIIRS-W051 Dyn Range Perf not met, RFD modify specification /
7   Create / No NORTHROP or GOVERNMENT Signature Approval
8   RDW_VIIRS-W052 ESIR A07885 Eff Focal Length out of tol's, RFD
9   modify specification / Confirm / No NORTHROP or GOVERNMENT Signature
10   Approval
11   RDW_VIIRS-W053 ESIR A07973 Stray light out of tol's, RFD modify
12   specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval
13   RDW_VIIRS-W054 NCMR-SBR91423 VIIRS Cross-talk out of tol's, RFD
14   modify specification / Create / No NORTHROP or GOVERNMENT Signature
15   Approval
16   RDW_VIIRS-W055 ESIR A08263 No Use of Captive Hdwr VIIRS Doors /
17   Confirm / No NORTHROP or GOVERNMENT Signature Approval
18   RDW_VIIRS-W056 ESIR A08140 Diode out of tol's, RFD modify NGIID
19   IF231050/ Confirm / No NORTHROP or GOVERNMENT Signature Approval
20   specification
21   RDW_VIIRS-W057 ESIR A08142 Isolation Rqmt's, RFD modify
22   specification / Closed by RAYTHEON / No NORTHROP or GOVERNMENT
23   Signature Approval
24   RDW_VIIRS-W058 ESIR A08143 Various Ripple out of tol's, RFD modify
25   specification / Closed by RAYTHEON / No NORTHROP or GOVERNMENT
26   Signature Approval
27
28

RDW_VIIRS-W059 ESIR A08165 1394 Board single pt failures, RFD modify specification / Closed by RAYTHEON / No NORTHROP or GOVERNMENT Signature Approval

RDW_VIIRS-W060 ESIR A08304 Cryo Rad cooldown time out of tol's, RFD modify specification / Confirm / No NORTHROP or GOVERNMENT Signature Approval

There are no RAYTHEON VIIRS waivers or ESIRs on ESD exposure or on prohibitive materials in VIIRS as alleged with particularity herein.

The RAYTHEON false unauthorized waivers of NPOESS/VIIRS FPIE/FPA DNB specifications and requirements which constitute admissions of VIIRS defective nonconformances, constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

57.

FALSE UNAUTHORIZED RAYTHEON WAIVERS RDW_VIIRS-W010, RDW_VIIRS-W012A, AND RDW_VIIRS-W014 TO CIRCUMVENT AND CONCEAL RAYTHEON DESIGNED IN USE OF PROHIBITED MATERIALS, WHICH CONSTITUTE ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND REQUIREMENTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification: RAYTHEON CAGE Code 11323 specification PS154640-132, ¶ 4.6.3, sub-section "I" of the Contamination Control Requirements specification for the Visible/Infrared Imager Radiometer Suite VIIRS) specifies that the use of the following materials on the VIIRS sensors is forbidden:

D. Tin plating unless subsequently fused or reflowed.

E. Pure, unalloyed Tin (greater than 99.1% Sn).

F. Mercury and compounds of mercury except in hermetically sealed devices

and focal plane arrays.

G.  Cadmium, zinc or selenium metal, except in hermetically sealed devices.

H.  Cadmium and zinc plating and silver brazing alloys containing cadmium and zinc.

W.  Electrolytic Nickel plating unless an Electroless process is employed, or Electrolytic Nickel is used on a on-optical surface as an underplate, diffusion barrier, or coating.

False Defective Nonconformance:  The RAYTHEON admission of VIIRS defective nonconformances in RAYTHEON RDW_VIIRS-W010, RDW_VIIRS-W012A, and RDW_VIIRS-W014, executed by M. Pavloff, VIIRS Program Manager, confirms that RAYTHEON knowingly in deliberate ignorance and reckless disregard produced VIIRS units that have failed to comply with VIIRS performance specifications and requirements, thereby compromising unit integrity and reducing system performance expectancy. Prohibited material and processes are still listed in the VIIRS Engineering Drawing Notes and Parts Lists. Units have been systematically accepted for VIIRS Flight use based on unapproved false Waivers, RDW_VIIRS-W010, RDW_VIIRS-W012A, and RDW_ VIIRS-W014 by reckless disregard of RAYTHEON Designed in Use of Prohibitive Materials, thereby jeopardizing system performance and mission assurance for VIIRS Flight 1 as well as Future Flight Missions 2,3 and 4, and thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

False Statements and Records:  With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of RAYTHEON Designed In Use of Prohibited Materials thereby constituting Product Substitution, by means of unauthorized RAYTHEON VIIRS waivers RDW_VIIRS-W010, RDW_VIIRS-W012A, and

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

RDW_VIIRS-W014, executed by M. Pavloff, VIIRS Program Manager, that were created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a) (1) and (2), and § (a)(1)(A) and (B).

58.

FALSE UNAUTHORIZED RAYTHEON WAIVERS RDW_VIIRS-W015, RDW_VIIRS-W020A, RDW_VIIRS-W021, RDW_VIIRS-W022A, RDW_VIIRS-W023, RDW_VIIRS-W026, RDW_VIIRS-W027 TO CIRCUMVENT AND CONCEAL ZERO INVENTORY COMPONENTS IN LIEU OF PROHIBITED MATERIALS TESTING, WHICH CONSTITUTE ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND REQUIREMENTS USED IN ALL 32 NPOESS 100 LEVEL SENSORS AND SUBSYSTEM UNITS.

