Allan J. Graf (SBN 057148)
Albert H. Ebright (SBN 029170)
CARLSMITH BALL LLP
Suite 2900
515 South Flower Street
Los Angeles, CA 90071-2901
Telephone: 213.955.1200
Facsimile: 213.623.0032
Email: falseclaimsact@carlsmith.com

Attorneys for Plaintiff-Relator Steven Mateski

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. STEVEN MATESKI,<br><br>Plaintiff,<br><br>v.<br><br>RAYTHEON COMPANY,<br><br>Defendant. | CASE NO.: 2:06-cv-03614-ODW(KSx)<br><br>Assigned to: Hon. Otis D. Wright, II<br><br>FIFTH AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729 *ET SEQ*.<br><br>REQUEST FOR TRIAL BY JURY |

Pursuant to leave of court granted on February 10, 2017, Plaintiff-Relator Steven Mateski alleges the following violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.* against Defendant RAYTHEON Company:

JURISDICTION

1. Pursuant to 28 U.S.C. § 1331 this court has original jurisdiction of this action arising under the False Claims Act, 31 U.S.C. § 3729.

## VENUE

2. At all times herein mentioned Defendant RAYTHEON Company ("RAYTHEON") was a corporation qualified to do business in the Central District of California. RAYTHEON's violations of the False Claims Act alleged herein and the damages sustained by the United States Government occurred within the Central District of California.

## PARTIES

3. At all times herein mentioned Plaintiff-Relator Steven Mateski ("MATESKI") has been a resident of the Central District of California. MATESKI has more than thirty (30) years' experience in the aerospace and defense industry. From 1987 to 1995, MATESKI was a Manufacturing Engineer/Planner for Northrop Grumman Corporation ("NORTHROP"); from 1996 to 2002, he was a Manufacturing Engineer/Planner at Hughes Electronics/Boeing Corporation; and from 2002 to 2006 he was employed by RAYTHEON as a Manufacturing Planner Engineer.

## BACKGROUND FACTS

4. In August 2002, NORTHROP was selected as the prime contractor to develop the National Polar-orbiting Operational Environmental Satellite System ("NPOESS"), a satellite system used for collecting meteorological, oceanographic, environmental, climatic data and imagery. At that time NORTHROP awarded the subcontract to RAYTHEON to design, manufacture and assemble the Visible Infrared Imaging Radiometer Suite ("VIIRS") sensor for NPOESS ("VIIRS Contract"). The VIIRS sensor was created to collect visible/infrared imagery and radiometric data on the atmosphere, clouds, earth radiation budget which measures whether there is global warming or global cooling, clear-air land/water surfaces, sea surface temperature, ocean color, and low-light visible imagery.

5. RAYTHEON, through its Raytheon Space and Airborne Systems division in El Segundo, California and through its Raytheon Vision Systems and Santa Barbara Remote Sensing division in Goleta, California, developed and built the VIIRS sensor from 2002 to 2010. The VIIRS sensor consists of thirty-two (32) "100 level subsystem units." Each "100 level subsystem unit" is a specialized data processor or signal processor or digital processor or analog processor comprised of high-reliability electronic component parts which are used for the collection and transmission of data by the VIIRS sensor. Failure of these units causes the loss of low light visible imagery thereby blinding or impairing the NPOESS telescope and preventing or impairing the collection and transmission of data.

6. Between 2002 and 2006, MATESKI, as Manufacturing Planning Engineer, worked on the VIIRS sensor. During that time MATESKI observed and became aware of the facts alleged herein whereby RAYTHEON (a) failed to build and assemble the VIIRS sensor and its component parts in conformance with the specifications and requirements of the VIIRS Contract and the NPOESS General Instrument Interface Document ("NGIID"), (b) substituted prohibited and substandard products and materials for the products and materials specified in the VIIRS Contract and the NGIID, and (c) concealed its deviations from the VIIRS Contract and the NGIID. As the result the thirty-two (32) "100 level subsystem units" of the VIIRS sensor failed as hereinafter alleged.

7. Certain of the requirements and specifications of the NGIID were designated as mandatory, which must be complied with unless two United States Government Contracting Officers expressly waive such specifications and requirements. The NGIID is incorporated by reference at this point as though set forth in full herein. Section 1.5a of the NGIID provides:

> "**Shall** designates the most important weighting level; that is mandatory. Any deviations from these contractually imposed

mandatory requirements require the approval of the SSPR [Single Source Procurement Reform Office] contracting officer, as well as the NPP [NPOESS Preparatory Project Office] contracting officer if the change affects interfaces for instruments being provided to NPP."

