O

# United States District Court
# Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* STEVEN MATESKI,<br><br>    Plaintiff,<br><br>    v.<br><br>RAYTHEON COMPANY,<br><br>    Defendant. | Case № 2:06-cv-03614-ODW(KSx)<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [184]** |

## I. INTRODUCTION

This action arises under the False Claims Act (FCA). In 2002, Defendant Raytheon Company contracted with Northrop Grumman Corporation to design and manufacture a weather sensor for a Government-funded satellite system. The contract documents contained extensive specifications and requirements for the sensor. Plaintiff-Relator Steven Mateski alleges that Raytheon knowingly deviated from these specifications but nonetheless certified that it complied with those specifications when requesting payment from Northrop. And because Northrop ultimately passed Raytheon's invoices to the Government for payment, Mateski alleges that Raytheon effectively defrauded the Government.

Raytheon now moves to dismiss Mateski's Fifth Amended Complaint, arguing that: (1) he has not identified any specific representations in Raytheon's requests for

payment; (2) he has not demonstrated how any such representations, if they exist, are false or misleading; (3) any such (mis)representations were in any event immaterial to the Government's decision to pay Raytheon; and (4) liability cannot attach to any pre-2009 misconduct because Raytheon sought payment from Northrop and not directly from the Government. (ECF No. 184.)

The Court concludes that Mateski has not adequately alleged either that Raytheon submitted a false claim or that Raytheon's allegedly false representations were material to the Government's payment decisions. Thus, the Court **GRANTS** Raytheon's Motion without leave to amend.[1]

## II. BACKGROUND

### A. Factual Background

In 2002, the United States Government awarded Northrop the prime contract for designing and developing the National Polar-Orbiting Operational Environmental Satellite System (NPOESS), a satellite that collects meteorological, oceanographic, environmental, and climatic data. (Fifth Am. Compl. ("5AC") ¶ 4, ECF No. 182.) Northrop, in turn, subcontracted with Raytheon to develop a weather sensor for the NPOESS called the Visible Infrared Imaging Radiometer Suite (VIIRS). (*Id.*) Two main contract documents governed Raytheon's work on the VIIRS: the VIIRS Contract and the NPOESS General Instrument Interface Document (NGIID). (*Id.* ¶ 6.) The NGIID contained extensive specifications and requirements regarding the design and manufacturing process for the VIIRS, some of which it designated as "mandatory." (*See id.* ¶¶ 7, 9.) Any deviation from a mandatory requirement was considered a "major" deviation that needed a waiver approved by two Government contracting officers. (*Id.* ¶¶ 7–8.) "Minor" deviations, on the other hand, could be waived by either Raytheon or Northrop. (*Id.* ¶ 8.)

Mateski, an engineer and a former Raytheon employee, worked on the VIIRS

---

[1] After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

from 2002 to 2006. (*Id.* ¶¶ 3, 6.) According to Mateski, Raytheon failed to comply with numerous mandatory specifications and failed to obtain properly-executed major deviation waivers. (*Id.* ¶ 9.) Mateski identifies 14 specifications in the NGIID that Raytheon failed to comply with, such as: failing to perform "complete tests and retests of component parts and of assembled hardware"; failing to perform "qualification and up-screening tests on electronic components"; "forg[ing] planning operation sign-offs" and not performing required inspections; "forg[ing] serial numbers on inspection status tags"; "substitut[ing] materials prohibited by the NGIID"; "falsif[ying] and fail[ing] to keep and maintain accurate records"; and others. (*Id.* ¶¶ 9(a)–(n).)

Between 2002 and 2010, Raytheon submitted two types of requests for payment to Northrop: monthly invoices for labor and materials, and semi-annual invoices for award fees. (*Id.* ¶ 12.) Northrop, in turn, submitted Raytheon's requests to the Government for payment. (*Id.*) Mateski alleges on information and belief that:

> Raytheon submitted to Northrop Requests for Payment and supporting documents with knowledge that they falsely represented that Raytheon had performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract, including but not limited to the NGIID, and with knowledge that the Requests for Payment failed to disclose that Raytheon had not obtained the requisite approvals for major deviations from the mandatory requirement of the NGIID and all other NPOESS program documents.

(*Id.* ¶ 16.)