Specification:   RAYTHEON CAGE Code 11323 Specification PS154640-132, Paragraph 4.6.3, of the Contamination Control Requirements Specification for the Visible/Infrared Imager Radiometer Suite (VIIRS) specifies that the use of the following materials on the VIIRS sensors is forbidden:

A. Materials for which qualification data does not exist for the intended application.

B. Metals and alloys used in structural applications, which are not resistant to stress corrosion.

D. Tin plating unless subsequently fused or reflowed.

E. Pure, unalloyed Tin (greater than 99.1% Sn).

F. Mercury and compounds of mercury except in hermetically sealed devices and focal plane arrays.

G. Cadmium, zinc or selenium metal, except in hermetically sealed devices.

H. Cadmium and zinc plating and silver brazing alloys containing cadmium

1   and zinc.

2   J.  Teflon used in structural applications or where mechanical forces will be

3   exerted on the material.

4   K. Teflon insulated hookup wire wherever placement will permit cold flow

5   of the conductor insulation.

6   W.  Electrolytic Nickel plating unless an Electroless process is employed, or

7   Electrolytic Nickel is used on a on-optical surface as an underplate, diffusion

8   barrier, or coating.

9   False Defective Nonconformance:   The RAYTHEON admission of defective

10  nonconformance in RAYTHEON VIIRS_RDW_VIIRS-W015, RDW_VIIRS-

11  W020A,   RDW_VIIRS-W021,   RDW_VIIRS-W022A,   RDW_VIIRS-W023,

12  RDW_VIIRS-W026, RDW_VIIRS-W027 confirm that Units for the VIIRS Flight 1

13  and Flight 2 have been assembled using Prohibited Materials and/or

14  untested/unproven materials and have been systematically accepted for Flight use

15  by those unapproved false RDWs, thereby jeopardizing system performance and

16  Mission Assurance for Flight 1 as well as Future VIIRS Flight Missions 2, 3 and 4,

17  where partial assembly has already begun under comparable conditions, which has

18  been circumvented by RAYTHEON knowingly in deliberate ignorance and reckless

19  disregard of VIIRS defective nonconformances in RAYTHEON RDWs and

20  RAYTHEON VIIRS RDFs, executed by M. Pavloff, VIIRS Program Manager,

21  including without limitation:

22  421310-100 (FU1) Components (previously noted) RDW_VIIRS-W015

23  414505-110 (Numerous Sub-Assys FU1) Numerous Components

24  RDW_VIIRS-W020A

25  416960-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

26  415652-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

27  415695-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

28

415620-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415655-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415650-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415640-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

414505-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415750-1 (Sub-Assy FU1 - 2 Units) Numerous Components RDW_VIIRS-W020A

415750-2 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415660-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415630-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415670-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415709-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415701-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415700-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415610-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415680-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

415690-100 (Sub-Assy FU1) Numerous Components RDW_VIIRS-W020A

417700-110 (FU1) Numerous Components RDW_VIIRS-W021

417680-110 (FU1) Numerous Components RDW_VIIRS-W021

418200-110 (FU1) Numerous Components RDW_VIIRS-W022A

418300-110 (FU1) Numerous Components RDW_VIIRS-W022A

418000-110 (FU1) Numerous Components RDW_VIIRS-W022A

418700-110 (6 Sub-Assys FU1) Numerous Components RDW_VIIRS-W022A

426300-100(-1) (FU1) Numerous Components RDW_VIIRS-W023

426350-100(-1) (FU1) Numerous Components RDW_VIIRS-W023

418700-110(-1) (FU1) Numerous Components RDW_VIIRS-W023

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

414505-110 (FU1) Numerous Components RDW_VIIRS-W026

414505-110 (FU1) Numerous Components RDW_VIIRS-W027

Prohibited materials and processes are still listed in the VIIRS Engineering Drawing Notes and Parts Lists. Components, where zero lot inventory remains, have not been tested for Prohibited Materials known to produce detrimental effects when used in space environments, compromising unit(s) integrity and reducing system life-expectancy, have been systematically accepted for VIIRS Flight use on unapproved false RDWs in Flight Unit 1 production (Multiple Units) jeopardizing Mission Assurance for VIIRS Flight 1 as well as Future Flight VIIRS Missions 2,3, and 4, where partial assembly has already begun under comparable conditions, which was circumvented by the false RAYTHEON RDW_VIIRS-W015, RDW_VIIRS-W020A, RDW_VIIRS-W021, RDW_VIIRS-W022A, RDW_VIIRS-W023, RDW_VIIRS-W026, RDW_VIIRS-W027, executed by M. Pavloff, VIIRS Program Manager, to exonerate zero inventory components in lieu of prohibited materials testing, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

False Statements and Records: With actual knowledge and reckless disregard, Defendant RAYTHEON has circumvented and concealed admitted VIIRS defective nonconformance of Zero Inventory Components in Lieu of Prohibited Materials Testing by means of unauthorized RAYTHEON VIIRS waivers RDW_VIIRS-W015, RDW_VIIRS-W020A, RDW_VIIRS-W021, RDW_VIIRS-W022A, RDW_VIIRS-W023, RDW_VIIRS-W026, RDW_VIIRS-W027, executed by M. Pavloff, VIIRS Program Manager, that were created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, without any contract modification or approval, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2),

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

and § (a)(1)(A) and (B).

59.

FALSE RAYTHEON WAIVER RDW_VIIRS-W018 TO CIRCUMVENT AND CONCEAL ASP CCA VIIRS SYSTEM UNIT FAILURES TO PERFORM TO VIIRS, WHICH CONSTITUTES AN ADMISSION BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCE WITH VIIRS SPECIFICATIONS AND REQUIREMENTS.

Specification:   414505-100 (FU1) [415690-100 ASP], PS154640-101, Paragraph 3.1.5.7, SRV0634 requires differential nonlinearity of +/-5 LSBs, is -0.54 LSB and +0.71 LSBs.