8. The VIIRS Contract allowed RAYTHEON to request waivers from contract requirements and specifications. It provided that RAYTHEON and NORTHROP could waive minor deviations. However, deviations from mandatory requirements of the NGIID, designated as "major" deviations, required the approval of the contracting officers of the two Government agencies designated in Section 1.5a of the NGIID.

## VIOLATIONS OF THE FALSE CLAIMS ACT

9. RAYTHEON, in the performance of the VIIRS Contract, knowingly did not conform and comply with the mandatory requirements and specifications for the VIIRS Contract set forth in the NGIID and failed to obtain the requisite approvals for major deviations from the NGIID in the following respects:

(a) RAYTHEON failed to perform complete tests and retests of component parts and of assembled hardware in violation of NGIID § 4.1.1.1.5 and § 4.2.7;

(b) RAYTHEON failed to perform qualification and up-screening tests on electronic components in violation of NGIID § 4.1.1.1.5 and § 4.2.7;

(c) RAYTHEON (i) forged planning operation sign-offs weeks after operations were performed in violation of NGIID § 4.1.1.1.2 which mandates true and accurate records of tests, and (ii) did not stop work to perform required inspections in violation of NGIID § 4.1.1.1.5 and § 4.2.7;

(d) RAYTHEON forged serial numbers on inspection status tags and signed-off on test operations where test procedures were not "Baseline

Released" in violation of NGIID § 4.1.1.1.2 which mandates true and accurate records of tests;

  (e) RAYTHEON substituted materials prohibited by the NGIID, *e.g.*, electro-deposited nickel plating, hot plastics capable of static discharges, pure tin, tungsten and debris shedding fasteners in violation of § 3.2.4.6 and § 3.3.1.3 of the NGIID;

  (f) RAYTHEON failed to design and build VIIRS sensors to a pre-approved electrical grounding scheme to protect component parts and assemblies from electrostatic discharge exposures ("ESD") in violation of § 3.2.4.6 and § 3.3.15.1.3 of the NGIID;

  (g) RAYTHEON performed reduced Acceptance testing on disassembled and reassembled units when full Acceptance testing was required in violation of NGIID § 4.1.1.1.5 and § 4.2.7;

  (h) RAYTHEON failed to obtain ESD preapproval of designs and assembly areas and test equipment by the ESD site coordinator and used non-approved test equipment in violation of NGIID § 3.3.14 and § 4.4;

  (i) RAYTHEON failed to write test event failure reports upon failures of units in Acceptance testing in violation of §§§ 4.1.1, 4.1.1.1.1 and 4.1.1.1.2 of the NGIID;

  (j) RAYTHEON failed to design a primary and redundant power supply in violation of NGIID § 3.2.4.3.2.3;

  (k) RAYTHEON failed to package, handle, transport and store materials to protect against ESD exposures in violation of NGIID § 3.5.3;

  (l) RAYTHEON failed to perform and conduct required Acceptance tests prior to delivery of the VIIRS sensor to NORTHROP for satellite level integration of the sensor onto the spacecraft in violation of NGIID § 4.2.7;

  (m) RAYTHEON falsified and failed to keep and maintain accurate

records documenting all relevant testing, all build and assembly of the VIIRS sensor, all rework and modifications of the VIIRS sensor in order to ensure compliance with the required manufacturing and assembly processes and controls in violation of NGIID § 4.1.1.1.2; and

(n)     RAYTHEON created unauthorized venting by use of an unsealed power connector prohibited by NGIID § 3.3.12.11, which caused contamination in one or more of the 32 "100 level subsystem units."

10.     As the result of these deviations from the specifications and requirements of the VIIRS Contract and the NGIID, the VIIRS sensor failed to operate as designed. Weeks after launch, the performance of the VIIRS sensor began to degrade and an emergency shutdown was ordered turning off all systems, except those necessary to keep the satellite in orbit. Engineering analysis discovered the light collecting mirrors were darkening as a result of previous exposures by RAYTHEON to prohibited materials during RAYTHEON's acceptance testing on the ground. In addition, the VIIRS sensor was not collecting and transmitting data, thereby leaving a critical coverage gap in the meteorological, oceanographic, environmental, climatic and space environmental data and information for military, commercial, scientific and public use.

11.     RAYTHEON has admitted it knowingly did not perform the mandatory requirements and specifications of the VIIRS Contract and the NGIID and that it falsified records and substituted products, as alleged in ¶ 9 above, by requesting waivers of said deviations for the purpose of concealing RAYTHEON's use of prohibited materials, non-conformances with the mandatory contract requirements and specifications for the VIIRS Contract, and ESD exposures caused by design failures and testing failures. RAYTHEON prepared the waivers to be signed by representatives of NORTHROP with knowledge that NORTHROP lacked authority under the NGIID and VIIRS Contract to approve such deviations.