Mateski identifies three bases for this belief. First, based on his thirty years of experience in the aerospace and defense industry, Mateski states that he has "personal knowledge that when a contractor submits to the United States Government a Request for Payment on an aerospace and defense industry contract, the contractor represents that the performance of the contract is in conformity with the requirements and specifications of the contract for which payment is requested." (*Id.* ¶ 13.) Second, under sections 52.232-32 and 32.905 of the Federal Acquisition Regulations, "every contractor submitting invoices and bills requesting payment by the United States

Government represents and/or certifies that the contractor is in conformity with the requirements and the specifications of the contract." (*Id.* ¶ 14.) Third, because Raytheon refused to produce its requests for payments in this case either as part of its initial disclosures or in response to Mateski's counsel's informal demand, Mateski infers that the requests must contain misrepresentations or misleading half-truths that give rise to FCA liability. (*Id.* ¶ 15.)

Finally, Mateski alleges that the Government "would not have paid Raytheon's Requests for Payment if [it] had known" that Raytheon had neither complied with the mandatory contract requirements nor obtained major deviation waivers. (*Id.* ¶ 16.) Mateski asserts that the Government has suffered at least $1 billion in damages as a result of Raytheon's misrepresentations. (*Id.*)

**B.     Procedural History**

In June 2006, Mateski filed this case on behalf of the United States. (ECF No. 1.) After investigating Mateski's claims for six years, the United States declined to intervene in the action. (ECF No. 78.) Raytheon subsequently moved to dismiss what was by then Mateski's Fourth Amended Complaint for lack of subject matter jurisdiction, arguing that public knowledge of the problems with the VIIRS sensor were fatal to Mateski's claim under the FCA's public disclosure bar. (ECF No. 96.) The Court agreed and dismissed the action. *United States ex rel. Mateski v. Raytheon Co.*, No. 2:06-CV-3614-ODW, 2013 WL 692798, at *1 (C.D. Cal. Feb. 26, 2013). Mateski appealed. (ECF No. 128.) In March 2016, the Ninth Circuit reversed, reasoning that the public disclosure bar did not apply because Mateski's allegations "differ in both degree and kind from the very general previously disclosed information about problems with VIIRS." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 580 (9th Cir. 2016).

Shortly after remand, the Supreme Court issued its opinion in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), which addressed FCA liability under a theory of implied false certification. Raytheon subsequently

moved to dismiss the Fourth Amended Complaint based on *Escobar* and on several other grounds. (ECF No. 154.) The Court granted Raytheon's motion, holding that a relator relying on a theory of implied false certification must identify the "specific representation" in the claim for payment that constitutes the misleading half-truth. *United States ex rel. Mateski v. Raytheon Co.*, No. 206CV03614ODWKSX, 2017 WL 1954942, at *5 (C.D. Cal. Feb. 10, 2017) (citing *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332 (9th Cir. 2017)). The Court also held that Mateski's Fourth Amended Complaint was excessively prolix and did not comply with basic pleading requirements. *Id.* at *6–7. The Court granted Mateski leave to amend to cure both deficiencies. *Id.* at *7. Mateski subsequently filed a Fifth Amended Complaint, and Raytheon now moves once again to dismiss Mateski's complaint. (ECF Nos. 182, 184.) Mateski has opposed Raytheon's motion, and the Government has filed a Statement of Interest urging the Court to reconsider its prior holding regarding the pleading requirements under an implied false certification theory. (ECF Nos. 185, 188, 198.) Raytheon's motion is now before the Court for decision.

### III. LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The court must dismiss a complaint that does not assert a cognizable legal theory or fails to plead sufficient facts to support an otherwise cognizable legal theory. Fed. R. Civ. P. 12(b)(6);

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

In addition, where, as here, the plaintiff's claim sounds in fraud, the complaint must comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Rule 9(b) requires the party alleging fraud to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). "In addition, the plaintiff must set forth what is false or misleading about a statement [in the defendant's claim for payment], and why it is false." *Ebeid*, 616 F.3d at 998 (citations, brackets, and internal quotation marks omitted). "Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect professionals from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citations, brackets, and internal quotation marks omitted).

## IV. DISCUSSION

Under the FCA, "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States Government is liable for civil penalties and treble damages. 31 U.S.C. § 3729(a)(1)(A). The essential elements of an FCA claim are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due. *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1173 (9th Cir. 2016); *Ebeid*, 616 F.3d at 997; *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th

Cir. 2006).

Raytheon argues that Mateski has not adequately alleged either a false statement or materiality. The Court addresses each in turn.