False Defective Nonconformance:  The RAYTHEON admission of VIIRS defective nonconformance in RDW_VIIRS-W018 confirms that RAYTHEON knowingly in deliberate ignorance and reckless disregard produced defective nonconformance VIIRS units that failed to comply with VIIRS performance specifications and requirements, thereby compromising unit integrity and reducing system performance expectancy. These Units have been systematically accepted for VIIRS Flight use based on false RDW_VIIRS-W018 in Flight Unit 1 production (Multiple Units) constituting Product Substitution, thereby jeopardizing system performance and mission assurance for VIIRS Flight 1 as well as Future Flight Missions 2 and 3 where partial assembly has already begun under comparable conditions, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

False Statement and Record:  With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of ASP CCA VIIRS System Unit Failures to Perform to VIIRS Specifications by means of unauthorized RAYTHEON VIIRS waiver RDW_VIIRS-W018, executed by M. Pavloff, VIIRS Program Manager,

that was created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

60.

FALSE RAYTHEON WAIVER RDW_VIIRS-W024 TO CIRCUMVENT AND CONCEAL UNIT FAILURES TO PERFORM TO VIIRS SPECIFICATIONS, WHICH CONSTITUTES AN ADMISSION BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCE WITH VIIRS SPECIFICATIONS AND REQUIREMENTS.

Specification: 414501-110 (FU1), PS154640-101, Revision B, Paragraph 3.1.5.13.2 Band to Band requirements.

False Defective Nonconformance: The RAYTHEON admission of VIIRS defective nonconformances in RAYTHEON VIIRS RDW_VIIRS-W024, confirms the VIIRS misalignments which demonstrate that specifications were not met due to nonconformance initial design of Tungsten base plate and subsequent redesign to Aluminum base plate. Additional improvements necessary for compliance have not been identified because of incomplete RAYTHEON engineering.

In deliberate ignorance and reckless disregard, RAYTHEON knowingly produced VIIRS Units that are failing to comply with VIIRS performance specifications and requirements, thereby compromising unit integrity and reducing system performance expectancy. Units have been systematically accepted for VIIRS Flight use on unapproved false RDW_VIIRS-W024, executed by M. Pavloff, VIIRS Program Manager, in VIIRS Flight Unit 1 production (Multiple Units), thereby jeopardizing system performance and mission assurance for VIIRS Flight 1 as well as Future Flight Missions 2,3 4 and 5, where partial assembly has already begun under comparable conditions, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. §

1  3729(a)(1) and (2), and § (a)(1)(A) and (B).

2  <u>False Statement and Record</u>:  With actual knowledge and reckless disregard,

3  Defendant RAYTHEON knowingly has circumvented and concealed admitted

4  VIIRS defective nonconformance of Unit Failures to Perform to VIIRS

5  Specifications by means of unauthorized RAYTHEON VIIRS waiver

6  RDW_VIIRS-W024, executed by M. Pavloff, VIIRS Program Manager, that was

7  created by RAYTHEON itself and falsely granted by RAYTHEON to

8  RAYTHEON itself, thereby constituting false statement and false record violations

9  of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

10                                                  61.

11         FALSE RAYTHEON WAIVERS RDW_VIIRS-W005, 417500-110 (FU1),

12  RDW_VIIRS-W005, 417600-110 (FU1), RDW_VIIRS-W007, 417900-110 (FU1),

13  RDW_VIIRS-W007, AND 417800-100 (FU1) TO CIRCUMVENT AND

14  CONCEAL RAYTHEON VIIRS DESIGN FAILURES TO COMPLY WITH THE

15  CORROSION AND DISSIMILAR METALS SPECIFICATIONS, WHICH

16  CONSTITUTE ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE

17  NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND

18  REQUIREMENTS.

19  <u>Specification</u>:  RAYTHEON CAGE Code 11323 <u>Specification</u> PS154640-132,

20  Paragraph 4.6.3, of the <u>Contamination Control Requirements Specification for the</u>

21  <u>Visible/Infrared Imager Radiometer Suite (VIIRS)</u> specifies that the use of the

22  following materials on the VIIRS sensors is forbidden:

23         A.  Materials for which qualification data does not exist for the intended

24         application.

25         B.  Metals and alloys used in structural applications, which are not resistant

26         to stress corrosion.

27  <u>Specification</u>:  RAYTHEON CAGE Code 11323 <u>Specification</u> PS154640-132,

28

Paragraph 4.4.1, of the <u>Contamination Control Requirements Specification for the Visible/Infrared Imager Radiometer Suite (VIIRS)</u> specifies: 4.4.1 Design constraints. To the maximum extent practical, and commensurate with other design requirements and constraints, the VIIRS sensor will be designed to limit or preclude the generation or release of contaminants (particulate and molecular) that may adversely affect system performance or reliability.

A. Use corrosion resistant materials.

J. Avoid combinations of dissimilar metals.

N. Specific concepts to minimize and control the effects of contamination will be incorporated into the VIIRS sensor designs. Only qualified materials known to have low contaminant generating characteristics for particles and outgassing will be used.