12. Between 2002 and 2010, RAYTHEON submitted to NORTHROP two types of requests for payment ("Requests for Payment") in connection with the VIIRS Contract, which RAYTHEON intended to have paid and knew would be paid by the United States Government:

    (a) Monthly invoices and accompanying documentation for labor and materials, which NORTHROP submitted to the United States Government for payment;

    (b) Semi-annual invoices and accompanying documentation for award fees which NORTHROP submitted to the United States Government for payment with NORTHROP's recommendation of how much of the award fee the United States Government should pay.

13. Based on MATESKI's more than thirty (30) years' experience in the aerospace and defense industry MATESKI has personal knowledge that when a contractor submits to the United States Government a Request for Payment on an aerospace and defense industry contract, the contractor represents that the performance of the contract is in conformity with the requirements and specifications of the contract for which payment is requested.

14. Section 52.232-32 and section 32.905 of the Federal Acquisition Regulations ("FAR") governing all contracts for goods and services with the United States Government, provide in relevant part that every contractor submitting invoices and bills requesting payment by the United States Government represents and/or certifies that the contractor is in conformity with the requirements and the specifications of the contract.

15. In its initial disclosure required by Rule 26(a)(1)(A)(ii) RAYTHEON was required to produce all documents it may use to support its defense. RAYTHEON intends to use the Requests for Payment and related documents to

defend against the false claims alleged herein. RAYTHEON did not produce the Requests for Payment and supporting documents in its disclosure served on July 27, 2016 under Rule 26. MATESKI does not have copies of the Requests for Payment and supporting documents; they are in the exclusive possession, custody and control of RAYTHEON. On February 13, 2017 MATESKI's counsel requested RAYTHEON's counsel to produce said Requests for Payment and supporting documents. On February 20, 2017 RAYTHEON's counsel refused to produce the requested documents.

16.  Based on the facts alleged in Paragraphs 13, 14, and 15 MATESKI is informed and believes and on that basis alleges that from 2002 to 2010, RAYTHEON submitted to NORTHROP Requests for Payment and supporting documents with knowledge that they falsely represented that RAYTHEON had performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract, including but not limited to the NGIID, and with knowledge that the Requests for Payment failed to disclose that RAYTHEON had not obtained the requisite approvals for major deviations from the mandatory requirements of the NGIID and all other NPOESS program documents. In reliance on these false representations and failures to disclose, the United States Government reimbursed NORTHROP for the work being billed and invoiced by RAYTHEON on the VIIRS Contract. The United States Government would not have paid RAYTHEON's Requests for Payment if the United States Government knew (i) that RAYTHEON had not performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract and the NGIID, and (ii) RAYTHEON had not obtained approvals of major deviations as required by the NGIID. As the result of the United States Government's paying the false Requests for Payment, it suffered damages of at least one billion dollars ($1,000,000,000), or according to proof at time of trial. Pursuant to the False Claims Act, 31 U.S.C. §

3729(a), the total damages caused by the false claims of RAYTHEON should be trebled plus a civil penalty of $5,500 to $11,000 for each RAYTHEON false claim.

WHEREFORE, MATESKI prays for judgment against RAYTHEON as follows:

(1) Restitution to the United States Government of the damages sustained from the false claims submitted by RAYTHEON and paid by the Government according to proof at the time of trial;

(2) Trebling the damages sustained by the United States Government pursuant to 31 U.S.C. § 3729(a)(1);

(3) An award of civil penalties for each false claim pursuant to 31 U.S.C. § 3729(a)(1);

(4) An award of attorneys' fees, expenses and costs; and

(5) Such other and further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b), Federal Rules of Civil Procedure, Mateski requests a trial by jury.

DATED: March 7, 2017          Respectfully submitted,

                              CARLSMITH BALL LLP


                              By   /S/ Allan J. Graf
                                   Allan J. Graf
                                   Attorneys for Plaintiff-Relator
                                   Steven Mateski

# PROOF OF SERVICE

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF LOS ANGELES   )

I am a citizen of the United States and a resident of the county aforesaid; I am over the age of eighteen years and not a party to the within entitled action; my business address is: Suite 2900, 515 South Flower Street, Los Angeles, California 90071-2901. On March 7, 2017, I served the within FIFTH AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729 *ET SEQ*. by prepaid Federal Express courier, addressed as follows:

> Robert E. Chandler Esquire
> Trial Attorney
> Commercial Litigation Branch
> Civil Division, U.S. Department of Justice
> Patrick Henry Building, Room 9006
> 601 D. Street N.W.
> Washington, D.C. 20530
> Post Office Box 261
> Benjamin Franklin Station
> Washington, D.C. 20004

I declare under penalty of perjury that the foregoing is true and correct. Executed March 7, 2017, at Los Angeles, California.

/S/ Rhea Weng
Rhea Weng