**A.   False Statement**

**1.   Legal Standard**

The submission of a false claim is the *sine qua non* of FCA liability; "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *see also United States ex rel. Campie v. Gilead Scis., Inc.*, __F.3d__, 2017 WL 2884047, at *7 (9th Cir. 2017). A claim for payment can be "false" in at least three ways. *Hendow*, 461 F.3d at 1171. First, it can be factually false, such as where "the claimant misrepresents what goods or services that it provided to the Government." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011); *see also Swoben*, 848 F.3d at 1172–73; *Hendow*, 461 F.3d at 1171. Second, it can *expressly* certify compliance with material conditions of payment that the claimant did not in fact comply with ("express false certification"). *Swoben*, 848 F.3d at 1172–73. Third, it can *impliedly* certify compliance with material conditions of payment that the claimant did not in fact comply with ("implied false certification"). *See Escobar*, 136 S. Ct. at 1995; *Kelly*, 846 F.3d at 331–32.[2]

In ruling on Raytheon's previous motion to dismiss, this Court held that a relator relying on a theory of implied false certification must identify a specific representation the defendant made that implicitly certified its compliance with the material conditions of payment. *Mateski*, 2017 WL 1954942, at *5. The Court reasoned that even though the Ninth Circuit's pre-*Escobar* case law—namely, *Ebeid*,

---

[2] "According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Escobar*, 136 S. Ct. at 1995.

1 616 F.3d 993—did not require such, and even though *Escobar* at first glance did not
2 appear to abrogate or undermine *Ebeid*, the Ninth Circuit's post-*Escobar* precedent—
3 namely, *Kelly*, 846 F.3d 325—appeared to interpret *Escobar* as imposing such a
4 requirement. *Mateski*, 2017 WL 1954942, at *3–5.

5 The Government urges the Court to revisit this conclusion. The Government
6 argues that "[a]lthough some of the language in the *Kelly* decision appears to be
7 inconsistent with the holding in *Ebeid*," the court in *Kelly* did not overrule *Ebeid* for
8 the simple reason that a three-judge panel *cannot* overrule its own precedent absent
9 intervening and contrary Supreme Court authority—which *Escobar* is not. (Stmt. of
10 Interest at 3, ECF No. 188.) As an original matter, the Court agrees that *Escobar* did
11 not abrogate or undermine *Ebeid*. *Mateski*, 2017 WL 1954942, at *5. However, as
12 the Court previously noted—and as the Government even seems to agree—the most
13 reasonable reading of *Kelly* is that an FCA claim under an implied false certification
14 theory cannot survive if the relator does not identify any specific representations in the
15 claims for payment. *Id.* Further, *Kelly* cited *Escobar* for this proposition, an authority
16 superior to (and later in time than) *Ebeid*. The only way to reconcile *Kelly* and *Ebeid*
17 is to conclude either that *Kelly* implicitly recognized that *Escobar* abrogated *Ebeid*, or
18 that *Ebeid* never actually posited a lower standard than *Kelly*—neither of which helps
19 Mateski or the Government.[3] But what the Court cannot do, as the Government
20 appears to suggest, is ignore *Kelly* as an inconsistent blip in the Ninth Circuit's FCA
21 jurisprudence.[4] Unless and until the Ninth Circuit clarifies its jurisprudence in this
22 area—which might come sooner rather than later, *see Rose v. Stephens Institute*, No.

---

[3] The Government does not suggest any way that this Court can read *Kelly* in harmony with *Ebeid*, and the Court sees none. *Mateski*, 2017 WL 1954942, at *5.

[4] The Court notes that *Campie*, which is the Ninth Circuit's most recently FCA case, included a rather clear-cut statement of law supporting the Court's prior conclusion: "To succeed on [an implied false certification theory], pursuant to . . . *Escobar*, [the relator] *must* not merely request payment, but also make specific representations about the goods or services provided," 2017 WL 2884047, at *7 (emphasis added). Even if this statement is dicta, as the Government suggests, district courts should not take the Ninth Circuit's dicta lightly. *Cf. United States v. Augustine*, 712 F.3d 1290, 1295 (9th Cir. 2013).

17-15111 (9th Cir. 2017)—the Court sees no reasonable alternative interpretation of *Ebeid*, *Escobar*, and *Kelly*.