<u>False Defective Nonconformance</u>: The RAYTHEON admission of VIIRS defective nonconformances in RAYTHEON VIIRS RDW 417500-110 (FU1) RDW_VIIRS-W005, 417600-110 (FU1) RDW_VIIRS-W005, 417900-110 (FU1) RDW_VIIRS-W007, and 417800-100 (FU1) RDW_VIIRS-W007, confirm that RAYTHEON knowingly in deliberate ignorance and reckless disregard produced VIIRS Units where Engineering Design Drawings failed to address Corrosion Controls and/or Dissimilar Metals (Galvanic Effects) to protect against corrosion (unpassivated Beryllium), thereby compromising unit integrity and reducing system performance and life-expectancy. These Units have been systematically accepted for NPOESS/VIIRS Flight use based on false waivers; 417500-110 RDW_VIIRS-W005, 417600-110 RDW_VIIRS-W005, 417900-110 RDW_VIIRS-W007, and 417800-100 RDW_VIIRS-W007 in VIIRS Flight Unit 1 production (Multiple Units) constituting Product Substitution, thereby jeopardizing system performance and mission assurance for VIIRS Flight 1 as well as Future Flight Missions 2, 3, and 4 where partial assembly has already begun under comparable conditions.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

RAYTHEON falsely stated unpassivated Beryllium is acceptable for VIIRS Flight use, thereby constituting Product Substitution and false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

False Statements and Records:  With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of RAYTHEON VIIRS Design Failures to Meet Corrosion and Dissimilar Metals Specifications by means of unauthorized RAYTHEON VIIRS Waivers RDW_VIIRS-W005, 417500-110 (FU1), RDW_VIIRS-W005, 417600-110 (FU1), RDW_VIIRS-W007, 417900-110 (FU1), RDW_VIIRS-W007, and 417800-100 (FU1) executed by M. Pavloff, VIIRS Program Manager, that were created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

62.

FALSE RAYTHEON WAIVERS RDW_VIIRS-W009A, 418100-110, RDW_VIIRS-W009A, 417700-110, RDW_VIIRS-W009A, 417900-110, RDW_VIIRS-W009A, 417800-100, RDW_VIIRS-W009A, 418200-100, RDW_VIIRS-W009A, AND 417360-100 TO CIRCUMVENT AND CONCEAL VIIRS TEST REQUIREMENTS INCLUDING VIIRS FIRST ARTICLE THERMAL CYCLE TESTING TO PROTOFLIGHT REQUIREMENTS, WHICH CONSTITUTE ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND REQUIREMENTS.

Specification:  PS154640-112, Revision A, "All remaining and future subassemblies will be Thermal Cycled to PS154640-112, Revision A".

False Defective Nonconformance: The RAYTHEON admission of VIIRS defective

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

1    nonconformances in RAYTHEON VIIRS Waivers RDW_VIIRS-W009A, 418100-

2    110, RDW_VIIRS-W009A, 417700-110, RDW_VIIRS-W009A, 417900-100,

3    RDW_VIIRS-W009A, 417800-100, RDW_VIIRS-W009A, 418200-100,

4    RDW_VIIRS-W009A, and 417360-100 confirm that RAYTHEON knowingly in

5    deliberate ignorance and reckless disregard bypassed new substantially more severe

6    VIIRS Protoflight Thermal Cycle test requirements on multiple units. The EDU

7    units were tested to previous (less severe) Protoflight levels and these reduced

8    levels were used to justify waiving the VIIRS FU1 Protoflight level testing even

9    though the new Protoflight values had been increased to more severe levels. The

10   414501-110 Unit (Multiple Sub-Assemblies) has been systematically accepted for

11   VIIRS Flight use on false RDWs for VIIRS Flight Unit 1 production.

12        In deliberate ignorance and reckless disregard, RAYTHEON falsely stated

13   non-performance of more severe Protoflight Thermal Cycle Test Requirements

14   established to determine survival levels of First Article Flight hardware is

15   acceptable for use in Acceptance Testing of Flight hardware in violation of VIIRS

16   Program PS154640-112 Revision A, and in violation of VIIRS Program Quality

17   Requirements (FE94) First Article Protoflight Test requirements, thereby

18   constituting Product Substitution and false claim violations of the False Claims Act,

19   31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

20   <u>False Statements and Records</u>:  With actual knowledge and reckless disregard,

21   Defendant RAYTHEON knowingly has circumvented and concealed admitted

22   VIIRS defective nonconformance of VIIRS Test Requirements including VIIRS

23   First Article Thermal Cycle Testing to Protoflight Requirements by means of

24   unauthorized RAYTHEON VIIRS Waivers RDW_VIIRS-W009A, 418100-110,

25   RDW_VIIRS-W009A, 417700-110, RDW_VIIRS-W009A, 417900-110,

26   RDW_VIIRS-W009A, 417800-100, RDW_VIIRS-W009A, 418200-100,

27   RDW_VIIRS-W009A, and 417360-100  executed by M. Pavloff, VIIRS Program

28

1    Manager, that were created by RAYTHEON itself and falsely granted by

2    RAYTHEON to RAYTHEON itself, thereby constituting false statement and false

3    record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and §

4    (a)(1)(A) and (B).

5                                            63.

6         FALSE RAYTHEON WAIVER RDW_VIIRS-W001 TO CIRCUMVENT

7    AND CONCEAL FAILURE TO PERFORM TO VIIRS EMI/EMC AND ESD

8    EXPOSURE SPECIFICATIONS, WHICH CONSTITUTES AN ADMISSION BY

9    RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCE WITH VIIRS

10   SPECIFICATIONS AND REQUIREMENTS.

11   Specification:    RAYTHEON CAGE Code 4U884 Specification RP 10-001,

12   Paragraph 3.2.10 Approved ESD protective materials and equipment specifies:

13        ESD control protective materials and equipment used to meet the

14        requirements of this standard shall be approved by the ESD Site

15        Coordinator/Team. An approved materials and equipment list may be

16        included in site specific documentation, or attached as an exhibit to this

17        document.

18   Specification: NPOESS General Instrument Interface Document (NGIID D31418,

19   Revision A), Interface Control Document IF233295 EMI/EMC Requirements: No

20   floating wires shall be allowed.

21   Specification: NPOESS General Instrument Interface Document (NGIID D31418,

22   Revision A), Interface Control Document IF233300 Spacecraft charging

23   Requirements: The design shall provide reliable electrostatic grounding connections

24   between all conductive elements.