### 2. Analysis

Mateski alleges—on information and belief—that Raytheon "falsely represented that [it] had performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract," and that it "failed to disclose that Raytheon had not obtained the requisite approvals for major deviations from the mandatory requirement." (5AC ¶ 16.) Mateski infers that Raytheon's claims include such representations and omissions based on: (1) his general experience as an aviation engineer, (2) two Federal Acquisition Regulations, and (3) Raytheon's refusal to produce the requests for payment to Mateski's counsel. Mateski argues that these allegations suffice under all three theories of FCA liability. The Court disagrees.

Under either a factually false theory or an express false certification theory, Mateski must identify an overtly false representation in the claim for payment. *See Campie*, 2017 WL 2884047, at *7; *Wilkins*, 659 F.3d at 305. Mateski attempts to do so by stating that Raytheon's claims for payment "falsely represented that [it] had performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract," but this general description amounts to little more than a legal conclusion couched as a factual allegation. The only fact in this statement that is particular to this case is Mateski's identification of the source of the conditions of payment—i.e., the VIIRS Contract and the NGIID—but this alone is not enough to pass muster under Rule 9(b). For example, Mateski alleges that Raytheon failed to perform "complete tests and retests of component parts and of assembled hardware." (5AC ¶ 9.) Yet without knowing precisely what representation Raytheon made regarding this work in its request for payment, it is impossible to discern whether that representation was false at all. All Raytheon can do with these vague allegations is to "just deny that [it] ha[s] done anything wrong" rather than actually "defend against the charge." *Swoben*, 848 F.3d at 1172.

Mateski's reliance on an implied false certification theory fares no better, and actually further highlights the problem with his generalized allegations. As the Court explained above, the distinguishing feature of this theory is that the claim for payment contains a representation that, while not overtly false, reasonably (but falsely) implies that the claimant complied with a material condition of payment (i.e., a misleading half-truth). *Escobar*, 136 S. Ct. at 2000; *Kelly*, 846 F.3d at 331–32. Yet the representation that Mateski identifies as the misleading half-truth is the very same representation that he argues is overtly false on its face: that Raytheon "represented that [it] had performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract." (5AC ¶ 16.) It is at best unclear how the same representation can be both overtly false and not overtly false, and thus underscores the challenge that such a vague allegation poses to Raytheon in attempting to defend itself in this action.

Finally, the lack of specificity as to exactly how Raytheon deviated from the contract documents significantly hinders the determination whether its claims for payment were false. Using the same example above, Raytheon allegedly failed to perform "complete tests and retests of component parts and of assembled hardware." (5AC ¶ 9.) But did Raytheon wholly fail to perform the tests and retests? Or did Raytheon simply perform incomplete tests? Which "component parts and assembled hardware" did Raytheon fail to "complete[ly]" test? Depending on exactly what representation Raytheon made in the claims for payment and exactly how much Raytheon deviated from this specification, Raytheon might not have submitted a false claim at all. *See Ebeid*, 616 F.3d at 1000 ("Ebeid simply alleges that Lungwitz 'concealed and failed to disclose that the Clinic's physicians had a financial relationship to the Home Health Care Agency and the Hospice to which the physicians referred patients.' . . . These general allegations—lacking any details or facts setting out the 'who, what, when, where, and how' of the 'financial relationship' or alleged referrals—are insufficient under Rule 9(b). . . . [A] global indictment of Lungwitz's

business is not enough." (citations omitted)).

### 3. Mateski's Arguments

Mateski makes several arguments as to why his allegations are sufficient, none of which the Court finds convincing.

#### i. Pleading on Information and Belief

First, Mateski argues that the contents of Raytheon's claims for payment are "peculiarly within the defendant's knowledge," and thus he can make generalized allegations regarding their contents based solely on information and belief. *See Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). The cases on which Mateski relies, however, are limited to the securities fraud context; the Ninth Circuit has expressly declined to loosen Rule 9(b)'s particularity requirements based on the relator's lack of inside information. *Ebeid*, 616 F.3d at 999. And because generalized allegations of fraud based on information and belief do not otherwise satisfy Rule 9(b)'s particularity requirements, *see Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987), Mateski's argument fails.[5]

#### ii. Refusal to Produce Claims for Payment

Next, Mateski argues that the Court may infer that the claims for payment contain specific misrepresentations that give rise to liability because Raytheon refused to disclose them either as part of its initial disclosures under Rule 26(a) or in response to an informal request by Mateski's counsel. This is also not persuasive. As an initial matter, the adverse inference doctrine typically operates as an evidentiary sanction—such as where the court permits a jury to infer that a document contained information adverse to the one who destroyed or failed to produce it. *See, e.g.*, *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991); *Jackson Family Wines, Inc. v. Diageo N.*

---

[5] In light of this, the Court need not assess whether the various bases on which Mateski's belief is grounded—namely, his purported experience in the industry and the two Federal Acquisition Regulations—could reasonably give rise to Mateski's allegations regarding the contents of the claims.