25   Specification: NPOESS General Instrument Interface Document (NGIID D31418,

26   Revision A), Interface Control Document IF233305 Resistance Requirements: The

27   resistance between the grounded elements shall not exceed 100 ohms DC.

28

<u>False Defective Nonconformance</u>:   RAYTHEON admission of VIIRS Defective Nonconformances in RAYTHEON VIIRS RDWs, executed by M. Pavloff, VIIRS Program Manager, whereby VIIRS Flight Unit 1 Encoding Motor output cable shieldings are not grounded (use of un-terminated "Floating Shields"). Reckless disregard by RAYTHEON to design to provide Electromagnetic Interference / Electromagnetic Contamination (EMI/EMC) shielding protection to surrounding sensitive instruments as required. In deliberate ignorance and reckless disregard, RAYTHEON failed to design to provide protection against (ESD) Exposure(s) via damaging electrostatic fields, static discharges, and electrical transients jeopardizing Mission Assurance by Latent Defects in Electrostatic Discharge Sensitive (ESDS) devices jeopardizing Mission Assurance for VIIRS Flight 1, which was circumvented by the false RAYTHEON RDW_VIIRS-W001 to circumvent and conceal VIIRS EMI/EMC and ESD exposure requirements, thereby constituting false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

<u>False Statement and Record</u>:   With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of Failure to Perform to VIIRS EMI/EMC and ESD Exposure Specifications by means of unauthorized RAYTHEON VIIRS waiver RDW_VIIRS-W001, executed by M. Pavloff, VIIRS Program Manager, that was created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

64.

FALSE RAYTHEON WAIVERS RDW_VIIRS-W018, AND RDW_VIIRS-W024 TO CIRCUMVENT AND CONCEAL VIIRS SYSTEM UNITS FAILURES TO PERFORM TO VIIRS SPECIFICATIONS, WHICH CONSTITUTE

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND REQUIREMENTS.

False Statements and Records:  With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of VIIRS System Units Failures to Perform to Specifications by means of unauthorized RAYTHEON VIIRS waivers RDW_VIIRS-W018, and RDW_VIIRS-W024, executed by M. Pavloff, VIIRS Program Manager, that were created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

65.

FALSE RAYTHEON WAIVERS RDW 417700-110 (FU1) RTMA RDW_VIIRS-W001 AND 417700-110 (FU1) HAMMA RDW_VIIRS-W001 IN RECKLESS DISREGARD TO OBTAIN PRIOR ESD AND EMI/EMC DESIGN APPROVAL FOR VIIRS MATERIALS AND EQUIPMENT USED IN COMPLIANCE WITH ESD PROTECTION REQUIREMENTS FOR VIIRS FLIGHT HARDWARE, WHICH CONSTITUTE ADMISSIONS BY RAYTHEON OF VIIRS DEFECTIVE NONCONFORMANCES WITH VIIRS SPECIFICATIONS AND REQUIREMENTS.

Specification:   RAYTHEON CAGE Code 4U884 Specification RP 10-001, Paragraph 3.2.10 Approved ESD protective materials and equipment specifies: ESD control protective materials and equipment used to meet the requirements of this standard shall be approved by the ESD Site Coordinator/Team. An approved materials and equipment list may be included in site specific documentation, or attached as an exhibit to this document.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>False Defective Nonconformance</u>:   RAYTHEON admission of VIIRS defective nonconformances in RAYTHEON RDWs, executed by M. Pavloff, VIIRS Program Manager, whereby VIIRS Flight Unit 1 Encoding Motor output cable shieldings are not grounded (use of un-terminated "Floating Shields"). Failure by RAYTHEON to design to provide Electromagnetic Interference / Electromagnetic Contamination (EMI/EMC) shielding protection to surrounding sensitive instruments as required. In deliberate ignorance and reckless disregard, RAYTHEON failed to design to provide protection against (ESD) Exposure(s) via damaging electrostatic fields, static discharges, and electrical transients jeopardizing Mission Assurance by Latent Defects in Electrostatic Discharge Sensitive (ESDS) devices jeopardizing Mission Assurance for VIIRS Flight 1, comparable to FPIE / FPA - ESD Exposures from "Floating Shields" used on STE Test Cable initial designs, thereby compromise the NPOESS/VIIRS Unit/System integrity and mission assurance, and cause the NPOESS mission downgrade or failure, thereby constituting false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1), and § (a)(1)(A).

<u>False Statements and Records</u>:   With actual knowledge and reckless disregard, Defendant RAYTHEON knowingly has circumvented and concealed admitted VIIRS defective nonconformance of RAYTHEON Failure to Obtain Prior ESD and EMI/EMC Design Approval for VIIRS Materials and Equipment used in Compliance with ESD Protection Requirements for VIIRS Flight Hardware by means of unauthorized RAYTHEON VIIRS waivers RDW 417700-110 (FU1) RTMA RDW_VIIRS-W001 and 417700-110 (FU1) HAMMA RDW_VIIRS-W001, executed by M. Pavloff, VIIRS Program Manager, that were created by RAYTHEON itself and falsely granted by RAYTHEON to RAYTHEON itself, thereby constituting false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

66.

FALSE RAYTHEON DELIBERATE IGNORANCE AND RECKLESS DISREGARD CONCEALMENT OF THE VIIRS DEFECTIVE NONCONFORMANCES AT THE IPO, AEROSPACE CORPORATION AND NORTHROP AUDIT ON AUGUST 29-30, 2007.