*Am., Inc.*, No. CV 11-5639 EMC (JSC), 2014 WL 595912, at *1 (N.D. Cal. Feb. 14, 2014); *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 564 (N.D. Cal. 2008). Mateski does not identify, and the Court cannot locate, any cases holding that such an inference can loosen pleading requirements—let alone Rule 9(b)'s stringent particularity requirements. Indeed, Mateski's argument puts the discovery cart before the pleading horse; Rule 9(b) is intended to "to *deter* the filing of complaints as a pretext for the discovery of unknown wrongs," *Stac Elecs. Sec. Litig.*, 89 F.3d at 1405 (emphasis added), and thus any rule relaxing pleading requirements based on purported discovery violations would severely undercut this purpose. At bottom, Mateski's argument is just another derivation of his argument that he should not have to comply with Rule 9(b) because he lacks access to Raytheon's claims for payment—an argument that the Ninth Circuit has rejected. *Ebeid*, 616 F.3d at 999.

### iii. *Campie*

Finally, after briefing on this motion was complete, Mateski submitted a notice of supplemental authority arguing that the Ninth Circuit's most recent FCA case, *Campie*, 2017 WL 2884047, at *7, demonstrates that he has adequately pleaded his claims. This case, however, is a far cry from *Campie*. There, the defendant (a drug manufacturer) allegedly obtained the active ingredient for three types of drugs from a Chinese source that was not registered with, or approved by, the Food and Drug Administration (FDA). *Id.* at *2. Despite this, the defendant represented to the Government that it obtained the active ingredient from a South Korean source (which was registered and approved with the FDA). *Id.* at *3. The Ninth Circuit held that the relator had adequately pleaded an FCA claim under both a factually false theory and an implied false certification theory. As to the former, the court noted that the defendant had expressly (and falsely) represented to the FDA that the active ingredient came from an approved source, and thus the defendant had sought payment for a "misbranded good[]." *Id.* at *7 (citing *United States v. Nat'l Wholesalers*, 236 F.2d 944, 950 (9th Cir. 1956)). As to the latter, the court noted that the claims for

reimbursement to various Government programs (such as Medicare) identified a particular drug, and that this identification impliedly (but falsely) represented that the drug complied with FDA standards (such as using active ingredients from approved sources). *Id.*

Mateski's allegations do not come close to this level of specificity. Mateski identifies vague and broad contract standards that Raytheon allegedly did not meet over a eight-year period, but gives no details as the exact manner in which Raytheon violated those standards. Mateski also does not identify a single specific representation that Raytheon made to the Government, and thus neither Raytheon nor the Court can discern how that representation (if it even exists) was in any way false (either overtly or impliedly). In short, *Campie* does not help Mateski at all.

**B.  Materiality**

Raytheon argues that its alleged misrepresentations were not material to the Government's decision to pay Raytheon, as evidenced by the fact that the Government kept paying Raytheon's invoices long after Mateski informed the Government of Raytheon's allegedly false claims for payment. The Court concludes that Mateski's barebones allegations regarding materiality require dismissal even without considering the Government's knowledge.

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 2002. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "The materiality standard is demanding"; "[m]ateriality . . . cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. As with all elements of an FCA claim, the relator must plead particular facts under Rule 9(b) in support of their allegations of materiality, and the failure to plead such facts should result in dismissal. *Id.* at 2004 n.6.

Here, Mateski's complaint contains only one sentence directly addressing the materiality of Raytheon's misrepresentations: "The United States would not have paid Raytheon's Requests for Payment if the United States Government knew (i) that Raytheon had not performed the VIIRS Contract in conformity with the requirements and specifications of the VIIRS Contract and the NGIID, and (ii) Raytheon had not obtained approvals of major deviations as required by the NGIID." (5AC ¶ 16.) This allegation, of course, is completely conclusory and thus insufficient; it does not show *how* Raytheon's misrepresentations were material. *See Ebeid*, 616 F.3d at 1000 ("Ebeid baldly asserts that had Lungwitz 'not concealed or failed to disclose information affecting the right to payment, the United States would not have paid the claims.' This conclusory allegation is insufficient under Rule 9(b).").