On August 29-30, 2006, at RAYTHEON Goleta (RVS), the NPOESS Integrated Program Office (IPO) and the Aerospace Corporation Eric Richter, Christopher Pate, and Melvin Cohen, conducted a technical review of the RAYTHEON VIIRS Subcontract 65349DGE2S, with NORTHROP Audit Lead Rick Ikemoto and Billy Callin, as requested by Brig. Gen. Susan K. Mashiko, NPOESS Deputy Systems Program Director. In deliberate ignorance and reckless disregard, RAYTHEON inter alia John Bouregy, RVS Program Manager, Eugene Jaramillo, Program Quality, Mike Haley, Operations Manager, Marilyn Medel, RVS Quality, and Robert Rodau, ESD Engineer, made false statements and created a false record by the deliberate concealment by RAYTHEON of the NPOESS/VIIRS FPIE/FPA DNB and other units defective nonconformances with the NPOESS/VIIRS contract Specifications and requirements, thereby constituting an additional RAYTHEON false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B), to wit:

(1)    Deliberate concealment by RAYTHEON of the VIIRS defective nonconformances with the VIIRS/NPOESS contract Specifications and requirements which were subsequently admitted in October 2006 PMP Revision A, thereby constituting an additional RAYTHEON false statement and false record violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(2) Deliberate concealment of the original VIIRS FPIE Build Books (which support the VIIRS defective nonconformances alleged herein) but only produced

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

and referred to the VIIRS FPIE Rework Book, which documents the correction of numerous VIIRS nonconformances but does not document the existing VIIRS defective nonconformance alleged with particularity herein, whereby the RAYTHEON false statements and false records constitute false claim violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(3)   In Deliberate Ignorance and Reckless Disregard, concealed at least sixty NPOESS/VIIRS FPIE/FPA DNB and other units waivers written by RAYTHEON and then RAYTHEON granted the waivers to RAYTHEON without approvals, which impair the NPOESS/VIIRS Mission Assurance, and constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

(4)   In Deliberate Ignorance and Reckless Disregard, concealed that in another room, RAYTHEON had disassembled the FPIE, which inter alia invalidated all FPIE testing, thereby constituting defective nonconformances with NPOESS/VIIRS FPIE/FPA DNB contract specifications and requirements, which impair the NPOESS/VIIRS Mission Assurance and constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2), and § (a)(1)(A) and (B).

67.

RAYTHEON IN RECKLESS DISREGARD CONCEALED VIIRS DEFECTIVE NONCONFORMANCES WITH NPOESS VIIRS SPECIFICATIONS AND REQUIREMENTS FOR FOLLOW-ON FLIGHT 2,3 AND 4 HARDWARE.

At a RAYTHEON VIIRS meeting on December 12, 2006, attended in person by Michael Haley, VIIRS Operations Manager, Ronald Estes, VIIRS ELS Lead Engineer, Ronald Townsend, VIIRS ELS Manufacturing Lead, and Steven Mateski, VIIRS Manufacturing Planner Engineer, and by teleconference, Eugene Jaramillo, VIIRS Manager Quality Assurance, and Richard Murth, VIIRS Components Engineer, inter alia the VIIRS Flight 2 verification request by Northrop Grumman

1   Corporation, NPOESS Prime Contractor (NORTHROP), was decided, to wit:

2       (1)   <u>VIIRS FLIGHT 2 VERIFICATION</u>. NORTHROP has required

3   RAYTHEON to announce one of two Scenarios concerning VIIRS Flight 2 by

4   December 20, 2006, namely:

5       (A)   SCENARIO 1:   Build VIIRS Flight 2 exactly as Flight 1 for

6   launch in 2011 by generating new waivers (copied from Flight 1 waivers) for Flight

7   2. If VIIRS Flight 2 is used as is, then VIIRS Flight 3 would have to be ready as is

8   to be a spare as required by the VIIRS contract which would require another set of

9   waivers. RAYTHEON Goleta RVS and SBRS are generating new RAYTHEON

10  Deviation Waivers (RDWs) as if this scenario has already been decided. In an

11  attempt to appease the customer, the RAYTHEON Flight 1 waivers were

12  dispositioned as "Flight 2 and up will comply" indicating that only VIIRS Flight 1

13  was noncompliant. As new waivers for VIIRS Flight 2 have been generated (copies

14  of Flight 1 waivers), it is now clear that RAYTHEON does not intend to meet the

15  VIIRS contractual obligations. It will be impossible for VIIRS Flights 2, 3, and 4 to

16  comply, in light of the original VIIRS Revision -, Parts, Materials and Processes

17  Control Plan (PMP) dated January 12, 2002 vis-a-vis the sheer volume of the PMP

18  Revision A, SDRL 024A dated October, 2006 which does not contain any new

19  VIIRS specifications or requirements but only incorporates those original VIIRS

20  specifications and requirements as required in the NPOESS General Instrument

21  Interface Document, D31418, into the PMP, which to date have not been

22  implemented in VIIRS Flights 1, 2, 3 and 4. Four years later RAYTHEON finally

23  admits and acknowledges the VIIRS contractual requirements in the revising of the

24  PMP Plan. A brief comparison of the original PMP Plan (Y4682) dated January 12,

25  2002 vis-a-vis PMP Plan Y4682 Revision A dated October 31, 2006 evidences

26  substantial additions of the original VIIRS specifications and requirements,

27  including without limitation, Parts Derating (Section 5.1.1.), Traceability and Lot