Moreover, none of the facts otherwise alleged in the complaint are sufficiently specific to satisfy Rule 9(b). For example, while Mateski alleges that the Government designated compliance with various VIIRS Contract provisions as "mandatory," such designations do not automatically make misrepresentations concerning those provisions material. *Escobar*, 136 S. Ct. at 2003 ("A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."). The descriptions of the various violations are also far too general for the Court to determine their significance to the project. For example, Raytheon allegedly "failed to write test event failure reports." (5AC ¶ 9(i).) What were these "event failure[s]"? Were each of them significant to the VIIRS's ultimate construction? If not, would the Government have cared if Raytheon submitted a claim suggesting that it had written such a report (or obtained the requisite waiver) when in fact it had not? Without allegations that can provide answers to these types of questions, it is impossible to discern if any misrepresentations based on Raytheon's noncompliance

with these provisions were *actually* material to the Government's payment decision.[6] *Cf. Escobar*, 136 S. Ct. at 2004 (rejecting the Government's argument that any statutory or regulatory violation is automatically material simply because "the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations," and noting that "[t]he False Claims Act does not adopt such an extraordinarily expansive view of liability").

## C. Leave to Amend

Generally, the Court should liberally grant the plaintiff leave to amend following dismissal of the complaint. *See, e.g.*, *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1117 (9th Cir. 2013). However, the Court may deny leave where there has been "repeated failure[s] to cure deficiencies by amendments previously allowed." *Id.* There is no magical number of opportunities the Court must afford the plaintiff to properly plead his or her claims; it all depends on the circumstances of the case. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (Reinhardt, J., concurring) (courts should not "[s]imply count[] the number of times a plaintiff has filed a complaint" in determining whether to grant leave).

Here, the Court concludes that leave to amend is not warranted. The Court previously held that Mateski's claims failed because he had not identified the specific representations that Raytheon made to the Government. Mateski suggested in that round of briefing that he could not do so because he was unfamiliar with Raytheon's billing process,[7] but the Court nonetheless gave Mateski leave to amend. Perhaps unsurprisingly, Mateski's Fifth Amended Complaint did not cure the deficiency.

---

[6] Mateski also points to its general allegation that Raytheon's non-compliance with the 14 different NGIID standards caused "the loss of low light visible imagery thereby blinding or impairing the NPOESS telescope and preventing or impairing the collection and transmission of data." (5AC ¶¶ 5–6.) Again, this is far too conclusory; it does not give "the who, what, when, where, and how" needed to support the inference of materiality. *Ebeid*, 616 F.3d at 998.

[7] Opp'n at 9 ("Mateski is an engineer not involved with billing and invoices for payment. Billing is a matter particularly within the knowledge of Raytheon. Discovery must be had on the question of what Raytheon's invoices for payment consisted of or contained."), ECF No. 160.

1 Instead, he listed various reasons why he should be excused from identifying those representations with particularity. It is thus clear that permitting further leave to amend to plead a specific representation would be futile.

As to materiality, the Court also sees no reason to grant leave to amend. Raytheon twice challenged the sufficiency of Mateski's allegations concerning materiality before he filed his Fifth Amended Complaint, thus making clear to him that the sufficiency of those allegations were very much contested. (*See* Mot. at 15–16, ECF No. 98; Mot. at 12–15, ECF No. 154.) Given this, Mateski should have taken care to fully plead all allegations relating to the materiality issue. Mateski did not do so. Instead, Mateski relies on woefully conclusory allegations that do not come close to establishing materiality under Rule 9(b). The lack of detail is all the more puzzling given that numerous prior iterations of the complaint contained extensive detail—although couched in indecipherable prose. (*See generally* ECF Nos. 1, 7, 19, 53, 88.) Whatever Mateski's reason for not incorporating that detail into the Fifth Amended Complaint in a more comprehensible form, the Court sees no reason why he would do so if the Court granted him further leave to amend.

## V.   CONCLUSION

For the reasons discussed above, the Court **GRANTS** Raytheon's Motion to Dismiss without leave to amend. (ECF No. 184.)

**IT IS SO ORDERED.**

August 3, 2017

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**