28

Control (Section 5.1.2), Upscreening requirements (Section 5.1.4), Destructive Physical Analysis requirements (Section 5.1.6), Qualification of EEE parts (Section 5.1.7), Prohibited Materials (Section 5.3.2), Corrosion Control and Dissimilar Metals (Section 5.3.4), Radiation Hardness Assurance (RHA) requirements (Section 5.4), EEE Part Freshness (Section 6.8.1), Electrostatic Discharge (ESD) Control (Section 6.8.3), Shelf Life and Aging Recertification requirements as well as numerous other VIIRS specifications and requirements. While all of those VIIRS specification requirements were always VIIRS program prerequisites, they were not implemented by RAYTHEON because the original VIIRS Parts, Materials, and Processes Plan dated January 12, 2002 did not include them. As part of SCENARIO 1, NORTHROP has required that the RAYTHEON Quality Assurance Manager, Eugene Jaramillo write a letter certifying that the risks have been mitigated for VIIRS Flight 2 and that no adverse consequences to NPOESS Mission Assurance could be expected despite the fact that the VIIRS Flight 2 life expectancy is 7 years vis-a-vis 3.5 years for Flight 1. Michael Haley, VIIRS Operations Manager, commented to the Relator Steven Mateski that he did not want Eugene Jaramillo, VIIRS Quality Assurance Manager, involved because Haley stated that Jaramillo would not go along with the VIIRS Flight 2 "use as is" in SCENARIO 1, and that Jaramillo already had a bias against VIIRS Flight 2 because of the way the VIIRS programs and parts had been conducted on VIIRS Flight 1. To the knowledge of the Relator Steven Mateski, RAYTHEON has not yet responded to NORTHROP.

(B) SCENARIO 2: Scrap VIIRS Flight 2, and procure new parts and build VIIRS Flight 2. If VIIRS Flight 2 (80% complete) is scrapped, then Flight 3 (80% complete), Flight 4 (50% complete), and Flight 5 (10% complete), would also have to be scrapped. To rebuild VIIRS Flight 2 would require numerous RAYTHEON drawing revisions to correct the noncompliant design to conform

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

with the original VIIRS specifications and requirements, which are now documented in the VIIRS PMP Revision A dated October 2006 but have not been implemented by RAYTHEON in VIIRS Flights 1, 2, 3, 4 or 5.

    (2) <u>VIIRS FLIGHT 2 NONCOMPLIANCES</u>. VIIRS Flight 2 noncompliant issues were discussed at the RAYTHEON meeting on December 12, 2006, to wit:

        (A)   Trace issues from Flight 1 to Flight 2 (Deltas)

        (B)   2002 purchase components date vs; Flight 2 2011 launch date (exceeds 5 year components life)

        (C)   Chassis holes to PWB layout mismatch (mounting holes .010" mismatch)

        (D)   Chassis cutouts J1 & J2 at Next Assembly (prevents cable mates)

        (E)   Chassis locking inserts - (debris shedding)

        (F)   Chassis Residual Stress-Free material (for flatness requirement)

        (G)   Chassis and Covers (Electro-deposited Nickel plating)

        (H)   J7 potting missing and pure Tin wired (421327 Drawing)

        (I)    J8 Spacers (421327-98 / 2 places) unplated (421327 Drawing)

        (J)   Top Cover Break-thru (unauthorized vent 421314 Drawing Top View - Do Not Break Thru)

        (K)   Top Cover plating Break-Thru (unauthorized non-continuous plating 421314 Drawing Note 3)

        (L)   Inductors on PWB not 100% X-Rayed - (DPA missing)

        (M)   Several components missing DPA - (Burn-in levels low and inadequate)

        (N)   Warm-water rinse - exposure of Ferrite Beads to rust oxidation.

RAYTHEON VIIRS Operations Manager Michael Haley refused to discuss VIIRS Flight 2 noncompliances raised by the Relator Steven Mateski, to wit:

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

(A)   C2 and C170 Capacitor shorting wire to ground path (trace)

(B)   ESD exposures from Test Cables "Floating Shields" (cables have since been repaired)

(C)   ESD exposures from Anodic coating isolation (Butterfly fixture 225741 Drawing)

(D)   RT1 & RT2 components not installed.

(E)   Lack of potting at P8 Connector to provide stress-relief on 421331 PWB.

(3) DPA TEST FALSE CLAIM. At the RAYTHEON meeting on December 12, 2006, Richard Murth, VIIRS Components Engineer, advised Michael Haley, VIIRS Operations Manager, that the original VIIRS specifications finally incorporated in the PMP Revision A dated October 2006, requires RAYTHEON to perform Destructive Physical Analysis (DPA) test approximately 120 part numbers on VIIRS Flight 2 vis-a-vis approximately 28 part numbers DPA tested on VIIRS Flight 1, as required in the PMP Revision A Appendix and VIIRS Bill of Materials. The DPA test pursuant to MIL-STD-1580 has always been a VIIRS requirement but was not implemented by RAYTHEON on VIIRS Flights 1, 2, 3 and 4.

SPECIFICATION: VIIRS PMP REVISION A, PARAGRAPH 5.1.6, DESTRUCTIVE PHYSICAL ANALYSIS (DPA):

A lot sample destructive physical analysis (DPA) shall be performed for those generic part families indicated in Appendix A consistent with MIL-STD-1580 using Raytheon procedures. Destructive physical analysis procedures define the methods of inspecting part design, construction, materials, and workmanship, and the accept/reject criteria. The level of analysis performed is based on experience with the supplier and the generic part type. The specific types and sample sizes of parts requiring DPA shall be as defined by the PMPCB in the APMPL based on Appendix A, Table A-1.

The DPA samples shall be representative of the production lot and complete all processing steps. Use of non-catastrophic screening failures for DPA is acceptable (this practice is encouraged for hybrid circuits and other high value parts). Non-catastrophic failures are defined as those which deviated slightly from electrical performance requirements but were otherwise operational. Combined DPA samples are acceptable and encouraged for similar items manufactured by the same manufacturer, using the same processes and controls, with the same lot date code (LDC) and varying only in some limited characteristics (e.g. capacitors manufactured to the same slash sheet, with different capacitance values). DPA reports and remains of samples shall be retained for at least 8 (eight) years after end of the contract. A DPA Review Board comprised of technical specialists selected by the PMPCB Chairperson will review anomalies and discrepancies noted during DPA. Lots failing DPA shall be dispositioned by MRB. The customer shall be notified of each DPA failure. The DPA shall be performed by an agency other than the manufacturer of the part (refer to Section 5.5.2 for test laboratory evaluation requirements).

The RAYTHEON deliberate ignorance and reckless disregard by refusal to implement known DPA test specifications and requirements, impairs the NPOESS/VIIRS Mission Assurance of Flights 1,2,3 and 4, and constitutes violation of the False Claims Act, 31 U.S.C. 3729(a)(1) and (2), and § (a)(1)(A) and (B).

68.

RAYTHEON RECKLESS DISREGARD OF ETHICS COURSES ON PRODUCT QUALITY AND SUBSTITUTION.

The RAYTHEON employees are required to complete an ethics course on Product Quality and Substitution wherein it is expressly provided to wit:

Product substitution occurs when a contractor provides a product that differs from a contract's requirements... Plus, a company's failure to provide a conforming product to the government can sometimes result in civil and/or criminal penalties.

69.

RAYTHEON knowingly made, used and caused to be made and used, a false record and statement to conceal the VIIRS defective nonconformances by RAYTHEON as alleged with particularity herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(2) and .§ (a)(1)(B).

70.

From 2002 to at least 2012, Defendant RAYTHEON has knowingly submitted false NPOESS VIIRS claims for payment, whereby the United States Government has been induced to pay money that it would not have paid if Defendant RAYTHEON had disclosed the true defective nonconformances with the NPOESS VIIRS specifications and requirements as alleged with particularity herein.

71.

From  2002 to at least 2012, in reckless disregard Defendant RAYTHEON knowingly presented, or caused to be presented false NPOESS VIIRS vouchers, on which payment was made by the United States Government with funds appropriated by the United States Congress for the NPOESS contract. RAYTHEON knowingly made false certified statements and records to conceal the defective nonconformance NPOESS VIIRS to secure approval and payment of vouchers by the United States Government and to secure appropriation approval by the United States Congress. Plaintiff alleges that each and every false NPOESS VIIRS voucher, statement and record by RAYTHEON constitute false claims under the False Claims Act, 31 U.S.C. § 3729(a), in the single damage sum of at least

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT

$1,000,000,000   or according to proof at the time of trial. Pursuant to the False Claims Act, 31 U.S.C. § 3729(a), the total damages caused by the false claims by Defendant RAYTHEON should be trebled plus a civil penalty of $5,000 to $11,000 for each RAYTHEON false claim.

72.

Under the False Claims Act, 31 U.S.C. § 3729(a), the measure of damages is the full VIIRS contract price, trebled, minus an offset for the value, if any, of the performance which RAYTHEON provided under the NPOESS VIIRS contract.

73.

From 2002 to at least 2012, Defendant RAYTHEON had actual knowledge and deliberately authorized, directed, and/or ratified the conduct of the officers, managers and employees of Defendants RAYTHEON in the performance of the acts with deliberate ignorance and reckless disregard as herein alleged in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

74.

From 2002 to at least 2012, in doing the acts herein alleged, the Defendant RAYTHEON officers, managers and employees have acted in their respective capacities as officers, managers or employees of Defendant RAYTHEON, in violation of the False Claims Act, 31 U.S.C. § 3729 et seq.

75.

In the event that the United States Government pursues recovery for any of the false claims by Defendant RAYTHEON, through any alternative remedy available to the United States Government, including any administrative proceeding or disposition, Coplaintiff and Relator shall have the same rights thereto as Coplaintiff and Relator would have had under the False Claims Act, including awards, attorneys fees, expenses and costs, pursuant to the False Claims Act, 31 U.S.C. § 3730(c)(5).

WHEREFORE, Plaintiff prays for judgment against Defendant RAYTHEON COMPANY as follows:

(1) Restitution to the United States Government of the damages sustained from false claims by Defendant Raytheon Company for payment by the United States Government, in the single damage sum of at least $1,000,000,000 or according to proof at the time of trial, pursuant to 31 U.S.C. § 3729 et seq.

(2) Statutory three times the damages sustained from the false claims by Defendant Raytheon Company for payment by the United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3729(a);

(3) Statutory civil penalty of not less than $5,000 and not more than $11,000 for each and every invoice false claim by Defendant Raytheon Company for payment under United States Government, according to proof at the time of trial, pursuant to 31 U.S.C. § 3730(d);

(4) Statutory awards, attorneys fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d);

(5) Such other and further relief as the Court deems just and proper.

### REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, request is hereby made for trial by jury.

DATED: August 22, 2012          Respectfully submitted,

CARLSMITH BALL LLP

By

Dean Francis Pace
Attorneys for Coplaintiff Relator

PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF LOS ANGELES        )

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is: Suite 2900, 515 South Flower Street, Los Angeles, California 90071-2901. On August 24, 2012, I served the within FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729 ET SEQ. by prepaid Federal Express courier, addressed as follows:

Paul J. Wogaman Esquire
Robert E. Chandler Esquire
Trial Attorneys
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
Patrick Henry Building, Room 9006
601 D. Street N.W.
Washington, D.C. 20530
Post Office Box 261
Benjamin Franklin Station
Washington, D.C. 20004

I declare under penalty of perjury that the foregoing is true and correct.

Executed August 24, 2012, at Los Angeles, California.

_Stephanie Reavesdail_
Stephanie Reavesdail

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

FOURTH AMENDED COMPLAINT